IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| CARMEN THOMPSON, <u>et al.</u>, | ) |
| Plaintiffs, | ) |
| vs. | ) Civil Action No. MJG 95-309 |
|  | ) Hon. Marvin J. Garbis |
| UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, <u>et al.</u>, | ) |
| Defendants. | ) |

## FEDERAL DEFENDANTS'
## TRIAL BRIEF

MICHAEL SITCOV
JUDRY L. SUBAR
DIANE KELLEHER
ALISON N. BARKOFF
PETER J. PHIPPS
U.S. Department of Justice
20 Massachusetts Ave., N.W., Rm. 7138
Washington, D.C. 20530
(202) 514-3969
*Attorneys for Federal Defendants*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................... 1

FACTUAL OVERVIEW ........................................................................................................ 3

I.    PUBLIC HOUSING ...................................................................................................... 3

    A.    The Basics of the History of Federally-Assisted Public
         Housing ........................................................................................................... 3

    B.    The Types of Funding Provided In Connection With
         Federally-Assisted Housing ....................................................................... 6

II.   PUBLIC HOUSING IN BALTIMORE ...................................................................... 10

    A.    The Demographics of Baltimore ............................................................... 10

III.  THE SITING OF PUBLIC HOUSING IN BALTIMORE ............................... 13

IV.   HUD'S ACTIVITIES TO FURTHER FAIR HOUSING .................................. 15

    A.    Site and Neighborhood Standards ....................................................... 15

    B.    Monitoring ............................................................................................... 17

    C.    HUD's Focus On Tenant Assignment Issues ...................................... 20

    D.    HUD's Devotion of Resources to Many Other Fair
         Housing Initiatives ................................................................................. 21

V.    THE REALITY OF PUBLIC HOUSING TODAY IS
    FUNDAMENTALLY DIFFERENT FROM THE REALITY
    OF FIFTY, OR EVEN FIFTEEN, YEARS AGO .......................................... 23

ARGUMENT ........................................................................................................................ 24

I.    PLAINTIFFS HAVE NO VIABLE CONSTITUTIONAL CLAIM
    AGAINST THE FEDERAL DEFENDANTS ................................................. 24

    A.    Plaintiffs' "Vestiges" Argument Cannot Work ...................................... 24

    B.    HUD'S Action Has Not Amounted To Intentional

Discrimination Against Plaintiffs ...................................................... 29

II.  PLAINTIFFS CANNOT MAINTAIN, AND SURELY CANNOT
PREVAIL, ON THEIR STATUTORY CLAIMS ......................................... 35

A.  Plaintiffs Have No Private Right of Action Under Title VIII
of the Fair Housing Act ...................................................................... 35

1.  Determining the existence of a private right of action ............ 36

2.  Congress did not intend to create a private action against
HUD under Title VIII. ............................................................ 38

3.  Plaintiffs Have No Right to Sue HUD
Under 24 C.F.R. § 941.202 ................................................... 41

III.  PLAINTIFFS' STATUTORY CLAIMS ARE NOT SUSTAINABLE
AS A MATTER OF FACT OR LAW .......................................................... 43

A.  Plaintiffs Cannot Demonstrate That HUD Violated Title VIII ........... 43

1.  Section 3608(d) & (e)(5):  HUD's Duty Affirmatively
to Further Fair Housing ......................................................... 43

2.  Section 3604(a) & (b): Unlawful Discrimination in the
Sale or Rental of Housing ...................................................... 45

B.  HUD Cannot Be Held Liable in this Case Under the APA ................. 49

C.  Plaintiffs Cannot Make Out A Claim Against HUD With Regard
to Demolition .................................................................................... 50

D.  Plaintiffs Fail To State A Claim Against HUD Under Title VI Or
Its Implementing Regulations ............................................................ 52

1.  Title VI Itself Provides No Basis For a Finding of Liability
Against HUD ......................................................................... 52

2.  Nor Can Plaintiffs Establish HUD's Liability Under Title
VI Regulations ....................................................................... 55

E.  Plaintiffs Have No Claim With Regard to HUD's Acceptance of
HABC's Certifications ....................................................................... 56

F.    Nor Can HUD Be Held Liable Under the HCDA ............................................... 57

IV.   MANY OF PLAINTIFFS' CLAIMS HAVE ALREADY BEEN
      RESOLVED AND ARE THEREFORE BARRED UNDER THE
      DOCTRINE OF RES JUDICATA ............................................................... 59

CONCLUSION ............................................................................................................... 60

## TABLE OF AUTHORITIES

**CASES**                                                    **PAGE(S)**

Alexander v. Sandoval, 532 U.S. 275 (2001) ..................................................................... passim

Americans Disabled for Attendant Programs Today v. HUD,
170 F.3d 381 (3d Cir. 1999) ......................................................................... 36, 49

Anderson v. City of Alpharetta, 737 F.2d 1530 (11th Cir. 1984) ......................................... 40, 43

Arlington Heights v. Metropolitan Housing Dev. Corp., 429 U.S. 252 (1979) .......................... 32

Atkins v. Robinson, 545 F. Supp. 852 (E.D. Va. 1982) ................................................. 31, 34, 44

Atkins v. Robinson, 733 F.2d 318 (4th Cir. 1984) ..................................................... 43

Bazemore v. Friday, 478 U.S. 385 (1986) ................................................................. 25

Belk v. Charlotte-Mecklenburg Bd. of Educ., 269 F.3d 305 (4th Cir. 2001) ............................ 24

Betsey v. Turtle Creek Associates, 736 F.2d 983 (4th Cir. 1984) ............................................ 32

Brinkley v. Harbour Recreation Club, 180 F.3d 598 (4th Cir. 1999) ......................................... 54

Bryant v. New Jersey Dept of Transp., 998 F. Supp. 438 (D.N.J. 1998) ................................... 53

California v. Sierra Club, 451 U.S. 287 (1981) .......................................................... 39

Cannon v. Univ. of Chicago, 441 U.S. 677 (1979) .................................................... 36

Clients' Council v. Pierce, 711 F.2d 1406 (8th Cir. 1983) .......................................... 33

Columbus Bd. of Educ. v. Penick, 443 U.S. 449 (1979) .......................................... 32

Cort v. Ash, 422 U.S. 66 (1975) ....................................................................... 37

Cuyahoga Falls v. Buckeye Cmty. Hope Found., 123 S. Ct. 1389 (2003) .................................. 31

Darst-Webbe Tenant Assn. Bd. v. St. Louis Housing Auth.,
339 F.3d 702 (8th Cir. 2003) ........................................................................... 52

Escobar v. Montgomery County Bd. of Educ., 2001 WL 98600
(D. Md. Feb. 1, 2001) ....................................................................................... 54

Freeman v. Pitts, 503 U.S. 467 (1992) .............................................................. 25, 27

Green v. City. School Bd., 391 U.S. 430 (1968) ............................................... 25, 26

Heckler v. Chaney, 470 U.S. 821 (1985) .............................................................. 50

Hodges v. Public Bldg. Com'n of Chicago, 864 F. Supp. 1493 (N.D. Ill. 1994) ........ 31

Hunter v. Underwood, 471 U.S. 222 (1985) ......................................................... 30

Irwin v. Department of Veterans Affairs, 498 U.S. 89 (1990) ................................ 36

Jaimes v. Lucas Metropolitan Housing Authority, 833 F.2d 1203
    (6th Cir. 1988) ............................................................................................. 43

Jenkins v. Missouri, 593 F. Supp. 1485 (W.D. Mo. 1984), aff'd,
    807 F.2d 657 (8th Cir. 1986) ....................................................................... 35

Jersey Heights Neighborhood Ass'n v. Glendening, 174 F.3d 180
    (4th Cir. 1999) ................................................................................ 36, 44, 53

Jones v. Office of Comptroller of Currency, 983 F. Supp. 197 (D.D.C. 1997) .......... 39, 40

Keith v. Volpe, 618 F. Supp. 1132 (C.D. Calif. 1985) ........................................... 49

Knight v. State of Ala., 14 F.3d 1534 (11th Cir.1994) ......................................... 27

Latinos Unidos de Chelsea ("LUCHA") v. HUD, 799 F.2d 774
    (1st Cir. 1986) ............................................................................... 40, 53, 58

Los Angeles v. Lyons, 461 U.S. 95 (1983) ........................................................... 46

Matsushita Elec. Indus. Co., Ltd. v. Epstein, 516 U.S. 367 (1996) ....................... 59

McCleskey v. Kemp, 481 U.S. 279 (1987) ............................................................ 33

McGrath v. HUD, 722 F. Supp. 902 (D. Mass. 1989) ........................................... 43

Metropolitan Housing Dev. Corp. v. Arlington Heights,
    558 F.2d 1283 (7th Cir.1977), cert. denied, 434 U.S. 1025 (1978) .............. passim

Miller v. Johnson, 515 U.S. 900 (1995) .............................................................. 30

Missouri v. Jenkins, 515 U.S. 70 (1995) ............................................................. 28

NAACP v. Secretary of HUD, 817 F.2d 149 (1st Cir. 1987) ...................................................... 38

Perry v. Housing Authority of Charleston, 664 F.2d 1210 (4th Cir. 1981) ................................ 40

Personnel Administrator of Mass. v. Feeney, 442 U.S. 256 (1979) ............................................ 30

Peters v. Jenney, 327 F.3d 307 (4th Cir. 2003) ..................................................................... passim

Reese v. Miami-Dade County, 242 F. Supp. 2d 1292 (S.D. Fla. 2002) ...................................... 15

Smith v. Town of Clarkton, 682 F.2d 1055 (4th Cir. 1982) ........................................... 31, 46, 49

Suter v. Artist M., 503 U.S. 347 (1992) ...................................................................................... 37

Sylvia Development, 48 F.3d 810 (4th Cir. 1995) ................................................................. passim

Thompson v. Thompson, 484 U.S. 174 (1988) ............................................................................ 37

United States v. Fordice, 505 U.S. 717 (1992) ..................................................................... 26, 30

United States v. O'Brien, 391 U.S. 367 (1968) .................................................................... 30, 31

United States v. Petersen, 143 F. Supp. 2d 569 (E.D. Va. 2001) ............................................... 30

United States v. Yonkers Board of Education, 837 F.2d 1181 (2d Cir.1987) ............................. 31

Universities Research Assn. v. Coutu, 450 U.S. 754 (1981) ...................................................... 40

Women's Equity Action League (WEAL) v. Cavazos, 906 F.2d 742
    (D.C. Cir. 1990) .................................................................................................................. 49

Young v. Pierce, 544 F. Supp. 1010 (E.D. Tex. 1982) ............................................................... 53

Young v. Pierce, 628 F. Supp. at 1052-55 ................................................................................. 33

## STATUTES

5 U.S.C. § 701(a)(2) ............................................................................................................ 36, 38

5 U.S.C. § 704 ............................................................................................................................ 36

5 U.S.C. § 706(2)(a) ................................................................................................................... 36

42 U.S.C. § 1436b ...................................................................................................................... 14

42 U.S.C. 1437a ............................................................................................ 6

42 U.S.C. §§ 1437b, 1437c, 1437g ............................................................ 42

42 U.S.C. § 1437p ...................................................................................... 51

42 U.S.C. §1437p(a) ............................................................................ 50, 51

42 U.S.C. § 1437v ................................................................................ 52, 57

42 U.S.C. § 2000d ...................................................................................... 53

42 U.S.C. § 2000d-1 .................................................................................. 52

42 U.S.C. § 2000e ...................................................................................... 54

42 U.S.C. §§ 3604(a) ............................................................................ 38, 45

42 U.S.C.A. § 3601, et seq. ....................................................................... 57

42 U.S.C. §§ 3608(d) and (e)(5) ...................................................... 38, 39, 43

42 U.S.C. §§ 3610, 3612, 3613, 3614 ...................................................... 39

42 U.S.C. § 5301(a) ............................................................................. 57, 58

42 U.S.C. § 5301(c) .................................................................................... 58

42 U.S.C. § 5304(b)(2) ............................................................................... 57

42 U.S.C. § 5309(b) .................................................................................... 58

Pub. L. No. 105-276, 112 Stat. 2461 ....................................................... 51

## RULES AND REGULATONS

24 C.F.R. § 1.4 ..................................................................................... 42, 55

24 C.F.R. §§ 91.225(a)(1) and 570.303 ................................................... 57

24 C.F.R. § 570.303 ................................................................................... 57

24 C.F.R. § 941.202 .......................................................................... 41, 42, 43

24 C.F.R. § 970 ......................................................................................................... 51

## LEGISLATIVE MATERIAL

Sen. Rpt. No. 97-139 (June 17, 1981), reprinted in 1981 U.S.C.C.A.N. 396, 523 ...................... 59

Sen. Rpt. No. 21, 105th Cong., 1st Sess. at 25 (May 23, 1997) .................................................. 51

## MISCELLANEOUS

Robert G. Schwemm, Housing Discrimination: Law and Litigation
§ 21.3, at 21-27 (1999) .......................................................................................................... 40

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| CARMEN THOMPSON, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| | ) | |
| vs. | ) | Civil Action No. MJG 95-309 |
| | ) | Hon. Marvin J. Garbis |
| | ) | |
| UNITED STATES DEPARTMENT | ) | |
| OF HOUSING AND URBAN | ) | |
| DEVELOPMENT, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### FEDERAL DEFENDANTS' TRIAL BRIEF

### PRELIMINARY STATEMENT

Well before the federal government began subsidizing housing for the poor, residential segregation based on race was an unfortunate fact of life in Baltimore. The federally-assisted public housing program did not create such segregation. Today, it does nothing more to allow the existence of segregated housing than would an order of this Court. The public housing program came into being during the second presidential term of Franklin D. Roosevelt; was significantly affected by the needs of the wartime economy during World War II; was buffeted by the winds of social change during the 1950s and 1960s; and then was fundamentally altered over the last thirty years during the last seven presidential administrations. Not only due to the passage of time, but also because of sharp changes in the applicable legal rubric and public policy, the federal public housing of the de jure segregation era no longer exists. Its policy

underpinnings were uprooted and replaced decades ago.[1]

Instead of a system constructing concentrated high-rise public housing that treated the races differently, for the last generation the United States Department of Housing and Urban Development ("HUD") has provided federal housing assistance by relying heavily on the private sector, by funding deconcentrated public housing, and by seeking to eradicate any hint of racial segregation.[2] As part of that process, HUD has had to balance the rights and interests of public housing residents and applicants; demographic realities; very real fiscal constraints imposed by Congress; as well as bureaucratic and programmatic resistance from local governmental entities. Today, though, HUD does what it has done for some time, which is no less than this Court could do by decree:  oversees expenditures in a reasonable and appropriate manner so as to provide federally-assisted affordable housing while furthering fair housing goals.

Plaintiffs characterize their claims as sounding in race discrimination.  In reality, however, the debate in this case amounts simply to nothing more than a difference of opinion with regard to the way in which federal housing policy should be administered.  Thus, while

---

[1] Plaintiffs' case, as made manifest in their own lengthy and tendentious pretrial Statement of Material Facts, is a rambling and far-flung conglomeration of facts, some of which have to do with the claims on which they hope to establish liability at trial, and some of which do not.  Because the Statement of Material Facts relies explicitly on most of the exhibits that plaintiffs apparently intend to profer at trial, and because the record after trial will likely consist of far fewer than that entire universe of exhibits, a point-by-point response to the Statement at this stage of the proceedings appears inappropriate.  Rather, provided below is a more focused, but less detailed, guide to the federal defendants' position as to why plaintiffs' characterization of their case is off the mark.  The federal defendants propose to provide a more set of suggested findings of fact and conclusions of law, making reference to specific exhibits and testimony where it is called for, after trial.

[2] References to "HUD" are also references to the two federal defendants in this case, HUD and its Secretary, Mel Martinez.

HUD and its predecessors have spent money to do things such as refurbishing squalid housing in largely minority neighborhoods, plaintiffs would have chosen to withhold money from areas inhabited by African-Americans on the basis of the race of the affected residents.  While HUD has chosen to replace demolished public housing in a manner directed by insightful thinking about housing policy, plaintiffs would have replaced such housing in a mechanical one-for-one fashion even when considerations of law and common sense would not require it.

These sorts of policy disputes cannot entitle plaintiffs to relief – even if plaintiffs' approach made more sense than HUD's.  Rather, this Court should resist plaintiffs' attempt to have their policy perspective imposed by judicial fiat for several reasons.  For one thing, the law does not support the case that plaintiffs wish to make, especially as it relates to the federal defendants.  The legal arguments on which plaintiffs wish to rely do not hold water.[3]  For another, plaintiffs will not be able to create a factual record that would justify the sort of relief they seek.

## FACTUAL OVERVIEW

I.     PUBLIC HOUSING

A.     The Basics of the History of Federally-Assisted Public Housing

Since the late 1930s, the federal government has been involved in providing federal assistance to local governments to support subsidized housing for the poor.  The federally-assisted housing system of today, however, is by no means the same system as the one

---

[3]  Although this Court has indicated its intention to proceed to trial (short of a settlement of this litigation), the undersigned submit that a number of the legal points made below would entitle the federal defendants to judgment as a matter of law on at least several, if not all, of plaintiffs' claims even without a trial.

that existed in 1937, or even the one that existed as recently as just three decades ago.

At its inception, the federal government provided housing assistance through aid to local public housing authorities ("PHAs"), and through federally-owned war housing that was later transferred to PHAs, including the Housing Authority of Baltimore City ("HABC"). Both methods involved large-scale, concentrated publicly-owned projects. Nor, in the early part of the last century, did the provision of federal funds for housing depend on whether a local jurisdiction had adopted a fair housing policy of a sort not mandated until many years later. Rather, in the days of Jim Crow, segregated public housing was allowed to exist.

Two prominent features defined the Baltimore housing market in the 1930s, before the federal government became involved in housing assistance: (1) a crisis of the urban poor and (2) high levels of segregation. In the 1930s, there was an extremely high degree of squalor and poverty in urban areas throughout the country, including in Baltimore, and those poor conditions motivated federal housing assistance programs. Respecting the respective roles of cities and the federal government, Congress passed the 1937 Housing Act, which sought to alleviate the problems of the urban poor through a partnership between federal and local governments. The mission of that program was to build new public housing units to alleviate the impoverished and slum conditions of urban America. These motivations applied with particular force in Baltimore, which suffered from one of the worst housing emergencies in the nation. In fact, the census of 1940 leaves little doubt that housing conditions in Baltimore ranked as the worst of the nation's seven largest industrial cities.

The federal government's goal of alleviating urban poverty through constructing decent public housing emerged at a time when Baltimore was highly segregated; almost 90%

-4-

Baltimore's African-American population lived in the census tracts with the worst housing conditions and the highest rates of disease. Despite those deplorable conditions, the private market and many city actors were determined to continue the pattern of racial segregation.

Faced with these dire circumstances, the federal government's only option was to move ahead and respond to the needs of the black urban poor. There was an immediate need to alleviate extreme poverty and disease in Baltimore. Accordingly, massive amounts of federally-assisted housing were constructed (albeit on a segregated basis) to respond to those exigent needs. In so doing, the federal government met the most pressing needs.

As time progressed, the federal government began desegregation efforts; these efforts gained momentum with the enactment of federal civil rights provisions. By the early 1960s, the beginning of the end of the de jure system had arrived. In 1962, President John F. Kennedy adopted a policy by Executive Order under which federal dollars were not allowed to be spent on segregated public housing. That administration policy was effectively written into statutory law with the passage of Title VI of the Civil Rights Act of 1964, which prohibits the expenditure of federal funds for racially discriminatory purposes, and Title VIII of the Civil Rights Act of 1968, which prohibits race discrimination, inter alia, in housing.

Since then, the programmatic rubrics under which federally-assisted housing is provided, both nationally and in Baltimore, have multiplied to such an extent that HUD's activities simply cannot be viewed as part of the same set of programs as those created by a pre-World War II Congress and administered by the Depression-era Executive Branch. So, too, rather than ignoring the racial implications of its actions, HUD today pursues fair housing goals with considerably more vigor than it is legally required to do. Some four decades since Congress

-5-

established HUD as a cabinet-level agency, and thirty-five years after the passage of the primary

piece of civil rights legislation on which plaintiffs base their claims, the way the federal

government oversees federally-assisted housing is a far cry from what was done in an earlier era

nearly a century ago.

> **B.     The Types of Funding Provided In
>          Connection With Federally-Assisted Housing**

For the first several decades of federally-funded public housing, the government

subsidized PHAs, without limits on the amount of money impoverished tenants of such housing

could be required to pay.  In 1969, Congress altered the relative responsibilities of PHAs, HUD

and tenants by passing the Brooke Amendment to the United States Housing Act, 42 U.S.C. §

1437a, limiting a public housing tenant's rental burden to a fixed percentage of his/her income.

To make up the difference between PHAs' rental income and their expenses, HUD funds a

PHA's operating budget on a formula basis.

In addition to this operating fund, HUD administers a number of programs to fund PHA

capital projects.  Most fundamentally, HUD's Capital Grant Program provides funding for the

acquisition and rehabilitation of public housing.  Additionally, such programs as the HOPE VI

program make money available for the construction of housing and rehabilitation of

neighborhoods.  Further, programs such as the Community Development Block Grant ("CDBG")

program and HUD's Home Investment Partnerships Program ("HOME") program offer money to

municipalities, such as the City of Baltimore, to develop infrastructure necessary for the building

and use of public housing.

Traditional public housing, of the sort built in Baltimore before the mid-1970s, generally

took the form of large, concentrated housing projects.  Beginning in the late 1960s, however,

Baltimore began to use another resource to provide public housing to its needy residents.  HABC

converted vacant houses the City acquired as a result of tax delinquencies into "scattered site"

public housing.  While HUD funded this housing because it provided a needed resource, HUD

did not – and, indeed, could not – control where it was placed, for the simple reason that it was

"placed" where vacant houses were acquired by the City.[4]

By the early 1970s, HUD and Congress recognized that focusing only on the sort of

housing assistance that comes in the form of publicly-owned multi-family or single-unit

dwellings would not be adequate to the relevant needs.  The Section 8 programs were enacted to

deal with these circumstances.  The Section 8 programs have two components: a tenant-based

program, and a project-based program.  The tenant-based program permits a low-income family

the option of choosing their own housing.  A Section 8 certificate or voucher guarantees a

payment from the government to a landlord; the family can take the certificate or voucher, add its

own rental contribution, and search for housing in the private market.[5]  HUD's Section 8

payments are based on the fair market rent ("FMR") calculations.  The FMR standard balances

the need for HUD to pay rents which enable families to locate units against the need for HUD to

---

[4] HUD also established goals which required HABC to identify vacant houses outside of areas of minority concentration.

[5] Section 8 certificate program participants could not rent units whose rents exceeded the HUD-set fair market rents.  Section 8 vouchers do not include such a cap; families are permitted to pay what they can afford, even if their contribution to the rent exceeds 30%.  The two forms of the Section 8 program were merged in 1998 into the "Housing Choice Voucher" program.  See Section 545 of the Quality Housing and Work Responsibility Act of 1998 (P.L. 105-276, approved October 21, 1998).

authorize as many vouchers as possible, since so many families need assistance.[6]  In the project-

based program, voucher assistance may be attached to specific housing units if the owner agrees

to either rehabilitate or construct the units, or if the owner agrees to set-aside a portion of the

units in an existing development for use by tenants with Section 8 assistance.

In the 1990s, Congress created another mechanism for PHAs to compete for

redevelopment funds: the HOPE VI program.[7]  HOPE VI was expressly designed to revitalize

severely distressed public housing developments and their surrounding neighborhoods.  While

the HOPE VI statutory language sets out the program's goals, the grants are awarded on the basis

of criteria established in yearly HUD Notices of Funding Availability ("NOFAs").  Applications

are then funded based both on how they score against competing applications and the amount of

money available that year.  The program has a strong mixed-income component, meaning that

redeveloped sites should have tenants with a range of incomes (including tenants who can pay

market-level rents).  Thus, although HOPE VI money is spent to revitalize areas that were

depressed to begin with, program funds are allocated to attract residents of a much broader socio-

economic range than originally lived in those areas.

HUD also addresses housing needs in ways other than by providing money directly for

housing.  For example, HUD administers the CDBG program.  CDBG is an entitlement program,

---

[6] As part of the Section 8 program, HUD has funded various mobility programs over the years.  The results of these programs have been mixed.  A recent study by HUD of the impact of Section 8 on mobility, known as the Moving to Opportunity ("MTO") program, showed fairly modest successes, despite the substantial investment of federal funds in the program.  MTO, at a cost of $70 million, did not appreciably improve the employment and education of its experimental group participants.

[7] HUD administers a myriad of other programs to assist the needy to obtain housing.  This memorandum addresses only those that are most significant to this case.

which means that the funds are distributed to all state and local governments which meet the criteria for eligibility, as does the City of Baltimore. HUD determines the amount of each entitlement grant by a statutory formula which uses several objective measures of community needs, including the extent of poverty, population, housing overcrowding, age of housing and population growth lag in relationship to other metropolitan areas.

CDBG entitlement communities, such as the City of Baltimore, develop their own programs and funding priorities. They must, however, ensure that 70% of their CDBG activities benefit low- and moderate-income persons. Other eligible activities may aid in the prevention or elimination of slums or blight or serve an urgent community development need. CDBG funds may not be used for activities which do not meet one of these broad national objectives.[8]

Another manifestation of HUD's concerns for affordable housing is the multi-family mortgage insurance program. This program provides favorable mortgage insurance rates to owners of multi-family apartment complexes in return for certain fair housing conditions on the leasing of multi-family apartments. Through these favorable lending terms, HUD generates additional apartments, some of which are affordable. And, by placing conditions on the apartment leases, HUD also ensures that apartment residents live in safe, sanitary dwellings. Where those conditions are not met, HUD takes swift action by relocating tenants out of the unsafe and/or unsanitary conditions by providing housing choice vouchers and extensive relocation counseling.

_____

[8] Baltimore City uses its CDBG money for a variety of activities including public services (such as day care, health care, job training), demolition of substandard and hazardous buildings, Section 108 loans (which have been used to redevelop some of the HOPE VI sites in Baltimore City), economic development, and housing acquisition and rehabilitation.

## II.    PUBLIC HOUSING IN BALTIMORE

### A.    The Demographics of Baltimore

The City of Baltimore is hardly the same, as a matter of demography, as it was when public housing began to be built. The portion of Baltimore City's population that is African-American has increased from 19% in 1940 to 64% in 2000. Simultaneously, Baltimore City experienced a huge population loss – approximately one-third of its population – primarily as a result of whites leaving the City. At the same time, though, Baltimore City has become more integrated – not less – over the last 35 years. In fact, Baltimore has continuously improved on measures of housing integration since 1970.

Because of Baltimore's changing demography, the racial compositions of the neighborhoods with public housing developments are located today are far different from what they were when HABC chose to site those projects. The degree of racial impaction of those neighborhoods at this point in time is far higher than it was when the siting decisions were made. As the City's demographics have changed over the last 60 years, so has the racial composition of the population of HABC's family public housing developments and of its public housing waiting list. As of 2002, 98% of tenants in Baltimore City's family public housing developments were African-American. Currently, on a project-by-project basis, at least 91% of the tenants of each of these developments are African-American. The racial composition of these developments closely mirrors the racial composition of the public housing waiting list, which is also 98% African-American, and has been at least 90% African-American since at least the early 1980s.

The makeup of HABC's public housing tenant population does not lend itself to ready integration. Even if HABC were to re-assign all of its existing white tenants to developments so

that they were maximally dispersed, the developments would still all be more than 91% African-American. While plaintiffs suggest that the construction of sites in majority-white neighborhoods would attract white tenants, that is mere conjecture. It may simply be that whites in Baltimore City who would otherwise qualify for public housing have other options available to them. Moreover, even if white tenants began to apply for public housing in significant numbers, which is unlikely, they would presumably be placed at the bottom of the waiting list. Since the public housing waiting list exceeds 13,000 persons, none of these white tenants would likely be assigned to live in public housing anytime soon. Indeed, being assigned a unit may take a period of years.

These demographic changes have not been limited to the makeup of family public housing. They have also affected the racial characteristics of Baltimore's elderly public housing tenants. Much of the elderly public housing in Baltimore City is in census tracts that have experienced post-siting demographic change. Specifically, 50% of elderly public housing units originally sited in census tracts below the citywide percent African-American are now located in census tracts above the citywide average. Also like public housing, the overwhelming majority of persons on the waiting list for the City's elderly public housing are African-American and just about all elderly developments have a supermajority of African-Americans.

While public housing was once the only method for providing federally-assisted housing to Baltimore City's low-income families, now only 37% of federally-assisted housing opportunities in Baltimore City are provided through public housing. The Section 8 programs[9]

---

[9] As discussed supra, the Section 8 programs include tenant-based vouchers and certificates and project-based units.

are now the dominant method of providing such opportunities and currently provide 63% of such opportunities.

Section 8 vouchers/certificates have provided Baltimore City's low-income families opportunities to live in more integrated areas. Almost a quarter of all voucher/certificate holders in the program between 1998 and 2003 (and a fifth of all African-American voucher/certificate holders) chose to use their vouchers/certificates in census tracts below the citywide average percent African-American.[10]

African-American residents of the Baltimore City metropolitan area are more dispersed now than they were in the past. They have not been confined to the inner-city Baltimore. In particular, the African-American population along the northwestern and northeastern edges of Baltimore City has increased significantly. An analysis of recent moves by African-American Section 8 holders in Baltimore City shows that these individuals are also moving out of the central city.

But this dispersal is also occasioned by return moves to the City. An analysis of the data from the Moving to Opportunity ("MTO") program in Baltimore shows that a significant number Baltimore's MTO experimental group participants returned to neighborhoods similar to the ones they originally lived in, despite the fact that as part of the MTO program, they received mobility counseling and a voucher slated for use in census tracts with less than a 20% poverty rate.

---

[10] In another example of HUD's aggressive oversight of HABC, when the Housing Authority's administration of its Section 8 programs fell below a required standard, the program was placed under the control of HUD's Troubled Agency Recovery Center. The effort undertaken by that entity to help address HABC's mismanagement was somewhat successful, although HABC has not entirely fixed its problems, and remains at risk of losing its ability to run that operation.

The manner in which members of different races choose where to live is a function of the different preferences expressed by African-Americans and whites for the racial composition of preferred neighborhoods. While residential choice is a complex, dynamic process, affected by income and assets, locations of family and friends, urban structures, and private market discrimination, preferences for the racial composition of one's neighborhoods is also a factor. These preferences have changed over time; for example, greater numbers of whites now express a preference for mixed neighborhoods. But there are still whites who prefer a majority-white neighborhood. Few African-Americans express a preference for neighborhoods in which they are the minority; instead, they express preferences for neighborhoods with a 50-50 racial mix. These preferences also affect the ways in which African-Americans and whites use their Section 8 vouchers.

## III.    THE SITING OF PUBLIC HOUSING IN BALTIMORE

Since the 1970s, HABC has not proposed, and HUD has not approved, any sites for the new construction of family public housing that is not covered by the Partial Consent Decree in this case. Yet, even with regard to the public housing that was approved before the Decree was entered, plaintiffs entirely misstate the facts by claiming that siting decisions have uniformly been infected by anti-African-American racial animus.

Public housing siting decisions are legally and factually complex. Decision-makers take into account all sorts of considerations, including availability of public transportation; proximity to shopping and recreation; access to social infrastructure (such as schools and health care); environmental suitability; and costs (including cost of land and of development). While many public housing projects were placed in largely minority areas many decades ago, and while

-13-

Congress has expressly instructed HUD not to "exclude from consideration . . . projects solely because the site proposed is located in an impacted area," 42 U.S.C. § 1436b, the fact is that many public housing units have also been sited in non-impacted areas.[11]  To take one such example, the most recent pre-Decree project to be newly constructed – Hollander Ridge – was one of the largest in terms of the number of units available to people such as the plaintiff class members.[12]

Hollander Ridge was built in the mid-1970s in two segments.  A high-rise building housed elderly residents, while low rise buildings were used for family public housing.  Although the location chosen for that site – an empty area adjacent to several transportation arteries – might not have been ideal in all respects, the record will not support a conclusion that the site was chosen because of anti-African-American bias.  In fact, it was sited in a census tract with a very low minority population.  While friction developed between the Hollander Ridge community and a largely white community adjacent to the site, that friction demonstrates, if anything, that the HABC and HUD decision-makers who selected and approved the site were willing to have the project sited there in spite of the anti-public housing agitation.  And, while at the behest of Senator Barbara Mikulski and other political leaders, some time later a wrought-iron fence was built around Hollander Ridge to replace an existing chain-link fence, there is no

---

[11]  Specifically, 36% of family public housing development units, and 30% of all family public housing units, have been sited in non-impacted areas.

[12]  The Hollander Ridge project does not, of course, exist any longer, because it was demolished with this Court's permission.  That fact renders any of plaintiffs' claims about it moot, just as so much of plaintiffs' case is moot.  This project is discussed here, however, both because plaintiffs continue to press this claim despite its mootness, and also because it exemplifies the fact that siting decisions are much more complex, and are much less the result of inappropriate racial considerations, than plaintiffs would have the Court believe.

evidence that HUD acted on the basis of racial antagonism or bias.

In more recent years, HUD considered various HABC proposals regarding the siting of replacement public housing units related to the Partial Consent Decree. In that connection, the record will make clear that although HABC tried, time and again, to pursue the placement of public housing in largely minority areas, HUD refused to approve such placement for just that reason.

By the same token, HUD's actions with regard to the demolition and replacement of public housing units have been entirely appropriate. The agency has no obligation to require any kind of one-for-one replacement of demolished units. Any contention to the contrary is simply a matter of policy disagreement. Cf. Reese v. Miami-Dade County, 242 F. Supp.2d 1292, 1307-8 (S.D. Fla. 2002) (reciting history of suspension and repeal of one-for-one replacement requirement). Nor has HUD been remiss in monitoring HABC's replacement housing activity.

## IV.   HUD'S ACTIVITIES TO FURTHER FAIR HOUSING

In making housing funds available to PHAs, HUD carefully balances its interest in providing housing authorities with the resources necessary to meet basic housing needs of the jurisdiction's low-income families, on the one hand, against the necessity of having those authorities fill those needs in a fair and nondiscriminatory way, on the other. Consequently, HUD does not simply hand out money to PHAs unconditionally.

### A.   Site and Neighborhood Standards

In providing capital development resources for public housing, as well as in funding project-based Section 8 units, HUD applies its site and neighborhood standards to determine

-15-

whether to approve a given location as a development site.[13]  These standards seek to promote

greater choice of housing opportunities for low-income families and to avoid undue

concentration of federally-assisted housing opportunities in areas where the residents are

primarily minority and/or low-income.  As a general matter, HUD encourages PHAs to site

newly constructed assisted housing outside areas of minority concentration.  Before new public

or project-based Section 8 housing can be located in an area of minority concentration, a PHA

must prove to HUD either that:  (1) sufficient, comparable opportunities for housing outside

areas of minority concentration exist; or (2) there is an overriding need for housing in the

neighborhood that cannot otherwise feasibly be met.  Although less stringent standards apply to

rehabilitated units to be used as public or project-based Section 8 housing, HUD has consistently

required that PHAs locate a portion of the units outside areas of minority concentration in order

to provide choice to assisted housing tenants.

HUD's review of proposed development sites is not a rubber stamp process.  As the

evidence at trial will make clear, HUD, and in particular its Baltimore field office, has not

hesitated to disapprove sites for fair housing reasons.  With respect to rehabilitated public

housing units, HUD consistently enforced its requirement that HABC place a specific proportion

of sites within a development project outside areas of minority concentration.  HUD has refused

to allow HABC to circumvent even the spirit of this requirement by attempting to rehabilitate all

of the sites in minority concentrated areas before rehabilitating any sites outside such areas.

Before HUD has approved a group of proposed sites for rehabilitation, it has required HABC to

---

[13]  Sites developed with HOPE VI funds can have their own site and neighborhood
standards, which are included in the particular grant agreement which governs the HOPE VI
activity.

identify sites both inside and outside areas of minority concentration within each proposed group. HUD has repeatedly disapproved proposed groups of sites due to HABC's failure to propose a sufficient number of sites outside areas of minority concentration. Further, the HUD field office has refused to waive the requirement that the rehabilitated projects provide choice, even when HABC went directly to HUD Headquarters seeking a waiver of this requirement.

With respect to new construction of federally-assisted units, HUD has encouraged HABC to choose sites outside areas of minority concentration. Where HUD approved the siting of new federally-assisted housing in areas of minority concentration, HUD ensured that there were meaningful comparable opportunities for housing available outside minority concentrated areas. To this end, HUD would only consider as "comparable" those units that would serve the same tenant population as the new construction units and that were expected to be available for occupancy at the same time as the proposed units. Once a unit outside an area of minority concentration was considered comparable, HUD would not allow HABC to count that unit as a "comparable opportunity" again. Further, before applying the "overriding need" criterion, HUD required HABC to submit substantial evidence both as to the need, and the inability to meet the need elsewhere. HUD has refused to allow HABC to use the "overriding need" criterion as a subterfuge for racial discrimination and, as a result, has not allowed HABC to construct new units under this criterion in these instances where HABC was unable to present sufficient objective proof that the criterion was met.

### B.    Monitoring

Even when it is not considering whether to approve a particular use of federal funds by a PHA, HUD spends considerable resources to keep tabs on the PHA's activities to ensure that the

PHA adheres to its fair housing obligations. The record in this case confirms that HUD followed that pattern in Baltimore.

Various HUD offices conduct management reviews or monitoring reviews. Through these reviews, HUD determines whether PHAs need advice, technical assistance, or other resources to stay in compliance with legal norms and good operational practice. These reviews have consumed much of HUD's limited resources over the years, and have often yielded very positive results. In Baltimore, a considerable amount of meaningful review activity has taken place over the last twenty years.

HUD's programmatic reviews involve civil rights standards, since it has incorporated civil rights requirements into the regulations for each of its programs. HUD conducts a variety of monitoring reviews to determine whether a PHA (or other recipient) is complying with these programmatic requirements. For example, HUD has conducted periodic occupancy reviews of the public housing program and examined issues such as HABC's implementation of the public housing waiting list and the racial composition of HABC's projects. As a result of these occupancy reviews, HUD has helped HABC correct a number of problems relating to the administration of its public housing waiting list. HUD required HABC to provide evidence that it was consistently choosing individuals off the waiting list in turn, and that individuals were only being given three offers of housing in accordance with its approved tenant assignment plan; HUD had HABC recertify its waiting list, thus decreasing the wait time on the list by removing individuals who were no longer interested in public housing; and HUD had HABC re-examine the racial composition of its waiting list and provide HUD with updated statistics.

With respect to the racial composition of HABC's projects, HABC, upon HUD's

-18-

recommendation, adopted a number of voluntary compliance measures devised by HUD's Public

Housing Desegregation Task Force in conjunction with the Civil Rights Division of the

Department of Justice. During these occupancy reviews, HUD also examined HABC's

compliance with other civil rights programmatic requirements, including participation by

minority businesses in its contracts and affirmative action in its employment.

HUD conducts similar reviews of the Section 8 programs' requirements. Here, also,

HUD's Baltimore office has expended considerable effort and time assuring that HABC's

Section 8 waiting list is utilized properly. Without HUD's monitoring, review, and follow-up on

unfavorable findings, HABC would have continued to use unfair methods of assigning housing

benefits to those in need.

Along similar lines, HUD monitors HABC's CDBG program. For example, in the early

1990s, as a result of various concerns, HUD determined that it was appropriate to condition

Baltimore City's continued CDBG funding on the satisfaction of certain conditions. The City

later satisfied the conditions, and the funding constraints were removed.

Further, HUD conducts compliance reviews to determine whether a PHA is out of

compliance with applicable civil rights laws. HUD's resources to conduct these compliance

reviews are extremely limited, as a review of a large PHA like Baltimore takes thousands of

person-hours to complete. HUD Headquarters sets goals with respect to these compliance

reviews (which is set at about 50 Title VI reviews per year, nationwide, out of approximately

3400 PHAs, for fiscal year 2003), and provides guidance to HUD's Field Offices in the form of a

risk assessment to help them determine which PHAs to review. Again, in Baltimore, such work

has taken up a very significant amount of the limited time and staff available to do such work,

but to good purpose. HUD has conducted a number of compliance reviews of HABC, which have led to at least three Voluntary Compliance Agreements ("VCAs") over the years. As a result of these reviews, HABC has voluntarily changed its method of assigning tenants to public housing units, and HUD has recently referred a major HABC civil rights compliance problem to the Civil Rights Division of the Department of Justice for enforcement proceedings.

Specifically, following a compliance review in 1976 and a subsequent review in the early 1980s, HABC entered into a VCA on civil rights issues. Likewise, as a result of compliance reviews in the late 1980s, HABC altered its method of implementing its tenant assignment plan in order to further fair housing policies. Following another compliance review in 1997, HABC entered into a VCA related to recordkeeping requirements under HUD's Title VI regulations. Prior to this VCA, HABC had been highly deficient in maintaining racial data that must be kept for HABC to comply with its obligations under Title VI. As a result of the agreement with HUD, and after receiving a tremendous amount of HUD technical assistance in overhauling its computer system, HABC has managed to collect the necessary information. With the help of this new system, HABC will now be able to comply more readily with its other Title VI obligations. Finally, in 2002, HUD found HABC in non-compliance with a VCA relating to disability issues that the parties had entered into following a compliance review in the mid-1990s. HUD referred the matter to the Department of Justice for further proceedings.

### C.      HUD's Focus On Tenant Assignment Issues

HUD has, from time to time, concentrated on a given compliance issue in a broad-based way. Thus, for a number of years HUD devoted much attention to the problem of how to place new tenants in public housing in such a way as to avoid perpetuating old segregative patterns.

The study of this issue began just after the Supreme Court decided <u>Brown v. Bd. of Education</u>, and lasted through the early 1990s. At first, the relevant policy-makers on the federal and local levels were of the view that, consistent with what might appear to be common sense, the fairest approach to assigning public housing tenants to specific units would be to allow them to choose where they would live. Later, HUD recognized that this approach would allow the members of different racial groups to self-segregate. Consequently, the tenant assignment policy that HUD required PHAs to follow evolved over time to what it is today: prospective tenants move up on a PHA's waiting list until it is their turn to choose a unit. At that time, they have a limited number of units offered to them. If they reject all of these options, the prospective tenant is then moved to the bottom of the waiting list.

### D.     HUD's Devotion of Resources to Many Other Fair Housing Initiatives

HUD has prodded the City to do more than the minimum necessary in connection with its CDBG program. Baltimore, as a community entitled to receive CDBG money, was obligated to prepare an "Analysis of Impediments to Fair Housing" ("AI"). Baltimore had to prepare an AI, to identify and take actions to overcome the impediments it identified, and to retain records regarding those actions.[14] Baltimore first prepared an AI in 1996; its AI was prepared in conjunction with all the other CDBG entitlement communities in the Baltimore metropolitan area (Baltimore County, Anne Arundel County, the City of Annapolis, Howard County, and Harford

---

[14] Jurisdictions are not required to prepare an AI on a particular schedule. Moreover, CDBG jurisdictions are not required to submit the AI to HUD. Instead, HUD is informed about what jurisdictions have done to address impediments when it reviews a jurisdiction's activities for the past program year. HUD, for its part, neither certifies that an AI has been done appropriately, nor is HUD required to act as any kind of guarantor of a PHA's undertakings in connection with the AI process (although, as discussed below, HUD's Baltimore office has done more in this regard than it is required to do).

County).  While that AI has not been formally amended since 1996, the City has reported annually on the actions it has taken to address the identified impediments.  Although HUD has no authority to force an entitlement jurisdiction to move more quickly in taking actions identified in an AI than it is inclined to, HUD can, and has, provided incentives to Baltimore to do just that.

In 2001, HUD provided the Baltimore metropolitan area CDBG jurisdictions with technical assistance funds for the purpose of working with a mediator to update their AI.  The services of the Maryland Center for Community Development ("MCCD") were obtained. MCCD worked with the CDBG jurisdictions over the next year-and-a-half.  The work culminated in the development of an updated form of the AI, which would call for considerably more focused attention to the fair housing needs of the residents of the Baltimore metropolitan area than has been given before.  Although none of the jurisdictions other than Baltimore City has yet signed on to the new plan, the funds spent by HUD on this effort have not been for naught, because the City restated and reinforced its commitment to fair housing principles, and because the other jurisdictions may still participate.

While HUD's fair housing operation certainly spends a considerable amount of time, money and effort on fair housing concerns that arise programatically in connection with federally-assisted housing, it also devotes a significant portion of its resources to other fair housing efforts.  Thus, HUD funds and monitors at least two grant programs – the Fair Housing Initiatives Program ("FHIP") and the Fair Housing Assistance Program ("FHAP") – both of which are aimed at furthering compliance with fair housing laws.  FHIP provides resources to non-profit entities to fund such activities as fair housing counseling efforts, and testing to determine where housing discrimination exists.  FHAP provides money to state and local

-22-

agencies that enforce their own laws that provide protection from housing discrimination. HUD monitors FHIP and FHAP on a yearly basis for compliance with programmatic requirements.

Further, one of the most resource-intensive activities of HUD's fair housing operation is the handling of individual fair housing complaints. Approximately 7,000 to 8,000 such complaints are filed each year. Approximately one-third of those filed are investigated by HUD (rather than state and local fair housing agencies, which investigate the remainder). When an individual believes that he or she has been discriminated against on an impermissible basis with regard to the purchase or rental of housing, or in connection with access to a mortgage, that person may file a complaint with HUD. The agency then is responsible for investigating and resolving the complaint in a timely fashion, an activity that often devours a significant percentage of HUD's fair housing resources (especially in light of the strict time limits that apply to these complaints).

Because Congress limits HUD's fair housing funds, the fact that so much actually is accomplished is a testament to HUD's commitment to fair housing.

## V.    THE REALITY OF PUBLIC HOUSING TODAY IS FUNDAMENTALLY DIFFERENT FROM THE REALITY OF FIFTY, OR EVEN FIFTEEN, YEARS AGO

Despite considerable efforts by HUD, particularly over the last decade-and-a-half, much remains to be done to render HABC's public housing stock entirely well-managed. But what HUD does today in terms of administering the programs that Congress has created to provide federally assisted housing is entirely distinct from the acts of its predecessors undertaken over half a century ago for which plaintiffs are attempting to hold HUD liable. Such current liability simply does not exist.

**ARGUMENT**

## I.    PLAINTIFFS HAVE NO VIABLE CONSTITUTIONAL CLAIM AGAINST THE FEDERAL DEFENDANTS

Plaintiffs raise two types of constitutional claims against the federal defendants in this case:  that HUD intentionally discriminated against members of the class of which they are a part, and that HUD has not eliminated the vestiges of discrimination.  Plaintiffs cannot prevail on either theory.

### A.    Plaintiffs' "Vestiges" Argument Cannot Work

First and foremost, relying upon desegregation cases brought against local school boards, plaintiffs point to the pre-1954 system of de jure segregation in public housing, and contend that (1) this court must determine whether the defendants have dismantled that illicit system, (2) defendants' failure to dismantle it continues the original violation, and (3) unless defendants prove they have dismantled it and achieved "unitary" status,[15] plaintiffs are not required to make any further showing of intent to establish defendants' liability.  Pls.' Br. at 33.  While this might have been the standard for assessing liability of a local school board operating a dual system in

---

[15]  Plaintiffs define (Pls.' Br. at n. 7) a "unitary" system as "a prior dual system that has been brought into compliance with the Constitution."  But, as the Fourth Circuit explained in Belk v. Charlotte-Mecklenburg Bd. of Educ., 269 F.3d 305, 318 (4th Cir. 2001):

> The Supreme Court has declined to define or provide a "fixed meaning" for the term "unitary."  However, in light of the aim of Brown I, which was "the elimination of state-mandated or deliberately maintained dual school systems," a school system must be declared unitary when it no longer discriminates between children on the basis of race. . .
>
> In undertaking a unitary status inquiry, a court must ask "whether the [defendant has acted] in good faith [to desegregate], and whether the vestiges of past discrimination ha[ve] been eliminated to the extent practicable."

(emphasis added and internal citations omitted).

-24-

1979, it is not the standard for assessing local school board liability in the Fourth Circuit today, nor was it ever the standard in the Fourth Circuit for assessing liability of a federal agency providing funds to a local housing authority to operate a low income public housing system. It certainly is not the standard that this Court has said is applicable to this case.

In its August 14, 2003, Memorandum and Order, this Court set forth the legal parameters by which the federal defendants' duty to disestablish prior de jure segregation would be measured at trial.[16] After examining the relevant Supreme Court case law, this Court determined that there is "a continuum along which the degree to which parties are bound to take affirmative steps to disestablish segregation may be measured." Id. at 8. That continuum, this Court stated, runs from the standard of Green v. City. School Bd., 391 U.S. 430, 437-38 (1968),[17] advocated by the plaintiffs, to the standard of Bazemore v. Friday, 478 U.S. 385, 408-09 (1986) (per

---

[16] The Court did not adopt either the federal defendants' or the plaintiffs' summary judgment position on this issue. Accordingly, rather than taking plaintiffs' approach of re-arguing the case advocating a position that has already been rejected (although the federal government does not concede that its summary judgment position was wrong, and will likely assert it in any appeal of an adverse decision on liability by this Court), federal defendants' trial brief follows the Court's August 14, 2003 ruling. The federal defendants note, however, that plaintiffs could not prevail even if the test that they champion applied.

[17] In Green v. Cty. School Bd., 391 U.S. 430, 437-38 (1968), local school boards that had operated de jure segregated school systems were deemed to have "the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." In such cases, the prior maintenance of a system of state-imposed segregation imposed an affirmative duty to eliminate its vestiges, and it was the defendant's burden to prove the absence of vestiges. Since Green, the Supreme Court has cautioned that "the school district is under no duty to remedy imbalance that is caused by demographic factors." Freeman v. Pitts, 503 U.S. 467, 494, 496 (1992) (noting that "[a]s the de jure violation becomes more remote in time and . . . demographic changes intervene, it becomes less likely that a current racial imbalance in a school district is a vestige of the prior de jure system.").

-25-

curiam) (White, J., concurring),[18] which was advocated by the federal defendants at the summary judgment stage. Id. at 8-10. Noting that it did "not view participation in public housing as a completely voluntary choice," this Court held that "the question of the Federal Defendant's duty to take affirmative steps in the instant case presents an issue on the continuum between the Green and Bazemore extremes." Id. at 12. It then discussed the subsequently-decided case of United States v. Fordice, 505 U.S. 717 (1992), in which the Supreme Court described that middle position on the continuum in the context of college attendance. Id. at 10-12.

Expressly eschewing the use of Green in the context of a public university system, 505 U.S. at 730 n.4, the Supreme Court in Fordice phrased the question not as whether all vestiges of the state's prior de jure segregation have been eliminated "root and branch," Green, 391 U.S. at 438, but as whether any state policy "traceable to the state's de jure segregation and that continues to foster segregation" has been "reformed to the extent practicable and consistent with sound educational practices." Fordice, 505 U.S. at 729. The policy challenged in Fordice was that of requiring higher scores on the standardized ACT test for admission to "white" universities than to "black" ones, a criteria first adopted during the de jure segregation years; since blacks did substantially worse on the test than whites, it was held to be such a policy. Id. at 729-32.

Under Fordice, "[i]f policies traceable to the de jure system are still in force and have discriminatory effects, those policies too must be reformed to the extent practicable and consistent with sound educational practices." 505 U.S. at 729. Adopting that standard, this

---

[18] Although Justice White's opinion was labeled a concurrence, five members of the Court joined in it. In Bazemore, the Court rejected a "failure to disestablish" claim on the ground that the challenged de jure system, regarding admission to a state-sponsored organization, had been replaced by a racially neutral admission policy.

-26-

Court concluded that HUD may be found liable at trial if the evidence shows that HUD

"perpetuates policies and practices traceable to its prior system that continue to have segregative

effects <u>and such policies are without sound justification and can be practically eliminated</u> . . . ."

Aug. 14, 2003 Mem. and Order at 12 (quoting <u>Fodice</u>, 505 U.S. at 731) (emphasis added and

alterations removed).

     The nub of the <u>Fordice</u> analysis focuses on whether a particular discriminatory policy that

was once followed is still in place at the time the litigation in question is being decided.  Thus,

"[w]here plaintiffs in a lawsuit contend that a state or other public actor has not discharged its

duty to dismantle its former system of <u>de jure</u> segregated higher education, the burden of proof

lies with the charging party to show that a challenged contemporary policy is traceable to past

segregation." <u>Knight v. State of Ala.</u>, 14 F.3d 1534, 1541(11th Cir.1994).  Even the burden

applicable in the context of an elementary school desegregation case – under which it is much

easier to find a defendant liable for failure to eliminate the vestiges of discrimination than under

<u>Fordice</u> – would not warrant a finding in favor of plaintiffs.  As the Supreme Court said in

<u>Freeman v. Pitts</u>, 503 U.S. 467, 495-496 (1992):

> Residential housing choices, and their attendant effects on the racial composition
> of schools, present an ever-changing pattern, one difficult to address through
> judicial remedies.  In one sense of the term, vestiges of past segregation by state
> decree do remain in our society and in our schools.  Past wrongs to the black race,
> wrongs committed by the State and in its name, are a stubborn fact of history.
> And stubborn facts of history linger and persist.  But though we cannot escape our
> history, neither must we overstate its consequences in fixing legal responsibilities.
> The vestiges of segregation that are the concern of the law in a school case may be
> subtle and intangible but nonetheless they must be so real that they have a causal
> link to the <u>de jure</u> violation being remedied.  It is simply not always the case that
> demographic forces causing population change bear any real and substantial
> relation to a <u>de jure</u> violation.  And the law need not proceed on that premise.  <u>As
> the de jure violation becomes more remote in time and these demographic</u>

> changes intervene, it becomes less likely that a current racial imbalance in a
> school district is a vestige of the prior de jure system.  The causal link between
> current conditions and the prior violation is even more attenuated if the school
> district has demonstrated its good faith.

(emphasis added).

Plaintiffs will be unable to demonstrate anything like the sort of causal link required by

Fordice between the contemporary policies that they challenge and segregation that ended

decades ago.  For one thing, as discussed above, the racial makeup of the City of Baltimore today

is far different from what it was during the pre-Brown period of segregated housing projects.

Even more significantly for present purposes, the federal government's policies of that earlier era

have been entirely superseded by HUD's current mission, policies, and practices.  Many years

ago, HUD took the anti-discrimination bull by the horns and has done what it can to keep

HABC's approach as consistent with fair housing principles as possible.  HUD has said that there

should be no invidious discrimination with regard to public housing.  HUD has meant it.  HUD

has backed up its words with disapprovals of inappropriate decisions; effective threats to cut off

funding; technical assistance to fix problems; reviews of HABC's activities that have brought

positive results for current and prospective public housing residents and much, much more.

Regardless of whether HABC has, itself, entirely eradicated race discrimination from its

programs, HUD has complied with its obligations, and then some.

This is particularly so given that a government agency that simply provides funding to a

discriminatory entity has much less of a duty to eradicate the present effects of such de jure

segregation than the government agency that operates the discriminatory entity.  Cf. Missouri v.

Jenkins, 515 U.S. 70, 101 (1995) (directing district court to consider "that the State's role with

-28-

respect to the quality education programs has been limited to the funding, not the

implementation, of those programs."). Here, of course, HUD provides funding to HABC, but

does not operate public housing in Baltimore. HUD cannot be held to the same standard as the

Housing Authority, even under this Court's standard.

Ultimately, plaintiffs' position regarding HUD's obligation to eliminate the vestiges of

past discriminatory practices leads to an untenable and grossly unfair result. Plaintiffs effectively

contend that HUD should deny HABC the use of funds that are needed to provide Baltimore's

poor with roofs over their heads until HABC commits to stop spending money to rejuvenate

neighborhoods in which African-Americans are in the majority. African-Americans make up

most of the population of Baltimore in general, and of the neighborhoods available for public

housing in particular. Congress has appropriated scarce taxpayer dollars to be spent on housing

and not to be withheld from dire needs. Accordingly, plaintiffs' position should be rejected.

**B.    HUD's Action Has Not Amounted To
        Intentional Discrimination Against Plaintiffs**

Plaintiffs cannot make out a Fifth Amendment "equal protection" claim. In order to show

a violation by the federal government of a plaintiff's Fifth Amendment "equal protection" rights,

the plaintiff must establish not only race-based differential treatment by the government, but also

that such treatment was intentional. As the Fourth Circuit has explained, such intent "'implies

more than intent as volition or intent as awareness of consequences. It implies that the

decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,'

not merely 'in spite of,' its adverse effects upon an identifiable group.'" Sylvia Development, 48

F.3d 810, 819 n.2 (4th Cir. 1995) (quoting Personnel Administrator of Mass. v. Feeney, 442 U.S.

256, 279 (1979)).

The equal protection analysis of race-based classifications consists of two components. As the Supreme Court explained in <u>Fordice</u>, for a challenged policy <u>not</u> rooted in the prior dual system (like the policies at issue here), the question is whether it establishes a new constitutional violation – which cannot be made out without a showing of discriminatory purpose.  505 U.S. at 733.  Thus, the court considers whether the "end" sought to be achieved is a compelling government interest, giving substantial judicial deference to the legislative will.  <u>Sylvia Development</u>, 48 F.3d at 820.  The second part of the analysis involves whether the "means" selected appropriately further that compelling interest.  <u>Id.</u>  Where a race-based classification is not officially stated as a reason for administrative action, the plaintiff has the burden of proving that the classification was actually utilized in the administrative action <u>and that its use was intentional and purposeful</u>.

Demonstrating a discriminatory purpose sufficiently to establish a constitutional violation is not an easy thing to do.  <u>See</u> <u>Miller v. Johnson</u>, 515 U.S. 900, 916 (1995) ("[t]he distinction between being aware of racial considerations and being motivated by them may be difficult to make"); <u>Hunter v. Underwood</u>, 471 U.S. 222, 228 (1985) ("[p]roving the motivation behind official action is often a problematic undertaking" and increasingly difficult as the size of the body producing the decision increases).  More than one court has explained that, "[t]oday, no legislative body would be so lacking in knowledge of this lenient standard or so lacking in perspicacity as to leave a record of action taken 'because of race.'"  <u>United States v. Petersen</u>, 143 F. Supp.2d 569, 585 (E.D. Va. 2001).  But, while "[i]nquiries into congressional motives or purposes are a hazardous matter," <u>United States v. O'Brien</u>, 391 U.S. 367, 383 (1968), in

-30-

constitutional challenges, "the stakes are sufficiently high for us to eschew guesswork." Id. at 384 (emphasis added).

Likewise, the Court should discount plaintiffs' blanket statement that "evidence of community opposition is probative of whether governmental actors are acting intentionally to discriminate." Pls.' Br. at 40. The "bigoted comments of a few citizens," Metropolitan Housing Dev. Corp. v. Arlington Heights, 558 F.2d 1283, 1292 (7th Cir.1977), are not sufficient to demonstrate discriminatory intent. Cf. Cuyahoga Falls v. Buckeye Cmty. Hope Found., 123 S. Ct. 1389, 1395-96 (2003) (racist views of private individuals not ascribed to government actors).

Further, the cases apply this principle, quite logically, to local governments elected by and responsive to the relevant communities – not to the federal government. See Smith v. Town of Clarkton, 682 F.2d 1055, 1066-67 (4th Cir. 1982) (evidence of discriminatory intent in the statements and testimony of housing commissioners and town mayor);[19] Atkins v. Robinson, 545 F. Supp. 852, 872 (E.D. Va. 1982), aff'd 733 F.2d 318 (4th Cir. 1984) (discussing state of mind of county board supervisor); United States v. Yonkers Bd. of Educ., 837 F.2d 1181, 1224 (2d Cir.1987) (discussing liability of City of Yonkers); Hodges v. Public Bldg. Com'n of Chicago, 864 F. Supp. 1493, 1503-04 (N.D. Ill. 1994) (City delayed proceedings and revised plans in response to community opposition based, in significant part, on racial animus, "thereby adopting it."). This is a far cry from the plaintiffs' argument here that the racial animus of a few white residents of Baltimore was "adopted" by the local defendants and, through them, should be

---

[19] In Clarkton, the local decisionmakers withdrew from participation in a public housing project, and recommended discharge of the housing authority personnel, admittedly based solely on results of an "opinion poll" conducted for the first time in history immediately after expressions of racial opposition to the project surfaced.

imputed to the federal defendants.

As the Supreme Court stated in <u>Arlington Heights I</u>, "determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." <u>Arlington Heights v. Metropolitan Housing Dev. Corp.</u>, 429 U.S. 252, 266 (1979). The Supreme Court has made clear in this regard that "disparate impact and foreseeable consequences, without more, do not establish a constitutional violation." <u>Columbus Bd. of Educ. v. Penick</u>, 443 U.S. 449, 464 (1979). <u>Accord Arlington Heights I</u>, 429 U.S. at 266 ("impact alone is not determinative, and the Court must look to other evidence").[20]

Among the "totality of the relevant facts" that the Supreme Court has identified are "the inevitability or foreseeability of consequences of a neutral rule[,]" <u>Feeney</u>, 442 U.S. at n. 25, the historical background of the decision, the "specific sequence of events leading up the challenged decision[,]" "[d]epartures from the normal procedural sequence" and legislative history. <u>Arlington Heights I</u>, 429 U.S. at 267-68.

In housing discrimination cases, the Fourth Circuit specifically recognizes the following factors as probative of whether a decisionmaking body was motivated by a discriminatory intent for constitutional purposes:

(1)    evidence of a "consistent pattern" of actions by the decisionmaking body disparately impacting members of a particular class of persons;

---

[20] Plaintiffs' contention (Pls.' Br. at 38) that it is sufficient to prove discriminatory impact is simply incorrect. The case they cite, <u>Betsey v. Turtle Creek Associates</u>, 736 F.2d 983, 987 n.3 (4th Cir. 1984), was a Fair Housing Act discriminatory impact case, and it discussed the burden of proving a statutory violation only, a matter which involves a different legal standard. <u>See</u> discussion of Title VIII, <u>infra</u>.

(2)    historical background of the decision, which may take into account any history of discrimination by the decisionmaking body or the jurisdiction it represents;

(3)    the specific sequence of events leading up to the particular decision being challenged, including any significant departures from normal procedures; and

(4)    contemporary statements by decisionmakers on the record or in minutes of their meetings.[21]

Sylvia Development, 48 F.3d 810 at 819, (citing Arlington Heights I, 429 U.S. at 266-68).  In taking history into account, of course, the Supreme Court has said that "we cannot accept official actions taken long ago as evidence of current intent."  McCleskey v. Kemp, 481 U.S. 279, 298 n.20 (1987).

Whether or not any of the evidence cited at pages 39 to 41 of plaintiffs' brief might be probative of whether the local and/or federal defendants were motivated by a discriminatory intent under the Sylvia Development standard, it certainly is not, as plaintiffs put it, "proof of defendants' intentionally discriminatory conduct."  Pls.' Br. at 39 (emphasis added)  Much more probative is the consistent pattern of HUD's aggressive monitoring of HABC's actions, its focused attention on fair housing issues, its considerable attempts to fund the provision of needed public housing in Baltimore in a way designed to promote fair housing and its appropriate treatment of the challenges presented by HABC.

Finally, even if the Court were to conclude that racial discrimination was a motivating

_____

[21]  Applying the Green standard, cases in two other circuits held intent to discriminate in public housing can be established merely by showing a pattern of failures by HUD to effectively enforce its regulations.  See, e.g., Clients' Council v. Pierce, 711 F.2d 1406, 1411-18, 1423 (8th Cir. 1983); Young v. Pierce, 628 F. Supp. 1037, 1052-55 (E.D. Tex. 1985).  Since the Supreme Court's holding in Fordice, however, the continued vitality of the holdings of these two cases is questionable.

factor in the challenged actions, an element of causation is necessary to the plaintiff's showing,

especially when, as here, plaintiff is trying to uncover the motivation of a governmental body.

While a plaintiff is not required to prove that "the challenged action rested solely on racially

discriminatory purposes," proof that racial discrimination was a motivating factor would not end

the matter.  Such proof merely shifts the burden to the decisionmaking body to demonstrate that

"the same decision would have resulted even had the impermissible purpose not been

considered." Sylvia Development, 48 F.3d at 819 n.2 (citing Arlington Heights I, 429 U.S. at

265, 270-71 n. 21) (emphasis added); Atkins v. Robinson, 545 F. Supp. 852 (E.D. Va. 1982),

aff'd, 733 F.2d 318 (4th Cir. 1984).  Defendants may also avoid findings of liability by

demonstrating "any countervailing compelling governmental interest." Id. at 870 n.100

(emphasis added).

     Here, the facts surrounding the focal event of discrimination relied upon by plaintiffs --

the building of a fence around the Hollander Ridge housing project -- do not come close to

meeting this standard.  The construction of an outer perimeter security fence around Hollander

Ridge had been recommended by the United States Secret Service.  An infusion of federal funds

for the construction of the security fence was sought aggressively by Senator Barbara Mikulski,

ranking member of the Senate committee responsible for appropriations to HUD.  HUD's

decision to contribute to the cost of the fence was the result of Senator Mikulski's request, not of

racial animus.

     So, too, as difficult as it has been to accomplish this result, HUD has successfully gotten

HABC to adopt – and, ultimately, to follow, as far as HUD can tell through its monitoring

reviews – a tenant selection and assignment plan that comports with HUD's requirements.  The

plan was developed, after considerable debate and consideration, as one that allows public housing tenants some modicum of choice while ensuring to the degree possible that tenant assignments will be based on considerations other than race. While plaintiffs' counsel claim that they would like to limit tenants' ability to choose where they will live even further (a position at odds with the one taken by plaintiffs themselves at deposition), such a disagreement amounts to nothing other than a policy dispute of the sort that this Court should not resolve. Plaintiffs certainly cannot provide any reason to resolve it in their favor. This is particularly so given the virtually uni-racial makeup of the public housing waiting lists in Baltimore.

At least one court of appeals has held it sufficient for HUD to demonstrate that it has taken affirmative efforts to achieve integration, even if those efforts were ultimately unsuccessful. See, e.g., Jenkins v. Missouri, 593 F. Supp. 1485, 1500 (W.D. Mo. 1984), aff'd, 807 F.2d 657, 673-82 (8th Cir. 1986). In this case, however successful HUD has been (and it has certainly succeeded somewhat in effecting positive changes in the lives of the minority residents of HABC's public housing), it has certainly been vigilant to a degree far beyond what the Constitution requires.

## II. PLAINTIFFS CANNOT MAINTAIN, AND SURELY CANNOT PREVAIL, ON THEIR STATUTORY CLAIMS

### A. Plaintiffs Have No Private Right of Action Under Title VIII of the Fair Housing Act

Most of plaintiffs' claims are not actionable because plaintiffs seek to pursue them under provisions of law that create no private right of action against the federal government. Consequently, whatever facts plaintiffs might develop at trial on those claims, relief must be

-35-

denied as to them.[22]

### 1.   Determining the existence of a private right of action

It is well established that a mere allegation that a federal statute has been violated and some person harmed thereby "does not automatically give rise to a private right of action in favor of that person." Cannon v. Univ. of Chicago, 441 U.S. 677, 688 (1979). Moreover, in the case of the federal government, a private right of action must be expressly provided for in the statute. See, e.g., Irwin v. Department of Veterans Affairs, 498 U.S. 89, 95 (1990) ("waiver of sovereign immunity cannot be implied but must be unequivocally expressed") (internal quotes omitted). In Cort v. Ash, 422 U.S. 66 (1975), the Supreme Court articulated the following test for determining when, in the absence of an express provision in the statute itself, the courts may "imply" a private right of action thereunder.

---

[22]   While plaintiffs do sue under the Administrative Procedure Act, which allows challenges to federal action "otherwise not in accordance with law," 5 U.S.C. § 706(2)(a), the inactionability of plaintiffs' claims under the statutes on which they rely is significant. For one thing, APA claims are not available in situations in which an adequate judicial remedy is otherwise available. See 5 U.S.C. § 704. See also Jersey Heights Neighborhood Ass'n v. Glendening, 174 F.3d 180, 192-93 (4th Cir. 1999) (denying judicial review of a Title VI discrimination claim against the Government because a direct remedy against the federal aid recipients "is not only 'adequate,' but . . . is preferable to a direct suit against the agency itself"); Americans Disabled for Attendant Programs Today v. HUD, 170 F.3d 381, 390 (3d Cir. 1999) (barring review of a Title VIII fair housing claim brought against HUD under the APA, because "an adequate judicial remedy also exists" through which plaintiffs "can pursue their claims of housing discrimination directly against the federal-funding recipients"). Because any harm suffered by plaintiffs can be remedied by relief in this case against HABC, the APA precludes relief against the federal defendants. Second, to the extent any of the HUD decisions challenged here is "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), review is not available, as discussed more fully below in connection with the applicable APA standards. Third, the fact that the APA, rather than the substantive statutes invoked by plaintiffs provides them with the right (if any) to sue could have an impact on the nature of the relief available to plaintiffs. This latter point will be explained more fully if necessary in the context of a remedy phase of this proceeding, in the unlikely event that such a phase becomes necessary.

> First, is the plaintiff 'one of the class for whose especial benefit the statute was enacted,'
> . . ., that is, does the statute create a federal right in favor of the plaintiff? Second, is there
> any indication of legislative intent, explicit or implicit, either to create such a remedy or
> to deny one? . . . Third, is it consistent with the underlying purposes of the legislative
> scheme to imply such a remedy for the plaintiff? . . . And finally, is the cause of action
> one traditionally relegated to state law, in an area basically the concern of the States, so
> that it would be inappropriate to infer a cause of action based solely on federal law?

Id. at 78 (internal citations omitted).  Since Cort, the Supreme Court has emphasized that "[t]he

intent of Congress remains the ultimate issue" and "unless this congressional intent can be

inferred from the language of the statute, the statutory structure, or some other source, the

essential predicate for implication of a private remedy simply does not exist."  Thompson v.

Thompson, 484 U.S. 174, 179 (1988) (internal quotes omitted).  The burden of proving that

Congress intended to make available a private right of action rests squarely with the plaintiff.

See Suter v. Artist M., 503 U.S. 347, 363-64 (1992).

Applying these standards, courts imply private rights of action against recipients of

federal funds that are alleged to have unlawfully discriminated.  But courts do not regularly imply

them against the federal government itself.  That is because: (1) such "implied" remedies would

be inconsistent with the requirement that sovereign immunity be expressly waived, and (2)

Congress expressly provided for judicial review of federal action in accordance with the terms

and limitations of the APA.  As now-Justice Breyer explained, when sitting on the First Circuit

Court of Appeals:

> [W]hen Congress means to permit a private party to ask a court to review the
> legality of federal actions in a manner that differs from APA review, Congress
> will say so explicitly in the statute.  Otherwise, it is reasonable to assume that
> Congress meant the APA to govern.
>
> Of course, we recognize that to apply the APA will mean no review if (to use the
> APA's language) "statutes preclude judicial review" or "agency action is

committed to agency discretion by law." 5 U.S.C. § 701(a). But this fact creates no anomaly, for it would be a self-contradiction for a court to find both (1) that one of these exceptions applies and (2) that Congress nonetheless intended to grant a private right of action permitting review.

NAACP v. Secretary of HUD, 817 F.2d 149, 152-53 (1st Cir. 1987) (Breyer, J.) (implication of

private right of action under Cort "typically involve[s] statutes that impose obligations upon a

nonfederal person") (internal citations omitted).

>            2.      **Congress did not intend to create a private action**
>                    **against HUD under Title VIII.**

Plaintiffs allege that HUD violated sections 3604(a) and (b) and sections 3608(d) and

(e)(5) of Title VIII, also known as the Fair Housing Act, 42 U.S.C. §§ 3604(a);(b); 3608(d);

(e)(5). See Am. Compl. ¶¶ 253-54. Section 3604 states that it shall be unlawful

>    (a)    To refuse to sell or rent after the making of a bona fide offer, or to refuse to
>           negotiate for the sale or rental of, or otherwise make unavailable or deny, a
>           dwelling to any person because of race, color, religion, sex, or national origin.
>
>    (b)    To discriminate against any person in the terms, conditions, or privileges of sale
>           or rental of a dwelling, or in the provision of services or facilities in connection
>           therewith, because of race, color, religion, sex, or national origin.

42 U.S.C. § 3604. Section 3608(d) requires all executive departments and agencies to

"administer their programs and activities related to housing and urban development" "in a

manner to affirmatively further fair housing." 42 U.S.C. § 3608(d). Section 3608(e)(5) applies

only to the Secretary of Housing and Urban Development, and requires it to "administer the

programs and activities relating to housing and urban development in a manner affirmatively to

further the policies of this subchapter."[23]  42 U.S.C. § 3608(e).

---

[23]  In analyzing the viability of an implied private right of action against HUD, 42 U.S.C. §§ 3608(d) and (e)(5) are used interchangeably.

-38-

Consideration of the factors set out in <u>Cort v. Ash</u> reveals that plaintiffs have no private right of action under these provisions.

**1. First <u>Cort</u> Factor -** "Statutes that focus on the person regulated rather than the individuals protected create 'no implication of an intent to confer rights on a particular class of persons.' " <u>Alexander v. Sandoval</u>, 532 U.S. 275, 289 (2001) (quoting <u>California v. Sierra Club</u>, 451 U.S. 287, 294 (1981)). As a general rule, statutes that act as directives to federal agencies engaged in the distribution of federal funds are not intended to create private rights of action. <u>Id.</u> (recognizing that, when statutes act as directives to federal agencies, there is little reason to infer a private remedy in favor of individuals).

The duty imposed on the Secretary by 42 U.S.C. § 3608(e)(5) to "administer the programs and activities relating to housing and urban development in a manner to affirmatively further [fair housing]" is a duty imposed by language that does not specifically indicate any special class of intended beneficiaries. The unfocused cast of that language renders inescapable the conclusion that Congress intended only a very general admonition to HUD and not the creation of a private right of action.

**2. Second <u>Cort</u> Factor -** The second of the factors identified in <u>Cort</u>, whether there is any indication of legislative intent to create a remedy, is, if anything, even more dispositive. The setup of Title VIII make clear that Congress intended the statute to be enforced by the federal government, or by private parties suing entities other than HUD. <u>See</u> 42 U.S.C. §§ 3610, 3612, 3613, 3614. <u>See</u> <u>Jones v. Office of Comptroller of Currency</u>, 983 F. Supp. 197, 202-03 (D.D.C. 1997). As the Fourth Circuit has made clear in ruling that Title VIII did not create a private right of action, "[r]ecent cases in the Supreme Court amply demonstrate that Congress may pass

-39-

legislation to benefit a particular class without creating a private right of action." Perry v. Housing Authority of Charleston, 664 F.2d 1210, 1216 & n.2 (4th Cir. 1981) (citing Universities Research Assn. v. Coutu, 450 U.S. 754, 771-773 (1981)).[24]

    **3. Third Cort Factor -** The third factor identified in Cort is whether the existence of a private right of action is consistent with the underlying purposes of the legislative scheme. The implication of a private right of action would be inconsistent with Congress' intent to have private parties sue non-federal entities (or to rely on HUD's enforcement of the statute) with regard to alleged Title VIII violations, as discussed above. Thus, "the modern view is that Congress did not create a private cause of action against HUD under Title VIII." Robert G. Schwemm, Housing Discrimination: Law and Litigation § 21.3, at 21-27 (1999). See also Jones, 983 F. Supp. at 202-03; cases cited at Fed. Def. Mem. In Support of Jmt. on the Pldgs. at 18-19. Those few cases that implied such a right of action failed to consider the appropriate Cort factors and/or in fact applied the APA standard of review.[25]

---

[24] Nor could plaintiffs assert a claim against HUD under section 3604. See, e.g., Anderson v. City of Alpharetta, 737 F.2d 1530, 1531n.2 (11th Cir. 1984) (no cause of action against HUD under § 3604 where HUD not directly involved in sale or rental of housing, since the language "or otherwise make unavailable or deny, a dwelling to any person because of race" cannot be extended to cover HUD's action or inaction in countering the deliberate foot-dragging of local governments who had a history of excluding public housing on racial grounds.)

[25] Those cases should be read as being, at best, ambiguous as to whether they found a private right of action directly under the statute, or whether their review was conducted pursuant to the APA. As the First Circuit explained, part of the ambiguity in this area can be attributed to reliance on decisions such as Shannon v. HUD, that predated Cort v. Ash. See Latinos Unidos de Chelsea ("LUCHA") v. HUD, 799 F.2d 774, 792 (1st Cir. 1986).

### 3.   Plaintiffs Have No Right to Sue HUD Under 24 C.F.R. § 941.202

Plaintiffs allege that HUD violated 24 C.F.R. § 941.202 by "acts and failures to act in financing, authorizing and approving public housing units virtually exclusively in areas of minority, low income and assisted housing concentration." Am. Compl. ¶ 259. Section 941.202 consists of HUD's "Site and neighborhood standards." It states that "[p]roposed sites for public housing projects to be newly constructed or rehabilitated must be approved" as meeting the standards set forth therein. Id. Subpart (c) sets forth the conditions under which a site for new construction projects may be located in an area of minority concentration, and subpart (d) the requirement that the site promote greater choice of housing opportunities and avoid undue concentration of assisted persons in areas containing a high proportion of low-income persons.

Whether a private cause of action exists to enforce a regulation turns upon whether a private cause of action exists to enforce its authorizing statute[s]. "Language in a regulation may invoke a private right of action that Congress through statutory text created, but it may not create a right that Congress has not." Sandoval, 532 U.S. at 291. It also depends on whether the regulation "forbids conduct that [the authorizing statute] permits;" if so, that regulation may not be enforced by an implied private right of action. Peters v. Jenney, 327 F.3d 307, 315-19 (4th Cir. 2003) (quoting Sandoval, 532 U.S. at 285).

In Sandoval, the Supreme Court held that regulations that forbid disparate impact practices and were promulgated under section 602 of Title VI, are not enforceable by means of an implied private right of action, because only Congress may authorize a cause of action, and did not do so in section 602. 532 U.S. at 284-86. On the other hand, section 601 of Title VI, which does allow an implied private right of action (at least, against non-federal entities), only prohibits

-41-

actions taken with the purpose of discriminating, not merely with the effect of discriminating. See Peters, 327 F.3d at 315 ("[S]ection 601 prohibits only intentional discrimination, not 'disparate impact' practices.") Because section 601 does not render unlawful the conduct forbidden by HUD's disparate impact regulations, see, e.g., 24 C.F.R. § 1.4, those regulations may not be enforced by an implied private right of action. Peters, 327 F.3d at 315-19 (citing Sandoval, 532 U.S. at 280).

The authorizing statutes for 24 C.F.R. § 941.202 are 42 U.S.C. §§ 1437b, 1437c, 1437g and/or 3535(e).[26] See 24 C.F.R. Part 941. As none of those statutes renders unlawful the conduct that 24 C.F.R. § 941.202 forbids (viz. siting public housing other than as prescribed by these standards), none provides a vehicle through which a private right of action to enforce § 941.202 might be implied.[27]

---

[26] Section 1437b grants the Secretary authority to make loans or commitments to make loans to PHAs for low income housing projects; § 1437c authorizes the Secretary to make annual contributions to PHAs for the development of low income housing projects; § 1437g authorizes the Secretary to provide PHAs with capital and operating funds; and § 3535(d) contains the Secretary's general rulemaking authority.

[27] The same is not true with respect to the portion of the regulation that simply requires compliance with Titles VI and VIII. Subsection (b) of the regulation, 24 C.F.R. § 941.202(b), states "[t]he site and neighborhood must be suitable from the standpoint of facilitating and furthering full compliance with the applicable provisions of Title VI of the Civil Rights Act of 1964, Title VIII of the Civil Rights Act of 1968, E.O. 11063, and HUD regulations issues pursuant thereto." As the Supreme Court stated in Sandoval, in such a posture it is "meaningless to talk about a separate cause of action to enforce the regulations apart from the statute." 532 U.S. at 284.

### III.   PLAINTIFFS' STATUTORY CLAIMS ARE NOT SUSTAINABLE AS A MATTER OF FACT OR LAW

#### A.   Plaintiffs Cannot Demonstrate That HUD Violated Title VIII.

##### 1.   Section 3608(d) & (e)(5):  HUD's Duty Affirmatively to Further Fair Housing

Plaintiffs cannot establish that HUD violated its affirmative duty to work toward the goal of desegregation in public housing projects.  At the outset, it should be noted that very few courts have ever articulated standards for the affirmative duty requirement in § 3608, which requires that HUD "administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of this subchapter."  42 U.S.C. § 3608(d) & (e)(5).

Notably, § 3608 does not impose a duty that is measured against specific results; rather it imposes a duty to take affirmative action.  See McGrath v. HUD, 722 F. Supp. 902, 908 (D. Mass. 1989) ("Title VIII does not mandate specific actions or remedial plans which HUD should undertake.").  Nothing in the text of the statute indicates, let alone suggests, that HUD could be liable for a failure to achieve results – rather, the only basis for HUD's liability would be if it failed to make efforts to affirmatively to further fair housing goals.

HUD cannot be held liable under Section 3608 unless its relationship with the discriminating entity is "close enough to constitute awareness of discriminatory practices." Jaimes v. Lucas Metropolitan Housing Authority, 833 F.2d 1203, 1208 (6th Cir. 1988) ("Jaimes II").  The Fourth Circuit requires a significant level of awareness of discriminatory animus before HUD could be found to have violated section 3608.  Atkins v. Robinson, 733 F.2d 318, 321-23 (4th Cir. 1984), affirming, 545 F. Supp. 852, 868 (E.D. Va. 1982).  See Anderson v. City of Alpharetta, 737 F.2d 1530, 1537 (11th Cir. 1984) (HUD not liable under section 3608(d) even

when it failed to pressure grantee to effect fair housing goals, because HUD only liable when it itself has discriminated, or when it is aware of "grantee's discriminatory practices and has made no effort to force it into compliance with the Act by cutting off existing federal financial assistance to the agency in question") (emphasis added).

The district court decision in Atkins, which the Fourth Circuit affirmed, concluded that HUD was not liable under Title VIII for "acquiescence" in the County's veto of a low income housing proposal, and that HUD has no affirmative duty to override a locality's opposition to a proposed housing project and force it to accept it. 545 F. Supp. at 888, aff'd, 733 F.2d at 321-23. Moreover, the Fourth Circuit rejected a broad reading of § 3608 in Jersey Heights, 174 F.3d at 193-194.

That HUD has met its obligation under section 3608 should be clear. The trial record in this case will be replete with efforts that HUD has made to administer its programs in a manner that promotes fair housing. Nationally, HUD has established standards for site selection which promote broader housing choice for low-income persons; HUD's model tenant selection and assignment policies are race-neutral, but still provide prospective public housing tenants with some choice as to where they live. In Baltimore, HUD has conducted compliance reviews to secure HABC's compliance with civil rights laws (e.g., Title VI and Section 504); HUD has provided technical assistance to improve the performance of HABC's programs (e.g., HABC's Section 8 office) and to underscore the importance of fair housing (e.g., Baltimore City's AI); HUD has reviewed HABC's program operations for compliance with innumerable legal and regulatory provisions (e.g., Title VI, Section 504, Title VII, Title VII, Section 3). Admittedly, some of these efforts have been more successful than others, but, at bottom, through these efforts,

-44-

HUD has met its affirmative duty under § 3608.  Moreover, these examples make clear that HUD

has not sat idly by and tolerated unfair housing practices in Baltimore (certainly, since the

passage of Title VIII in 1968).  In short, due to its vigilance and affirmative actions, HUD has

satisfied its § 3608 duties and cannot be held liable on that ground.

### 2. Section 3604(a) & (b): unlawful discrimination in the sale or rental of housing.

Plaintiffs continue to reach in trying to recover under § 3604(a) & (b).  Those subsections

make it unlawful:

(a)     To refuse to sell or rent after the making of a bona fide offer, or to refuse
        to negotiate for the sale or rental of, or otherwise make unavailable or
        deny, a dwelling to any person because of race, color, religion, sex,
        familial status, or national origin.

(b)     To discriminate against any person in the terms, conditions, or privileges
        of sale or rental of a dwelling, or in the provision of services or facilities in
        connection therewith, because of race, color, religion, sex, familial status,
        or national origin.

42 U.S.C. § 3604.  Although plaintiffs fail to provide any basis in governing law to show that

either of these subsections create private rights of action against HUD, the defects in plaintiffs'

proof is even more serious.

Plaintiffs themselves cannot argue that based on race they were categorically denied

access to certain public housing units by HUD.  Rather, plaintiffs couch even their own language

and claim that the ancient siting decisions, the effects of the scattered site and Section 8 voucher

programs, and locational preferences made the formerly white projects "less available to

plaintiffs."  Pls.' Br. at 46.  But by premising their claims under this subsection on the siting

decisions and locational preferences of yesteryear, plaintiffs at most make a claim against HABC,

-45-

and not HUD, because the siting decisions and locational preferences were HABC's doing. Another blow to plaintiffs' attempts to recover based on the no-longer existing locational preferences is the fact that plaintiffs seek only injunctive relief and since the locational preferences ceased to exist over a decade ago, there is no current wrong that serves as the basis for the injunction plaintiffs seek. See Los Angeles v. Lyons, 461 U.S. 95 (1983) (past injury does not give plaintiff standing to obtain injunctive relief for potential future violation).

Plaintiffs' claims under § 3604(b) similarly fail. Beyond the no longer existing locational preferences, plaintiffs fail to identify the terms, conditions, or privileges through which they have been discriminated against based on their race. Neither the Section 8 voucher program nor the siting decisions contain "terms, conditions, or privileges" that are facially discriminatory.

Rather than argue their § 3604(a) & (b) claims straight up, plaintiffs attempt to employ the four-part balancing test of Metropolitan Housing Development Corp. v. Village of Arlington Heights, 558 F.2d 1283, 1290 (7th Cir. 1977) ("Arlington Heights II") to determine whether a violation has occurred, namely,

(1)     how strong is the plaintiff's showing of discriminatory effect;

(2)     is there some evidence of discriminatory intent, though not enough to satisfy the constitutional standard of Washington v. Davis;

(3)     what is the government's interest in taking the action complained of; and

(4)     does the plaintiff seek to compel the government to affirmatively provide housing for members of minority groups or merely to restrain the government from interfering with individual property owners who wish to provide such housing.

Clarkton, 682 F.2d at 1065.

To recover, under these four factors, a plaintiff bears the burden of proving that a facially

-46-

neutral policy has a disparate racial impact.  Plaintiffs cannot do so here.

With respect to the first factor, plaintiffs exaggerate the racial impact of HUD's current programs.  Plaintiffs argue that the scattered site program and the Section 8 voucher program resulted in high minority concentrations in neighborhoods.  In making these assertions, plaintiffs ignore the fact that Baltimore is a majority-minority city already.  Plaintiffs also ignore the fact that the Section 8 vouchers are portable and can be used anywhere they wish to use them.  HUD cannot be held liable based on the self-segregation of Section 8 voucher holders.  Nor can HUD be liable because Baltimore is a majority-minority city with already existing concentrations of African-Americans.

Likewise, plaintiffs are hard-pressed to find any evidence that any of HUD's current practices reflect a discriminatory intent.  Plaintiffs fail to identify any specific intentionally discriminatory actions taken by HUD at any point in time.  Rather, plaintiffs wish this Court to infer that because HABC engaged in many years of racial discrimination, HUD must have similarly intended to discriminate based on race.  First, this is circumstantial evidence of the highest degree.  And, second, it turns a blind eye to the myriad of efforts that HUD made, both nationally and in Baltimore, to promote fair housing.  Without any direct evidence of discriminatory intent, plaintiffs fare poorly under this factor.  As explained by the Arlington Heights II court, "it is evident that the equitable argument for relief is stronger when there is some direct evidence that the defendant purposefully discriminated against members of minority groups because that evidence supports the inference that the defendant is a wrongdoer.  Thus, the absence of any such evidence in this case is a factor buttressing [the defendant's] contention that relief should be denied."  558 F.2d at 1292.

-47-

In arguing the third factor, plaintiffs ignore the fact that in addressing public housing concerns in Baltimore, HUD was following its statutory and regulatory directives. Under the third Arlington Heights II factor, "if the defendant is a governmental body acting within the ambit of legitimately derived authority, we will less readily find that its action violates the Fair Housing Act." 558 F.2d at 1293. In Arlington Heights II, the plaintiffs' case against the Village weakened because the Village was acting within the scope of the authority under Illinois law; moreover, municipalities are traditionally afforded wide discretion in zoning. Similarly here, plaintiffs make no ground under the third factor because HUD was acting within the valid scope of its authority.

Under the fourth Arlington Heights II factor, the courts are more willing to grant relief when the plaintiff seeks the removal of obstacles to the building of integrated housing than when the plaintiff asks the court to compel the government to take affirmative steps such as appropriating money to build integrated housing. 558 F.2d at 1293. "[T]he courts are far more willing to prohibit even nonintentional action by the state which interferes with an individual's plan to use his own land to provide integrated housing," id., than to require a defendant to appropriate money, utilize his land for a particular purpose, or take other affirmative steps toward integrated housing.

Because this factor clearly favors the federal defendants in this case, plaintiff attempt to distort it, claiming only that "the relief sought must be specific and limited." Pls.' Br. at 48-49. Moreover, plaintiffs' case citations are pulled out of context. In Clarkton, the reason this factor favored the plaintiff was that plaintiff "sought only to restore the status quo regarding the consideration of public housing in Clarkton, and did not seek injunctive relief which would

-48-

require Clarkton to build public housing from its own treasury." 682 F.2d at 1065.  In <u>Arlington</u> <u>Heights II</u>, it favored the plaintiffs because they owned the land on which the disputed project would be built and did not seek any affirmative help from the Village in aid of the project's construction; rather, they sought to enjoin the Village from interfering with their plans to dedicate their land to furthering the congressionally sanctioned goal of integrated housing.  558 F.2d at 1293.  In <u>Keith v. Volpe</u>, 618 F. Supp. 1132 (C.D. Calif. 1985), it favored the plaintiffs because the plaintiffs did not seek to compel the government affirmatively to provide housing for members of minority groups, but merely to enjoin it from interfering with private property developers who wish to provide such housing.

It is even more difficult for plaintiffs to meet their burden under this factor because this factor considers the nature of the remedy requested as a necessary part of determining liability. <u>Clarkton</u>, 682 F.2d at 1065.  Therefore, the Court would not be able to find liability against HUD in this respect until after the remedial phase of this proceeding (if such a phase is deemed necessary), even if plaintiffs made their case in all other regards.

**B.      HUD Cannot Be Held Liable in this Case Under the APA**

While the plaintiffs may press their APA claims against HUD, those claims also fail as a matter of law because plaintiffs have alternative remedies which are, as a matter of law, adequate within the terms of the APA.  Congress has set forth specific remedies for plaintiffs' claims and, as plaintiffs can and have brought suit against the local defendants in accordance with the relief scheme provided by Congress, plaintiffs' remedies against the non-federal defendants must be found to be adequate.  See <u>American Disabled for Attendant Progs. Today (ADAPT) v. HUD</u>, 170 F.3d 381, 390 (3d Cir. 1999); <u>Women's Equity Action League (WEAL) v. Cavazos</u>, 906

F.2d 742, 751 (D.C. Cir. 1990).  To find otherwise would simply allow an end-run around the limitations Congress imposed on the APA's waiver of sovereign immunity – a result the doctrine of the separation of powers does not permit.

Moreover, plaintiffs essentially claim that HUD failed to do an adequate job of supervising HABC's operations.  This is a challenge to HUD's enforcement discretion; how and when to take enforcement action against PHAs is a matter committed to HUD's discretion by law and thus is unreviewable by a court.  See Heckler v. Chaney, 470 U.S. 821, 831 (1985).  Executive agencies are far better equipped than the judiciary to deal with the many factors involved in the proper ordering of agency policies, priorities, and resources.  Accordingly, plaintiffs' claims against the federal defendants, which allege that HUD has failed to take necessary enforcement actions to disestablish alleged de jure segregation, cannot be reviewed by the Court.

**C.     Plaintiffs Cannot Make Out A Claim
Against HUD With Regard to Demolition**

Plaintiffs next allege that HUD violated § 1437p of the Housing Act, 42 U.S.C. § 1437p, and 24 C.F.R. § 970 "by allowing, ratifying or approving demolition of public housing and displacement of residents that do not comply with the requirements of [those provisions]."  Am. Compl. ¶ 259.  Section 1437p requires that the Secretary of HUD "shall approve" an application by a PHA to demolish or dispose of all or part of a public housing project if the PHA provides the listed certifications, 42 U.S.C. §1437p(a).  The Secretary "shall disapprove" such an application if he determines that "(1) any certification . . . is clearly inconsistent with information and data available to the Secretary or information or data requested by the Secretary; or (2) the

application was not developed in consultation with [affected residents and resident boards, and appropriate government officials.]" Id. at § 1437p(b).[28]

But PHAs are explicitly allowed to move people out of their housing "for the purpose of improving living conditions" or "providing more efficient services." Id. at § 1437p(e).  In enacting this substitution, Congress expressly found that "the interests of low-income persons, and the public interest, will best be served by a reformed public housing program that . . . streamlines program requirements," Pub. L. No. 105-276, 112 Stat. 2461 (Oct. 21, 1998), § 502(a)(5)(B), and by "deregulating and decontrolling public housing agencies, thereby enabling them to perform as property and asset managers." Id. at § 502(b)(1).

At the same time, Congress eliminated the "one for one replacement" obligation under which the public housing program had previously operated. See id. § 531.  In rescinding this requirement, Congress explained:

> The one-for one replacement requirement has been one of the major impediments to eliminating the most distressed public housing and revitalizing public housing communities.  Because there typically have been no funds to fulfill the requirement, as well as an insufficient number of suitable sites for replacement housing, the one-for-one replacement requirement has simply prevented the demolition of obsolete and dangerous projects.

Senate. Rpt. No. 21, 105th Cong., 1st Sess. at 25 (May 23, 1997).

To the extent to which a HOPE VI grant recipient is required to replace demolished units, the provision of Section 8 vouchers to displaced residents would be adequate to fulfill such a

---

[28]  At the time of plaintiffs' original complaint, such a duty might have been inferred from then-§ 1437p(d), which read, "[a] public housing agency shall not take any action to demolish or dispose of a public housing project or a portion of a public housing project without obtaining the approval of the Secretary and satisfying the conditions specified in subsections (a) and (b) of this section."  However, that section was repealed in 1998.

duty. Darst-Webbe Tenant Assn. Bd. v. St. Louis Housing Auth., 339 F.3d 702, 714-15 (8th Cir.

2003). But, in fact, given the 1998 amendments to 42 U.S.C. § 1437v, no such replacement

obligation exists. See id. In fact, such an obligation would be contrary to congressional intent in

this regard. Id.

The facts that will be shown at trial relating to plaintiffs' demolition claim will show that

when HABC has sought HUD's approval to demolish a public housing development, it has

submitted the necessary materials. HABC has demolished public housing developments which

are no longer viable; indeed, many of these demolitions have occurred under the auspices of the

Partial Consent Decree.

### D.   Plaintiffs Fail To State A Claim Against HUD Under Title VI Or Its Implementing Regulations

#### 1.   Title VI Itself Provides No Basis For a Finding of Liability Against HUD

Section 601 of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, provides:

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

Enforcement of section 601 by federal agencies is covered by section 602, 42 U.S.C. § 2000d-1,

which directs each federal agency to effectuate the provisions of section 601 through the issuance

of rules and regulations consistent with the objectives of that section.[29]

---

[29] Compliance is effectuated under section 602 "by the termination of or refusal to grant or to continue assistance under such program or activity to any recipient as to whom there has been an express finding . . . of a failure to comply with [the] requirement [of non-discrimination]," or any other means provided by law. 42 U.S.C. § 2000d-1. Further, section 602 sets forth the procedure for funding termination. Courts have stated that the purpose of the administrative framework is to provide a forum in which to initiate fund termination

In its August 30, 2001 Memorandum and Order, this Court found an implied private right of action against HUD under Section 601 of Title VI. Aug. 30, 2001 Mem. and Order at 19. In Jersey Heights, 174 F.3d 180, the Fourth Circuit stated that there is no private right of action against federal funding agencies under section 602. Id. at 191.[30]

The Fourth Circuit recently stated that it is

clear that § 601 prohibits only intentional discrimination, not "disparate impact" practices. . . . [and] proscribe[s] only those racial classifications that would violate the Equal Protection Clause or the Fifth Amendment . . .

Peters, 327 F.3d at 315 (citations omitted). This standard is in contrast to that applicable under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, which prohibits employment practices that have a disparate impact on members of a particular racial group. Peters, 327 F.3d at 321 n.17.

It is not sufficient for plaintiffs to show they were harmed because a housing program disproportionately excluded them from participation. "This disparity, without any evidence of actual discriminatory intent and in the face of significant other housing assistance, is not enough to establish intentional discrimination in housing." LUCHA, 799 F.2d at 788-89. Title VI plaintiffs must show direct discrimination. Id. Plaintiffs will not be able to meet this standard, particularly given the huge efforts that HUD makes to provide significant housing assistance on a

_____

proceedings in the event a grant recipient fails to meet its obligations. See, e.g., Young v. Pierce, 544 F. Supp. 1010, 1015 (E.D. Tex. 1982).

[30]  In n. 18 of their brief, plaintiffs state that Section 602 is enforceable pursuant to the APA and § 1983, citing Justice Stevens' dissent in Sandoval, 532 U.S. at 383 n.3, 299-300. However, that dissent refers only to actions against state actors under § 1983, and not to the APA at all. Similarly, Bryant v. New Jersey Dept of Transp., 998 F. Supp. 438 (D.N.J. 1998) says nothing about the APA; it addressed only whether the plaintiffs fell within the zone of interests of Title VI for standing purposes.

fair and equitable basis for the benefit of the plaintiff class members.

As plaintiffs point out, courts have commonly used the Title VII discrimination proof scheme to evaluate claims for intentional discrimination under Title VI. See, e.g., Escobar v. Montgomery County Bd. of Educ., 2001 WL 98600, at *5 (D. Md. Feb. 1, 2001). While this practice would seem no longer to comport with the law in this Circuit, given the higher level of intent needed to be shown to demonstrate a Title VI violation under Peters, 327 F.3d at 315, plaintiffs cannot prevail even if the Title VII analytical framework did apply. That framework

> first requires that the plaintiff establish a prima facie case of discrimination by a preponderance of the evidence. . . . To establish a prima facie case of discrimination under Title VII, [plaintiff] must show (1) that she is a member of a protected class; (2) that she suffered an adverse employment action; (3) that at the time of the adverse employment action she was performing at a level that met her employer's legitimate job expectations; and (4) that the position remained open to or was filled by similarly qualified applicants outside the protected class. Once the prima facie case is established, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. . . . If the employer meets its burden of production, the presumption of discrimination raised by the prima facie case is rebutted and "drops from the case," . . . and the plaintiff bears the ultimate burden of proving that she has been the victim of discrimination . . . .

Brinkley v. Harbour Recreation Club, 180 F.3d 598, 607 (4th Cir. 1999). Here, plaintiffs would at least have to show that they were actually denied public housing to which they were entitled, that others who were not members of their racial group received. And plaintiffs will not be able to show that HUD's actions denied them such housing. But even that would not be enough for plaintiffs to win. Because HUD will be able to establish legitimate reasons for the various decisions it has made that are subject to review in this case, judgment will have to be entered, ultimately, in favor of the federal government.

-54-

### 2.    Nor Can Plaintiffs Establish HUD's
### Liability Under Title VI Regulations

Notwithstanding the unequivocal holding of <u>Sandoval</u> that there is no private right of

action to enforce Title VI disparate impact regulations, expressly brought to the plaintiffs'

attention in note 8 of this Court's August 30, 2001 Memorandum and Order, and the Court's

admonition to plaintiffs regarding it, the amended complaint includes claims under Title VI

disparate impact regulations.  For example, Am. Compl. ¶ 256 alleges claims under 24 C.F.R. §

1.4(b)(3), which prohibits a PHA from choosing sites "with the purpose or effect" of

discriminating on the basis of race.  Such claims clearly do not survive <u>Sandoval</u>.

In a similar vein, plaintiffs allege claims under 24 C.F.R. § 1.4(b)(2)(ii), <u>see</u> Am. Compl.

¶ 256, which precludes a recipient that operates low income housing from assigning eligible

applicants to dwelling units without a "plan" that satisfies the listed requirements.  Title VI does

not, however, prohibit tenant assignment without such a plan.  As Title VI does not render

unlawful the conduct that § 1.4(b)(2)(ii) forbids, that regulation may not be enforced by an

implied private right of action.  <u>See</u> <u>Peters</u>, 327 F.3d at 315-19.

Plaintiffs also allege claims under 24 C.F.R. § 1.4(b)(6)(i), <u>see</u> Am. Compl. ¶ 256, which

requires a recipient to take affirmative action to overcome the effects of prior discrimination.  As

Title VI has no concomitant requirement, it does not render unlawful the conduct that

§1.4(b)(6)(i) forbids; consequently, that regulation may not be enforced by an implied private

right of action.  <u>Peters</u>, 327 F.3d at 315-19.

Plaintiffs allege claims under 24 C.F.R. § 1.4(b)(1), <u>see</u> Am. Compl. ¶ 256, which

prohibits a recipient from specified actions on the ground of race, color, or national origin

"directly or through contractual or other arrangements." To the extent that it prohibits actions

that do not constitute intentional discrimination, it prohibits conduct that Section 601 allows and,

as such, cannot be the basis of a private action after <u>Sandoval</u>. <u>See</u> <u>Peters</u>, 327 F.3d at 315-39.

### E.    Plaintiffs Have No Claim With Regard to HUD's Acceptance of HABC's Certifications

Plaintiffs allege that HUD violated Sections 1437c-1(d)(15) and 1437v of the U.S.

Housing Act "by failing to require that local defendants affirmatively further fair housing as

required [by those sections]." Am. Compl. ¶ 259. Section 1437c-1(d)(15) states that

> (d) An annual public housing agency plan under subsection (b)[31] for a public housing agency shall contain the following information relating to the upcoming fiscal year for which the assistance under this chapter is to be made available:
>
> *   *   *
>
> (15) Civil rights certification. A certification by the public housing agency that the public housing agency will carry out the public housing agency plan in conformity with title VI of the Civil Rights Act of 1964, the Fair Housing Act, section 504 of the Rehabilitation Act of 1973, and title II of the Americans with Disabilities Act of 1990, and will affirmatively further fair housing.

Plaintiffs do not allege that HABC failed to submit the requisite plan, or that its plan failed to

include a civil rights certification. That is <u>all</u> § 1437c-1(d)(15) requires. It does not charge HUD

with "requir[ing] that local defendants affirmatively further fair housing," as plaintiffs contend in

¶ 259 of their Amended Complaint.

By the same token, none of the 14 subsections, 21 sub-subsections, and 26 sub-sub-

subsections found in § 1437v references an obligation to affirmatively further fair housing, much

---

[31] Subsection (b) requires each public housing agency to "submit to the Secretary an annual public housing agency plan under this subsection for each fiscal year for which the public housing agency receives assistance under section 1437f(o) or 1437g of this title."

less charges HUD with the task of ensuring that HABC fulfill that obligation. Accordingly, plaintiffs fail to state a claim on which relief can be granted under 42 U.S.C. § 1437v.

Am. Compl. ¶ 260 alleges that the federal defendants violated the certification requirements of the Housing and Community Development Act of 1974 ("HCDA"), 42 U.S.C. § 5304(b)(2), and regulations promulgated thereunder at 24 C.F.R. §§ 91.225(a)(1) and 570.303, by "failing to administer the CDBG program in a manner affirmatively to further fair housing opportunities in the City of Baltimore." 42 U.S.C. § 5304(b)(2) states:

> Any grant under section 5306 of this title shall be made only if the grantee certifies to the satisfaction of the Secretary [that] the grant will be conducted and administered in conformity with the Civil Rights Act of 1964 [42 U.S.C..A. § 2000a et seq.] and the Fair Housing Act [42 U.S.C.A. § 3601 et seq.], and the grantee will affirmatively further fair housing.

(emphasis added). 24 C.F.R. § 91.225(a)(1) states:

> Each jurisdiction is required to submit a certification that it will affirmatively further fair housing, which means that it will conduct an analysis to identify impediments to fair housing choice within the jurisdiction, take appropriate actions to overcome the effects of any impediments identified through that analysis, and maintain records reflecting the analysis and actions in this regard.

(emphasis added). And 24 C.F.R. §570.303 states: "The jurisdiction must make the certifications that are set forth in 24 CFR part 91 as part of the consolidated plan." Because it is indisputable that the local defendants in fact made the requisite certifications, which is all these provisions require, these allegations of the amended complaint fail to state claims upon which relief can be granted.

## F.   Nor Can HUD Be Held Liable Under the HCDA

The HCDA was passed not to combat discrimination but in response to Congress' concern for the "critical social, economic and environmental" conditions existing in the nation's

cities, 42 U.S.C. § 5301(a), with the goal of "develop[ing] viable urban communities," 42 U.S.C.

§ 5301(c).  As the First Circuit explained, "[t]here is no suggestion that the minority community

stands in a special position with respect to this goal." LUCHA, 799 F.2d at 794.  And the

certification requirement merely "reflects generally the requirement that federal fund recipients

not discriminate." Id. See also cases cited in Fed. Def. Mem. In Supp. of Jmt on the Pldgs. at 20.

In a similar vein, neither the legislative history nor the statutory enforcement scheme as a whole

contains the slightest indication that Congress intended the certification requirement "to create a

mini-Civil Rights law, with its own private right of action, within the HCDA." LUCHA, 799

F.2d at 794.[32]  Indeed, the certification requirement was added to the statute six years after its

enactment as part of a "procedural simplification rather than substantive change."  Sen. Rpt. No.

97-139 (June 17, 1981), reprinted in 1981 U.S.C.C.A.N. 396, 523.  Therefore, plaintiffs have no

legal basis to establish liability with regard to this statute.

 In any event, as mentioned above, HUD has not done anything it should not have done, or

failed to do anything it is required to do, in connection with HABC's certifications.  HUD has

consistently made sure that HABC has made the certifications with regard to fair housing that it

must make, and has taken action to assist the Housing Authority to overcome the obstacles that it

faces in meeting its fair housing goals, which is more than the statute requires.

---

[32] Indeed, the Act specifically provides for enforcement of its nondiscrimination provisions not by private actions against HUD but by the Secretary of Housing and Urban Development, who may work through the state governor, refer the matter to the Attorney General for civil action, or take other action including the termination or reduction of funding. See 42 U.S.C. § 5309(b).  Moreover, a damage remedy would be inconsistent with the purpose of the program in that it would divert program resources from the purpose of the Act, which is to rebuild and rehabilitate decaying urban areas. Even the cost of defending a lawsuit might easily exceed the amount of a typical rehabilitation loan.

**IV.  MANY OF PLAINTIFFS' CLAIMS HAVE ALREADY BEEN RESOLVED AND ARE THEREFORE BARRED UNDER THE DOCTRINE OF RES JUDICATA**

A court's approval of a settlement agreement resolving litigation precludes a party from relitigating the settled claims. Matsushita Elec. Indus. Co., Ltd. v. Epstein, 516 U.S. 367 (1996). In this case, this Court approved a partial settlement of this case. Nonetheless, plaintiffs are attempting to establish HUD's liability for the claims that they settled. They cannot do this because the law of res judicata, as explained in Matsushita, says they cannot. Their attempt to relitigate the settled part of this case must be rejected.

## CONCLUSION

Plaintiffs have no claim against HUD.  The Court should rule in favor of the federal defendants.

Dated:  November 17, 2003

Respectfully submitted,

THOMAS M. DiBIAGIO
United States Attorney

JENNIFER HUESMAN
Assistant United States Attorney

MICHAEL SITCOV
JUDRY L. SUBAR
DIANE KELLEHER
ALISON N. BARKOFF
PETER J. PHIPPS
U.S. Department of Justice
20 Massachusetts Ave., N.W., Rm. 7138
Washington, D.C. 20530
(202) 514-3969

*Attorneys for Federal Defendants*

-60-