## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

CARMEN THOMPSON, *et al.*,

                    Plaintiffs,

       v.

UNITED STATES DEPARTMENT OF
HOUSING AND URBAN
DEVELOPMENT, *et al.*,

                  Defendants.

Civil Action No. MJG-95-309

### PLAINTIFFS' PRE-TRIAL MEMORANDUM

Peter Buscemi
E. Andrew Southerling
Edward S. Keefe
David M. Kerr
Harvey Bartle, IV
Jason G. Benion
Jennifer A. Bowen
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
202-739-3000

Theodore M. Shaw, Director-Counsel
Robert H. Stroup
Melissa S. Woods
Matthew Colangelo
Melanca D. Clark
NAACP LEGAL DEFENSE &
  EDUCATIONAL FUND, INC.
99 Hudson St., 16th Floor
New York, NY 10013
212-965-2200

Barbara Samuels, Bar No. 08681
ACLU FOUNDATION OF MARYLAND
3600 Clipper Mill Road, Suite 350
Baltimore, MD 21211
410-889-8555

Andrew D. Freeman, Bar No. 03867
BROWN, GOLDSTEIN & LEVY, LLP
120 E. Baltimore Street, Suite 1700
Baltimore, MD 21202
410-962-1030

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

OVERVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.  Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  Overview of HUD Decision-Making . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

I.  Federal Defendants are Under an Affirmative Constitutional Duty to Disestablish
    the Vestiges of Prior Intentional Segregation . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    A.  This Court Should Reach Plaintiffs' Constitutional Claim . . . . . . . . . . . . . . . . 8

    B.  HUD Is Constitutionally Obligated to Disestablish Prior Intentional
        Segregation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        1.  HUD Has a Constitutional Duty to Dismantle Segregation in the
            Baltimore Region . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        2.  The Present Segregation of African-American Public Housing
            Residents is Not Merely a Racial Imbalance Caused by Neutral
            Demographic Factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

II.  HUD Has Failed to Meet Its Constitutional Duty to Dismantle Segregation . . . . . . . . 19

    A.  HUD's Development of Public and Assisted Housing During the
        Open Period Has Perpetuated Segregation . . . . . . . . . . . . . . . . . . . . . . . . . 19

        1.  HUD's Actions with Regard to Family Public Housing and
            Project-Based Section 8 Units Perpetuated Segregation . . . . . . . . . . . . 19

        2.  HUD's Administration of the Section 8 Voucher Program has
            Perpetuated Segregation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

            a.  HUD's Management of Section 8 Voucher Portability is an
                Obstacle to Desegregation . . . . . . . . . . . . . . . . . . . . . . . . . 25

            b.  HUD's Failure to Provide for Mobility Counseling Has
                Impeded Desegregation . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

            c.  HUD Has Failed to Use Its Authority to Address Obstacles to
                Desegregative Voucher Use Created by the Tight Housing
                Market in the Baltimore Region . . . . . . . . . . . . . . . . . . . . . 28

        d.     HUD's Processes Fail to Ensure that the Section 8 Program Actually Results in Desegregation . . . . . . . . . . . . . . . . . . . . . . . . 30

B.    HUD Has Failed to Use the Significant Authority it Wields Through its Grant Programs to Achieve or Even Pursue Desegregation . . . . . . . . . . . . . . . 31

    1.    HUD's Review of CDBG Fair Housing Requirements is Minimal and Non-Substantive . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

    2.    Although Unconstrained from Doing So, HUD Has Decided Not to Use its Leverage under its CDBG Grant-Making Authority to Facilitate Regional Desegregation in Baltimore . . . . . . . . . . . . . . . . . . 35

C.    HUD Has Failed to Undertake Coordinated Efforts to Promote Regional Desegregation Across its Program Offices . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

III.    This Court Properly Held that HUD Violated Its Statutory Obligation to Further Fair Housing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

A.    HUD Has a Statutory Duty to Take Actions that Affirmatively Further Fair Housing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

B.    HUD's Actions and Failures to Act During the Open Period Fall Far Short of its Statutory Obligation to Further Fair Housing . . . . . . . . . . . . . . . . . 42

IV.    Remedy for Constitutional and Statutory Violations . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

A.    Having Found Unlawful Activity, the Court Has Broad Remedial Power to Undo the Legacy of HUD's Statutory and Constitutional Violations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

B.    Plaintiffs' Proposed Remedy Requires HUD to Fulfill its Statutory and Constitutional Duties While Remaining Within the Bounds of HUD's Authority and Preserving HUD's Discretion . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

    1.    This Court Can and Should Order HUD to Create an Affordable Housing Desegregation Plan for the Baltimore Region . . . . . . . . . . . . . 47

    2.    This Court Can and Should Order HUD to Consider Regional Desegregation in Evaluating Applications for Federal Funding . . . . . . . 49

    3.    This Court Can and Should Order that HUD Create Measurable Desegregative Housing Opportunities . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

    4.    This Court Can and Should Require HUD to Manage its Voucher Program in a Way That Achieves Desegregation . . . . . . . . . . . . . . . . . . 55

5.    This Court Can and Should Order That HUD Make Provision for
Community Input into HUD's Consideration of Regional
Approaches to Fair Housing  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

# TABLE OF AUTHORITIES

## CASES

*Alabama Center for the Environment v. Browner*, 20 F.3d 981 (9th Cir. 1994) . . . . . . . . . . . . . 46

*Banks v. Perk*, 341 F. Supp. 1175 (N.D. Ohio 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Banks v. Perk*, 473 F.2d 910 (6th Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Brown v. Board of Education of Topeka*, 349 U.S. 294 (1955) . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Clients' Council v. Pierce*, 711 F.2d 1406 (8th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Columbus Board of Education v. Penick*, 443 U.S. 449 (1978) . . . . . . . . . . . . . . . . . . . . 9, 10, 18

*Darst-Webbe Tenant Association Board v. St. Louis Housing Authority*,
    339 F.3d 702 (8th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Davis v. School Commissioners of Mobile County*, 402 U.S. 33 (1971) . . . . . . . . . . . . . . . . . . 45

*Dayton Board of Education v. Brinkman*, 443 U.S. 526 (1979) . . . . . . . . . . . . . . . . 12, 23, 24, 31

*Dean v. Martinez*, 336 F. Supp. 2d 477 (D. Md. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Ford Motor Co. v. NLRB*, 305 U.S. 364 (1939) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Freeman v. Pitts*, 503 U.S. 467 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Green v. County School Board of New Kent County*, 391 U.S. 430 (1968) . . . . . . . . . . . . . 10, 11

*Hills v. Gautreaux*, 425 U.S. 284 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 17, 45

*Holton v. City of Thomasville Sch. District*,
    425 F.3d 1325 (11th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Housing Opportunities Made Equal, Inc. v. Cincinnati Enquirer, Inc.*,
    943 F.2d 644 (6th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Jaimes v. Toledo Metropolitan Housing Authority*,
    715 F. Supp. 835 (N.D. Ohio 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*NAACP, Jacksonville Branch v. Duval County School*,
    273 F.3d 960 (11th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*NAACP v. HUD*, 817 F.2d 149 (1st Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*NAACP v. Kemp*, 721 F. Supp. 361 (D. Mass. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46, 50

*NAACP v. Harris*, 567 F. Supp. 637 (D. Mass. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*North Carolina State Board of Education v. Swann*, 402 U.S. 43 (1971) . . . . . . . . . . . . . . 9, 45

*Otero v. New York City Housing Authority*, 484 F.2d 1122 (2d Cir. 1973) . . . . . . . . . . . . . . 40

*Project B.A.S.I.C. v. Kemp*, 776 F. Supp. 637 (D.R.I. 1991) . . . . . . . . . . . . . . . . . . . . . . . . 41

*Public Citizen Health Research Group v. Brock*,
    823 F.2d 626 (D.C. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Resident Advisory Board v. Rizzo*, 425 F. Supp. 987 (E.D. Pa. 1976) . . . . . . . . . . . . . . . . 43, 45

*Santillan v. Gonzales*, 388 F. Supp. 2d 1065 (N.D. Cal. 2005) . . . . . . . . . . . . . . . . . . . . . . . 46

*School Board of City of Richmond v. Baliles*, 829 F.2d 1308 (4th Cir. 1987) . . . . . . . . . . . 10, 14

*Shannon v. HUD*, 436 F.2d 809 (3d Cir. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 47

*Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1 (1971) . . . . . . . . . . . . . 10, 45

*Tcherepnin v. Knight*, 389 U.S. 332 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Thompson v. HUD*, 348 F. Supp. 2d 398 (D. Md. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Thompson v. HUD*, No. 95-309, Mem. & Order Denying Fed. Defs.'
    Mot. Summ. J. (D. Md. Jan. 10, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Trafficante v. Metropolitan Life Insurance Co.*, 409 U.S. 205 (1972) . . . . . . . . . . . . . . . . 39, 41

*United States v. Fordice*, 505 U.S. 717 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11, 18

*United States v. Yonkers Board of Education*,
    624 F. Supp. 1276 (S.D.N.Y. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Walker v. City of Mesquite*, 169 F.3d 973 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Walker v. HUD*, No. 3:85-CV-1210-R
    (N.D. Tex. Apr. 16, 1996) (Remedial Order Affecting HUD) . . . . . . . . . . . . . . . . . 48, 58

*Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*Young v. Cisneros*, No. P-80-8-CA
    (E.D. Tex. Mar. 30, 1995) (Final Judgment and Decree) . . . . . . . . . . . . . . . . . . 48, 56, 57

*Young v. Pierce*, 628 F. Supp. 1037 (E.D. Tex. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 43

*Young v. Pierce*, 685 F. Supp. 986 (E.D. Tex. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50, 58

## FEDERAL STATUTES

5 U.S.C. § 706(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

42 U.S.C. § 1437a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

42 U.S.C. § 1437c-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50, 51

42 U.S.C. § 1437d . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

42 U.S.C. § 1437f . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 56

42 U.S.C. § 1437p . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

42 U.S.C. § 3601 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

42 U.S.C. § 3608(e)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

42 U.S.C. § 5301 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 54

42 U.S.C. § 5304 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 50

42 U.S.C. § 5311 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

42 U.S.C. § 12702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51, 54

42 U.S.C. § 12705 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50, 51

## REGULATIONS

60 Fed. Reg. 42,222 (Aug. 15, 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

61 Fed. Reg. 63,930 (Dec. 2, 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

63 Fed. Reg. 46,104 (Aug. 28, 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

63 Fed. Reg. 48,548 (Sept. 10, 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31

63 Fed. Reg. 57,882 (Sept. 25, 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

64 Fed. Reg. 26,631(May 14, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

65 Fed. Reg. 58,870 (Oct. 2, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

70 Fed. Reg. 57,653 (Oct. 3, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

24 C.F.R. § 91.2(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

24 C.F.R. § 91.5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 34

24 C.F.R. § 91.15(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

24 C.F.R. § 91.225(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 49

24 C.F.R. § 91.500(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 51

24 C.F.R. § 570.913 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

24 C.F.R. § 903.2(d)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

24 C.F.R. § 903.7(o) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

24 C.F.R. § 941.202 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51, 54

24 C.F.R. § 982.207(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

24 C.F.R. § 982.503(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30, 58

24 C.F.R. § 985.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

## MISCELLANEOUS AND OTHER AUTHORITIES

114 Cong. Rec. 3422 (1968) (Statement of Sen. Mondale) . . . . . . . . . . . . . . . . . . . . . . . . . 39

114 Cong. Rec. 9563 (1968) (Statement of Rep. Celler) . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

**OVERVIEW**

**I.     Introduction**

Plaintiffs filed the instant lawsuit in 1995 to challenge the pervasive segregation of African-American public housing families in the poorest and most racially isolated neighborhoods of Baltimore City.  This segregation has proceeded unabated from the construction of the first intentionally segregated public housing projects in Baltimore in 1940.  In 2005, this Court held that HUD's failure to use its significant authority to address the present-day consequences of its past discrimination had perpetuated the segregation of Baltimore's African-American public housing families, and thereby violated the Fair Housing Act's requirement that HUD "affirmatively further fair housing."  In the present phase of this litigation, it remains to be determined whether HUD's unlawful conduct has also violated the Fifth Amendment's equal protection guarantee, which imposes upon HUD an affirmative constitutional obligation to dismantle the vestiges of prior intentional discrimination.  Based on the scope of the statutory and constitutional violations, this Court should order such relief as will correct for HUD's six-plus decades of unlawful conduct in the Baltimore Region.

Plaintiffs present to this Court a Proposed Remedial Order (filed concurrently with this Memorandum), and explain below how the remedies in the Proposed Order are tailored to the scope of HUD's constitutional and statutory violations, are necessary to rectify HUD's unlawful conduct, are well within this Court's remedial authority, and are duly deferential to HUD's administrative discretion.  The remedy should include changes to HUD's procedures for pursuing its fair housing and desegregation obligations, so as to ensure that HUD gives full consideration to these mandates at proper points in its decision-making process.  Plaintiffs also ask this Court to include measurable desegregative outcomes in its remedial order, because

compliance with HUD's legal obligations can only be ascertained, in the end, by the effectiveness of its efforts to accomplish desegregation.

Because the propriety of the remedy will depend on the nature and scope of the legal violation, Plaintiffs begin with evidence and argument as to HUD's liability under the Fifth Amendment. Plaintiffs demonstrate that from 1989 to the present (the liability period for this case), HUD has failed to meet its affirmative constitutional obligation to dismantle the vestiges of its own prior intentional segregation of Baltimore's public housing. As the result of past purposeful discrimination, African-American public housing residents in the Baltimore Region today are overwhelmingly concentrated in segregated ghettos in Baltimore City. Baltimore's African-American public housing residents have virtually no opportunity to live in white, suburban neighborhoods with better opportunities for themselves and their children for education, employment, safety, and recreation. During the liability period HUD has exercised its considerable authority over public and assisted housing activity in the Baltimore Region in a manner that not only failed to achieve desegregation, but perpetuated segregation. HUD's failure to disestablish the segregated public housing system that it created and maintained has had a powerful detrimental effect on the life chances of generations of African-American public housing families.

Plaintiffs also briefly argue that this Court's previous finding of Fair Housing Act liability was correct and should not be reconsidered. HUD has an obligation under the Fair Housing Act to take active steps to fulfill the goal of open housing patterns and prevent the perpetuation of segregation. In the context of the Baltimore Region's distribution of population and housing, this obligation necessarily involves *effective* and *active* steps to provide desegregative assisted and affordable housing opportunities throughout the Baltimore Region,

not just Baltimore City.  The facts, including additional facts discovered since the initial liability

phase of the trial, establish that HUD has fallen far short of this obligation.

Once the constitutional and statutory violations are established, Plaintiffs proceed to a

discussion of appropriate and necessary remedial relief.

The Fifth Amendment, the mandate of *Brown v. Board*, and the sweeping language and

goals of the Fair Housing Act are more than aspirational statements of high ideals to which HUD

may refer in word but not in deed.  It is well past time for HUD to live up to these imperatives

and *accomplish* the desegregation of Baltimore's public housing.  Remedies that seek to

influence the manner in which HUD reaches decisions regarding fair housing in the Baltimore

Region can help achieve this goal, but by themselves are not sufficient.  HUD has shown itself

incorrigibly to suffer from, as the Supreme Court has said, "too much deliberation and not

enough speed."  For this reason, the remedy needs to require that HUD create desegregative

housing opportunities in the Baltimore Region for black public housing families.  Only through

such a remedy can African-American public housing residents in Baltimore overcome the harms

suffered through decades of government-sanctioned discrimination.

The D.C. Circuit, similarly faced with an agency that refused to live up to its legal duties,

explained its obligation in fashioning a remedy as follows: "At some point, we must lean

forward from the bench to let an agency know, in no uncertain terms, that enough is enough."

*Pub. Citizen Health Research Group v. Brock*, 823 F.2d 626, 627 (D.C. Cir. 1987).  After more

than half a century of ignoring the continuing segregation of public housing in the Baltimore

Region, HUD's behavior has reached the point where enough is enough.

## II.    Overview of HUD Decision-Making

As a background for understanding the nature of HUD's constitutional and statutory

3

violations, and as a framework for considering the proposed remedies, Plaintiffs set forth an overview of HUD decision-making as it relates to desegregation and the promotion of regional fair housing. *See* Supplement to Revised Remedial Procedural Order (Apr. 14, 2005) (noting the necessity of "receiv[ing] evidence regarding the precise manner in which HUD reaches decisions regarding the promotion of fair housing in the Baltimore Region.") (Paper 672).

HUD's major public and assisted housing programs are administered by three sub-cabinet program offices, or "line offices": the Office of Public and Indian Housing, the Office of Community Planning and Development, and the Office of Housing. HUD has identified these offices, as well as the Office of Fair Housing and Equal Opportunity, as the offices most involved in decisions that affect desegregation and the promotion of fair housing.

The Office of Public and Indian Housing ("PIH") administers the HUD programs that are most directly related to the segregation of public housing residents, through its management of public housing and voucher programs. The public housing program involves management and oversight of the development, construction, rehabilitation, and demolition of public housing projects – publically-owned housing developments (including scattered site housing) that provide housing to low-income persons and that are operated by local public housing authorities ("PHAs").[1] PIH also operates the Section 8 voucher program,[2] through which low-income families receive rental-assistance vouchers that they can use to help pay for rental units on the private housing market. For all three of these PIH programs – public housing, project-based

---

[1] Plaintiffs in this case are all residents of the public housing projects constructed and administered under the aegis of PIH, in coordination with the local PHA, the Housing Authority of Baltimore City ("HABC").

[2] Section 8 vouchers have been renamed "Housing Choice Vouchers" during the pendency of this lawsuit. *See* 64 Fed. Reg. 26,631, 26,632 (May 14, 1999). This Memorandum will use the term "Section 8 vouchers" in order to maintain consistency of terminology with previous memoranda and orders in the case.

Section 8, and Section 8 vouchers – the family pays 30% of its actual income for shelter costs,

regardless of how low that income is.  Decisions made by PIH in the operation of these programs

have had, and will continue to have, a dramatic and defining impact on the housing opportunities

available to low-income African-Americans in the Baltimore Region.  These decisions include,

in overview, the following:

- approving the siting of public housing projects;
- authorizing exceptions to site and neighborhood standards (that seek to minimize new construction in areas of minority concentration);
- approval of and conditions placed on the demolition of public housing;
- provision of replacement units for demolished public housing;
- setting regional rent levels for voucher holders, and authorizing (or refusing to authorize) exceptions to those rent levels;
- facilitating (or declining to facilitate) administration of vouchers across the jurisdictional lines of local PHAs;
- providing (or failing to provide) mobility counseling and other supportive services for voucher users to move from one jurisdiction to another;
- recruiting (or failing to recruit) private landlords to accept Section 8 vouchers.

These decisions, and the effect of these decisions on African-American public housing families

in Baltimore City, will be discussed in greater detail below and at trial.

The Office of Community Planning and Development ("CPD") is tasked with

"develop[ing] viable communities by promoting integrated approaches that provide decent

housing, a suitable living environment, and expand economic opportunities for low and

moderate income persons."  SOF ¶ 146.[3]  As most directly relevant to fair housing, CPD

administers several block grant programs – including the Community Development Block Grant

("CDBG"), and HOME Investment Partnerships – that provide funds to local jurisdictions to be

used for development activities directed toward housing and housing-related facilities and

services.  CDBG, the largest of the block grant programs, distributes over $37 million per year to

---

[3]All references in this Memorandum to "SOF ¶¶ __" are to the Plaintiffs' Statement of Facts filed concurrently with this Memorandum.

local jurisdictions within the Baltimore Region; these funds must principally be used for the benefit of low- and moderate-income persons, and local jurisdictions must assure that they will "affirmatively further fair housing" in their use of the funds. The CPD Office makes decisions about how (or how not) to leverage its grant-making authority to assure compliance with fair housing requirements and desegregative goals, and these decisions can have a significant effect on whether the range of desegregative opportunities increases, or decreases, for African-American public housing residents in the Baltimore Region.

The Office of Housing[4] oversees the Federal Housing Administration and regulates the housing insurance business and housing industry. As most directly relevant to fair housing, the Office of Housing runs the project-based Section 8 program, through which HUD contracts directly with private owners of rental properties to provide housing at fixed locations for low-income persons. The Office of Housing also operates several programs that insure mortgages made by private lenders to help finance the construction, acquisition, or rehabilitation of multifamily housing (that is, properties with more than five units). FHA multifamily mortgage insurance programs primarily provide housing for moderate-income families and are not affordable for the low- and extremely low-income families served by public housing and Section 8. FHA multifamily mortgage insurance programs have potential desegregative value, however, because developers of Section 8 projects may use FHA mortgage insurance to finance, in part, the developments. FHA insurance programs are also relevant to fair housing because Section 8 projects that have mortgages with FHA insurance can, in certain circumstances, be converted to market-rate housing or redeveloped for another use, thus reducing the stock of assisted housing.

---

[4]The Office of Housing is sometimes called "FHA," because the Assistant Secretary for Housing is also the Commissioner of the Federal Housing Administration.

HUD decisions with regard to when and how Section 8 projects with FHA insurance may leave the assisted housing stock affect the desegregative opportunities available to African-American public housing residents.

The Office of Fair Housing and Equal Opportunity ("FHEO") is responsible for implementing civil rights and fair housing requirements set by civil rights and housing statutes, HUD regulations, and presidential executive orders. FHEO oversees and reviews compliance with these fair housing requirements as they apply to HUD's public and assisted housing programs, to HUD-funded grant recipients, and in the private rental market. While FHEO is not itself generally able to impose sanctions for noncompliance, FHEO makes recommendations to the other HUD line offices as to whether PHAs and other HUD-funded grant recipients are complying with programmatic and statutory civil rights requirements.

Through these and other decisions, to be discussed in more detail below and at trial, HUD shapes the housing opportunities available to African-American public housing residents. HUD can determine whether black public housing families in Baltimore City will continue to live, as they have for the past six decades and longer, in racially-isolated ghettos with poor life opportunities, or whether black public housing families will be given the chance to move to better neighborhoods in communities that offer far greater by way of life chances. Through its conduct to date, HUD has permitted the Baltimore Region to become what the Kerner Commission feared when it warned: "Our nation is moving toward two societies, one black, one white – separate and unequal."[5]

The evidence will show that while HUD has on occasion paid lip service to the

---

[5]The Kerner Report: The 1968 Report of the National Advisory Commission on Civil Disorders 1 (1968).

importance of regional approaches to fair housing, HUD efforts in this regard in the Baltimore Region have been so sporadic and disjointed as to be utterly without value in achieving desegregation of Baltimore public housing.  At the same time, HUD has pursued its programmatic activities with little to no regard for the effect of its decisions and actions on public housing desegregation, with the result that by commission and omission HUD has perpetuated the segregation of African-American public housing families in Baltimore.

**ARGUMENT**

**I.     Federal Defendants are Under an Affirmative Constitutional Duty to Disestablish the Vestiges of Prior Intentional Segregation**

In its January 2005 Liability Order, this Court reserved judgment on Plaintiffs' constitutional claims, deferring until the present remedial phase a decision on the question whether Federal Defendants[6] violated Plaintiffs' constitutional rights under the Fifth Amendment.  *Thompson v. HUD*, 348 F. Supp. 2d 398, 451 (D. Md. 2005).

**A.     This Court Should Reach Plaintiffs' Constitutional Claim**

As an initial matter, this Court has previously suggested – citing the general principle of avoiding unnecessary adjudication of constitutional issues – that it may decide not to reach the merits of Plaintiffs' constitutional claim, especially if there is no difference between the remedy for a statutory and a constitutional violation.  *See id.* at 451 & n.106.

As Plaintiffs describe below in the discussion of the constitutional claim and in the presentation of proposed remedial relief, the law and facts are clear as to both the existence of a

_____

[6]Federal Defendants are the United States Department of Housing and Urban Development and the Secretary of HUD, sued in his official capacity.  This Memorandum uses both "Federal Defendants" and "HUD" to refer to the remaining defendants in this action.

long-standing Fifth Amendment violation and the necessity of broad remedies to redress that constitutional violation. *See infra* Parts I.B & II. A constitutional violation arguably provides stronger support than a statutory violation for this Court to order the creation of desegregative housing opportunities, insofar as this Court's remedial authority would extend to the breadth necessary to redress the constitutional harm. *See, e.g.*, *Hills v. Gautreaux*, 425 U.S. 284, 297 (1976) ("Our prior decisions counsel that in the event of a constitutional violation, 'all reasonable methods be available to formulate an effective remedy' . . . ." (quoting *N.C. State Bd. of Educ. v. Swann*, 402 U.S. 43, 46 (1971))); *see also infra* Part IV.A.

Given the nature and extent of Federal Defendants' violation of the Fair Housing Act, this Court could justifiably order the full remedy that Plaintiffs seek on the basis of HUD's statutory violation alone. However, while there is strong case law to this effect from other federal circuits, *see infra* Parts III.A & IV.A, Plaintiffs recognize that it may be an open question in the Fourth Circuit. If this Court were to decline for prudential reasons to reach the constitutional claim, and were to enter a remedial order based on the § 3608(e)(5) violation alone, a reversal by the Fourth Circuit could result in remand to this Court for resolution of the constitutional issues one or two years hence, on evidence that is before the Court now. Judicial economy thus calls for resolution of Plaintiffs' constitutional claim in the present proceeding.

### B.    HUD Is Constitutionally Obligated to Disestablish Prior Intentional Segregation

Prior purposeful discrimination gives rise to an affirmative constitutional duty to remedy past wrongs. *See Brown v. Bd. of Educ. of Topeka*, 349 U.S. 294, 299-301 (1955) ("*Brown II*"); *see also, e.g.*, *Columbus Bd. of Educ. v. Penick*, 443 U.S. 449, 458-61 (1978).

Plaintiffs bear the initial burden of proving that Federal Defendants previously operated a system of intentional racial segregation and that the system remains segregated. *See, e.g.*,

*Penick*, 443 U.S. at 458-59; *Green v. County Sch. Bd. of New Kent County*, 391 U.S. 430, 437-38

(1968). Such a showing establishes a presumption of causation – that is, a presumption that any

continuing racial imbalances are proximately caused by the past intentional discrimination. *See*

*Freeman v. Pitts*, 503 U.S. 467, 494 (1991); *Swann v. Charlotte-Mecklenberg Bd. of Educ.*, 402

U.S. 1, 26 (1971); *Sch. Bd. of City of Richmond v. Baliles*, 829 F.2d 1308, 1311 (4th Cir. 1987)

("It is well established that once a court has found an unlawful dual school system, the plaintiffs

are entitled to the presumption that current disparities are causally related to prior segregation,

and the burden of proving otherwise rests on the defendants.").[7]

A showing of prior segregation gives rise to "a *continuous* constitutional obligation to

disestablish" the segregated system. *Penick*, 443 U.S. at 458 (emphasis added); *see also*

*Freeman*, 503 U.S. at 485 ("The duty and responsibility of a school district once segregated by

law is to take all steps necessary to eliminate the vestiges of the unconstitutional *de jure*

system."). Plaintiffs need not prove contemporaneous intentional discrimination during the

Open Period[8]; rather, past intentional segregation creates the affirmative constitutional duty to

---

[7]Federal Defendants have previously argued to this Court that under *United States v. Fordice*, 505 U.S. 717 (1992), the relevant constitutional question is whether a previous discriminatory policy that was once followed is still in place today and is "traceable" to past segregation. *See* Fed. Defs.' Trial Br. 26-27 (Nov. 17, 2003) (Paper 558). This Court has already rejected this argument: "Nor does the Court understand *Fordice* to require overly mechanical inquiries, for instance as to whether Defendants' policies were 'traceable' to pre-*Brown* practices." *Thompson*, 348 F. Supp. 2d at 415 n.21. Federal Defendants have also argued that it is Plaintiffs' burden to prove that the challenged actions or policies are traceable to the prior segregation. *See* Fed. Defs.' Trial Br. 27 (Nov. 17, 2003) (Paper 558). This argument is contradicted by direct holdings not only of the Fourth Circuit but also of the Supreme Court, as cited above. *See, e.g.*, *Freeman*, 503 U.S. at 494; *Baliles*, 829 F.2d at 1311.

[8]For purposes of liability, the relevant Open Period begins on January 31, 1989 (six years before the case was filed), and continues to the present.

disestablish, regardless of contemporaneous intent.[9]  *See, e.g.*, *United States v. Fordice*, 505 U.S. 717, 729-32 (1992); *Green*, 391 U.S. at 437-42.  Once the duty to disestablish arises, HUD bears the burden of proving that it has fulfilled that duty.  *Fordice*, 505 U.S. at 739 ("*Brown* and its progeny . . . established that the burden of proof falls on the *State*, and not the aggrieved plaintiffs, to establish that it has dismantled its prior *de jure* segregated system.").  Federal Defendants cannot meet this burden merely by showing that they abandoned intentionally discriminatory policies – rather, Federal Defendants must "take affirmative steps to dismantle its prior *de jure* system."  *Id.* at 743; *see also id.* at 731-32.  Good intentions or token efforts toward desegregation are insufficient; HUD must demonstrate that its actions were effective in dismantling the segregated system, regardless of intent.  *Dayton Bd. of Educ. v. Brinkman*, 443 U.S. 526, 538 (1979) ("[T]he measure of the post-*Brown I* conduct of a school board under an unsatisfied duty to liquidate a dual system is the effectiveness, not the purpose, of [its] actions in decreasing or increasing the segregation . . . .").

In addition to the requirement that HUD take affirmative steps to desegregate, part of the duty to disestablish is the obligation not to take any action that would perpetuate or increase segregation.  *Id.* at 538 ("Part of the affirmative duty imposed by our cases . . . is the obligation not to take any action that would impede the process of disestablishing the dual system and its effects."); *see also Fordice*, 505 U.S. at 743.  Any actions that continue segregative effects or

---

[9]This Court has repeatedly recognized in prior orders that a showing of intent during the Open Period is not necessary to establish constitutional liability.  *See Thompson*, 348 F. Supp. 2d at 413 ("While an affirmative discriminatory act must be purposeful, there is no similar 'intent' element concerning the abdication of duties stemming from past discriminatory acts."); *id.* at 451 ("The Plaintiffs could establish an Equal Protection claim if circumstances warranted holding that, even without proof of a contemporaneous discriminatory intent, Defendants failed to meet their obligation to remove vestiges of prior *de jure* segregation in public housing."); *see also Thompson v. HUD*, No. 95-309, Mem. & Order Denying Fed. Defs.' Mot. Summ. J., slip op. at 19-20 & n.12 (D. Md. Jan. 10, 2006) (Paper 751) [hereinafter 2006 Summary Judgment Order].

impede desegregation will give rise to constitutional liability (again, without regard to intent), unless HUD meets the "heavy burden" of showing that such actions serve "important and legitimate ends." *Brinkman*, 443 U.S. at 539.[10]

### 1. HUD Has a Constitutional Duty to Dismantle Segregation in the Baltimore Region

As HUD has conceded throughout this litigation, HUD participated in the intentionally discriminatory creation and operation of racially segregated public housing in Baltimore. This Court previously found that HUD operated and was complicit in the operation of a *de jure* system of segregated public housing in the Baltimore Region:

> There is no doubt that, prior to 1954, African-Americans in Baltimore City were subjected unconstitutionally to second-class status by virtue of being separated from their neighbors on the basis of their race. This segregation was effected by, among other things, a public housing system (administered by Local Defendants, with Federal Defendants' support) that, *de jure*, housed Blacks and Whites in different and separated developments.

*Thompson*, 348 F. Supp. 2d at 443; *see also id.* ("Plaintiffs have demonstrated past affirmative and purposeful segregatory actions by Defendants in the administration of housing policy . . . ."). Indeed, there is voluminous and uncontested factual evidence that HUD played an active role in establishing and perpetuating Baltimore's segregated public housing. *See, e.g.*, SOF ¶¶ 1-55.[11]

In addition, Plaintiffs have presented overwhelming evidence – as this Court has also

---

[10]While much of the Supreme Court's jurisprudence regarding a state actor's affirmative duty to dismantle prior intentional segregation has arisen in the school desegregation context, there is no reason to limit this doctrine to the context of public schools. *See, e.g.*, *United States v. Yonkers Bd. of Educ.*, 624 F. Supp. 1276, 1534 (S.D.N.Y. 1985); *see also Thompson*, 348 F. Supp. 2d at 413-14.

[11]Plaintiffs also direct the Court's attention to its extensive findings of fact in its 2005 Liability Order as to the pervasive and long-standing nature of HUD's intentional discrimination in housing. *See, e.g.*, *Thompson*, 348 F. Supp. 2d at 405-09, 443, 456-63, 465-524. Plaintiffs incorporate by reference the facts found by this Court in its 2005 Liability Order.

already found – that the vestiges of HUD's prior intentional segregation of public housing persist

to this day.  As this Court explained in its January 2005 Liability Order:

> The statistical evidence demonstrates that during the Open
> Period, the majority of those who benefitted from any of HUD's
> federally-assisted housing activity ended up living in Baltimore
> City; that the vast majority of the public housing units in the
> Baltimore Region were occupied by African-Americans; [and] that
> these public housing units remained concentrated within Baltimore
> City (where a majority of residents are African-American) . . . .
>     The statistical evidence demonstrates that HUD's various
> housing programs, as implemented, failed to achieve significant
> desegregation in Baltimore City.  This is true during the Open
> Period as it had been in the preceding decades.

*Thompson*, 348 F. Supp. 2d at 461.

Past intentional discrimination in public housing has led to the striking present-day

situation in which the Baltimore Region's public housing is overwhelmingly concentrated in the

poorest, blackest ghettos of East and West Baltimore (City).  Public housing is both far more

highly concentrated in Baltimore City, and far more highly concentrated in areas of the

Baltimore Region that have above-average percentages of African-American residents, than is

the case with the private housing market overall.  For example, nearly 92% of family public

housing (including public housing projects and scattered site units) was concentrated in

Baltimore City as of 1995, with a mere 8% located in the five suburban counties[12] that make up

the remainder of the Baltimore Region.  *See* SOF ¶ 59.  By contrast, only 41% of occupied rental

housing units in the Baltimore Region (and about 29% of all housing units) were in Baltimore

City as of 2000 Census figures.  *See id.* ¶ 60.  Similarly, nearly 94% of family public housing

---

[12]Anne Arundel County, Baltimore County, Carroll County, Harford County, and
Howard County.  Queen Anne's County, which is part of the census-defined Metropolitan
Statistical Area, is excluded where possible because of its geographic location.  *See Thompson*,
348 F. Supp. 2d at 458 & n.16.

(including projects and scattered site units) was concentrated in census tracts with above-average percentages of African-American residents, compared to just 49% of the Region's occupied rental housing (and 34.5% of all housing units). *See id.* ¶ 61. A showing that 92% of family public housing remains concentrated in Baltimore City, which contains only 41% of the Region's rental housing – and that 94% of family public housing is concentrated in disproportionately black census tracts, where only 49% of the Region's rental housing is located – leads indisputably to the conclusion that vestiges persist of HUD's intentional ghettoization of public housing residents. *See Walker v. City of Mesquite*, 169 F.3d 973, 976 & nn. 3-4 (5th Cir. 1999) (describing an almost identical concentration of public housing in Dallas (in which 95% of public housing units (6,100 of 6,400) were located in predominantly minority areas in 1994) as characteristic of a "sordid" history of "overt and covert racial discrimination and segregation"). Plaintiffs' Statement of Facts details additional evidence to support the inescapable conclusion that vestiges of HUD's prior intentional discrimination persist. *See, e.g.*, SOF ¶¶ 9, 14-18, 56-68, 91-93; *see also Thompson*, 348 F. Supp. 2d at 458-63, 465-80, 502-06..

The evidence therefore plainly shows not only that HUD complied with and facilitated the operation of racially segregated public housing in Baltimore, but also that the vestiges of that prior intentional segregation persist to the present. Accordingly, Plaintiffs are entitled to a presumption of causation, which HUD has the heavy burden of rebutting. *Freeman*, 503 U.S. at 494-95; *Baliles*, 829 F.2d at 1311.

> **2.      The Present Segregation of African-American Public Housing Residents is Not Merely a Racial Imbalance Caused by Neutral Demographic Factors**

In an attempt to rebut this presumption of causation, and thereby to evade the finding that they are under an affirmative constitutional duty to disestablish the segregated public housing

14

system that they participated in creating and perpetuating, Federal Defendants have claimed that demographic changes in the Baltimore Region caused the present segregation of Baltimore's African-American public housing residents.  *See* Fed. Defs.' Trial Br. 10-13, 28 (Nov. 17, 2003) (Paper 558).  This argument fails both legally and factually.

Although government entities are not constitutionally liable for every racial imbalance that may be caused by demographic factors, *see Freeman*, 503 U.S. at 494-96; *Thompson*, 348 F. Supp. 2d at 446, the Supreme Court's concern with unduly invoking judicial authority to redress every passing racial imbalance is not implicated here.  In *Freeman*, DeKalb County – having been found in 1969 to have operated a segregated school system – had been subjected to a court-supervised desegregation plan for nearly twenty years, after which the district court held that the County had succeeded in eliminating the vestiges of certain aspects of that prior segregated system.  In response to a challenge to this finding, the Supreme Court held that the 1969 desegregation plan had in fact accomplished its objective of "achiev[ing] maximum practicable desegregation . . . before dramatic demographic changes altered residential patterns."  *Freeman*, 503 U.S. at 493-94.  The Court accordingly concluded that racial imbalance that arose *subsequent* to the enactment of an effective desegregation plan did not create an actionable constitutional violation: "*Once the racial imbalance due to the de jure violation has been remedied*, the school district is under no duty to remedy imbalance that is caused by demographic factors."  *Id.* at 494 (emphasis added); *see also Swann*, 402 U.S. at 31-32 ("Neither school authorities nor district courts are constitutionally required to make year-by-year adjustments of the racial composition of student bodies *once the affirmative duty to desegregate has been accomplished* and racial discrimination through official action is eliminated from the system." (emphasis added)).  In the instant case, by contrast, there has been no finding by this

15

Court – and no evidence that could even arguably support a finding – that HUD ever remedied the racial imbalance caused by its intentional violation, or that HUD accomplished its affirmative duty to desegregate. The notion that demographic changes have erased HUD's constitutional obligation is therefore legally incorrect.

The claim that the ghettoization of black public housing residents results from demographic changes as opposed to past intentional segregation of public housing is also unsupported by the facts. HUD has pointed out that the African-American proportion of Baltimore City's population has increased over time, from 35% in 1960 to 64% in 2000. But population change in Baltimore City has not *caused*, or even partially caused, the present situation in which black public housing residents are isolated into segregated black areas of the City. *Cf. Holton v. City of Thomasville Sch. Dist.*, 425 F.3d 1325, 1338-39 (11th Cir. 2005) ("If the school district can demonstrate that demographic factors have 'substantially caused' the racial imbalances in its schools, 'it overcomes the presumption that segregative intent is the cause, and there is no constitutional violation.'" (quoting *NAACP, Jacksonville Branch v. Duval County Sch.*, 273 F.3d 960, 966 (11th Cir. 2001))). As Plaintiffs' expert witnesses have exhaustively demonstrated, and as other facts in the record definitively prove, segregated public housing projects for African-Americans before 1954, and racially identifiable public housing projects after 1954, were sited in areas that *already contained* heavy African-American population concentration at the time of construction. *See* SOF ¶¶ 1-29; *see also Thompson*, 348 F. Supp. 2d at 465-86. In other words, public housing was *not* placed randomly in Baltimore City in areas that only later, as a process of population shifts, gradually became areas of black concentration.

Nothing in the demographic history of the Baltimore Region has prevented public

housing from being located in any of the Region's many primarily-white areas. Rather, the absence of desegregated housing opportunities for low-income African-American families has been the product of HUD's failure to take a regional approach to promoting desegregation, and its accommodation of white suburban opposition to housing for poor, black families. It is this conscious, consistent failure to create public housing in areas that are predominantly white that has led to the near-complete absence of opportunities for black public housing families to live in neighborhoods that are anything other than overwhelmingly black and poor.

If anything, the increasing concentration of African-Americans within Baltimore City *heightens*, not lessens, HUD's culpability in failing to pursue and create desegregative housing opportunities throughout the rest of the Baltimore Region. The Supreme Court's decision thirty years ago in *Hills v. Gautreaux* established the principle that the geographic area that is relevant in the housing desegregation context, unlike the school desegregation context, is the regional housing market as a whole, and not just the area within the city limits:

> Here the wrong committed by HUD confined the respondents to segregated public housing. The relevant geographic area for purposes of the respondents' housing options is the Chicago housing market, not the Chicago city limits. That HUD recognizes this reality is evident in its administration of federal housing assistance programs through "housing market areas" encompassing "the geographic area within which all dwelling units . . . are in competition with one another as alternatives for the users of housing."

*Gautreaux*, 425 U.S. at 299 (quoting HUD, Techniques of Housing Market Analysis 8 (Jan. 1970)). This Court has already found the relevant housing market in the instant case to be the Baltimore Region as a whole. *See* 2006 Summary Judgment Order 31-32 & nn. 24-25 (Paper 751). Given the steady increase in the African-American proportion of the Baltimore City population over time, HUD's failure to pursue desegregative housing opportunities in the

suburban counties outside Baltimore City – which were the areas of the housing market in which desegregative opportunities were increasingly likely to be found – is simply further evidence of HUD's abdication of its constitutional duty.

Nor does the mere passage of time since the end of *de jure* housing segregation in 1954, or since HUD's conscious accommodation of segregated siting decisions for decades thereafter, mitigate HUD's constitutional duty to disestablish.  Under certain circumstances, especially where desegregation efforts have already been undertaken, the passage of time can lessen the harmful effects of prior intentional discrimination.  *See Freeman*, 503 U.S. at 496; *Thompson*, 348 F. Supp. 2d at 447.  Nonetheless, in most circumstances, the passage of time *exacerbates* constitutional liability.  The Supreme Court has explicitly held that where *de jure* segregation was once in place, every failure to make amends perpetuates the original violation:

> "*Brown II* was a call for the dismantling of well-entrenched dual systems," and school boards operating such systems were "clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch."  Each instance of a failure or refusal to fulfill this affirmative duty continues the violation of the Fourteenth Amendment.

*Penick*, 443 U.S. at 458-59 (quoting *Green*, 391 U.S. at 437-38) (internal citation omitted).  In light of this ongoing, continuous constitutional obligation, it would pervert logic to assert that the *longer* HUD ignored its constitutional duty to disestablish, the *less* culpable it became.

Because Plaintiffs have met their burden of showing both prior intentional segregation and the present vestiges of that segregation, and because the present segregation of African-American public housing residents is not merely a racial imbalance caused by demographic factors, HUD must prove that it has dismantled the prior segregated system in order to escape constitutional liability.  *Fordice*, 505 U.S. at 739.

**II.    HUD Has Failed to Meet Its Constitutional Duty to Dismantle Segregation**

There is well over a preponderance of evidence in the record proving that HUD's actions and inaction in the Baltimore Region during the Open Period have failed to disestablish the prior segregated system, and have in fact perpetuated and increased segregation.  This Court should accordingly hold that HUD has violated the Fifth Amendment.

**A.    HUD's Development of Public and Assisted Housing During the Open Period Has Perpetuated Segregation**

As noted above, by the 1990s African-American public housing families were overwhelmingly concentrated in the most segregated areas of Baltimore City, as had been the perpetual circumstance since the creation of the intentionally segregated system in 1940.  *See infra* Part I.B.  From 1989 to the present, HUD has exercised its considerable authority over public and assisted housing activity in the Baltimore Region in a manner that not only failed to achieve desegregation, but *perpetuated* segregation.  HUD has maintained a public housing system for the Baltimore Region in which almost all "hard units" are located in poor, African-American neighborhoods in Baltimore City.  Outside of the limited number of units created under the Partial Consent Decree in this case (which cannot be used as evidence to absolve HUD of any liability, *see* Decree § 10.3), HUD has created almost no hard units available to African-American families in any of the counties.  Meanwhile, HUD actions and inaction have prevented the Section 8 voucher program from fulfilling its potential to offer meaningful opportunity for African-American families to move to white suburban areas with better schools, job opportunities, and public safety.

**1.    HUD's Actions and Inaction with Regard to the Location of Family Public Housing and Project-Based Section 8 Units Have Perpetuated Segregation**

Defendants' expert Shelley Lapkoff presented evidence at the liability trial showing that

19

during the 1990s, over 4,000 family public housing units were demolished, only to be replaced by lower density housing "on virtually the same sites as the demolished units."  SOF ¶ 56.  An additional 200 new public housing and scattered site units were created in Baltimore City during the 1990s, of which the vast majority were sited in census tracts with above-average percentages of African-Americans.  *Id.*; *see also Thompson*, 348 F. Supp. 2d at 460-61.  At the same time, a mere 50 public housing and scattered site units were placed in the counties surrounding Baltimore City during this same time period.  *See* SOF ¶ 57.  Fifty new public housing and scattered site units in the counties during the 1990s, out of a total of over 17,000 family public housing and scattered site units that existed in the region overall as of 1995, *see id.* ¶ 58, is a mere fraction of a percent of the overall total, and demonstrates HUD's failure to make any regional effort at developing public housing opportunities in the counties outside Baltimore City.

What is worse, this failure to develop public housing and scattered site units in the counties during the 1990s took place against the backdrop, noted above in Part I.B.1, of an overwhelming concentration of the Region's public housing and scattered site units in Baltimore City (nearly 92% in the City, and just 8% in the surrounding counties as of 1995) and in census tracts region-wide with above-average concentrations of African-Americans (nearly 94% in tracts with above-average percentages of African-Americans, and just 6% in tracts below average as of 1995).  *See id.* ¶¶ 59-61.

Nor did HUD fare any better in its provision of project-based Section 8 housing.  Through the project-based Section 8 program, HUD "contracts directly with private owners to provide housing at rents set at 30% of the actual incomes of the low-income households the owner promises to select as tenants."  Ex. 648, Khadduri Expert Report at 12.  Those project-based Section 8 housing units that are available to low-income families are highly concentrated

in Baltimore City, often in close proximity to the older public housing projects, while Section 8 projects restricted to elderly and disabled occupancy are much more widely distributed throughout the Baltimore Region.  Despite the concentration of family-eligible Section 8 projects in segregated parts of the Region, these units are slightly less segregated than family public housing.  *See* Webster Rebuttal Report 3-5 & tbls. 1-4.  These units therefore *could* have some desegregative value for African-American residents of Baltimore City public housing, but HUD's management of this program, rather than attempting to promote desegregation, has in fact impeded desegregation.

The stock of project-based Section 8 housing has been declining steadily throughout the Open Period, through the expiration of long-term Section 8 contracts, early termination of these contracts by HUD, and a number of other administrative processes by which properties that also have FHA-insured mortgages leave the assisted housing program to become market rate properties or to be demolished.  *See* SOF ¶¶ 198-217.  Nationally this housing stock is diminishing at the rate of approximately 10,000 units per year, and this pattern persists in the Baltimore Region – Anne Arundel County, for example, lost nearly 60% of its project-based Section 8 housing stock between 2000 and 2005.  *See* SOF ¶ 68.  None of HUD's decision-making processes as to whether to preserve assisted properties, instead of permitting them to be retired from the assisted housing stock, include an assessment of the fair housing implications or potential effect on desegregation efforts.  *See* SOF ¶¶ 198-217.  HUD is thus approving the elimination of assisted properties, including some with potential desegregative value, with no consideration for its constitutional obligation to desegregate.

HUD has claimed that its management of the project-based Section 8 program has in fact promoted desegregation throughout the Region, through the creation since 1989 of project-based

Section 8 housing units outside Baltimore City.  *See* Ex. 673, HUD Resp. to Interrogs. (Apr. 12, 2005) ¶ 11.  However, outside of what has been required under the Partial Consent Decree in this case, *not one* of the project-based Section 8 properties developed after 1989 was available for *family* public housing – the only type of occupancy that could meaningfully have served as a desegregative opportunity for African-American residents of family public housing projects in Baltimore City – instead, *every single property* was developed as either elderly or disabled housing.  *See* SOF ¶¶ 62-67.  Thus, during the Open Period, HUD has been permitting family-eligible project-based Section 8 housing to be retired from the assisted housing stock with no consideration for its negative effect on desegregation, while at the same time approving new project-based Section 8 developments that are wholly unavailable to be used as a desegregative resource.  HUD's actions through the project-based Section 8 program have not only failed to disestablish the segregation of African-American public housing residents in Baltimore City, but have actually worsened their racial isolation.

> **2.    HUD's Administration of the Section 8 Voucher Program has Perpetuated Segregation**

Given the ineffectiveness of any HUD activities from 1989 to the present in the areas of family public housing, scattered site development, and project-based Section 8 contracts, the only type of federally-assisted housing that could even arguably have desegregated public housing in Baltimore City is the Section 8 voucher program.  *See Thompson*, 348 F. Supp. 2d at 459 (finding as fact that "any increase in federally-assisted housing opportunities during the 1990s came as a result of the Section 8 voucher/certificate program").  However, the Section 8 program as operated by HUD since 1989 has not only failed to achieve desegregation or promote integrated housing patterns for voucher holders, but has perpetuated segregation.

The touchstone of HUD's compliance with its constitutional obligations under the Fifth

Amendment is, as noted, the *effectiveness* of any efforts at dismantling the vestiges of prior segregation. *See, e.g.*, *Brinkman*, 443 U.S. at 538. By this measure, the Section 8 voucher program has been wholly insufficient to absolve Federal Defendants of constitutional liability.

The voucher program as currently operated has resulted in the concentration of African-American voucher users within Baltimore City, and in extremely segregated, high-poverty census tracts. According to 2005 data, approximately 63% of all African-American voucher users in the Region live in Baltimore City. *See* Ex. 653, Webster Report 13-14, figs. 18A–19B. By contrast, a mere 9% of white voucher users in the Region live in Baltimore City, with the remaining 91% able to find housing in the surrounding counties. *See id.* In addition to being much more likely to live in Baltimore City, African-American voucher users are also many times more likely to live in high-black, low-income census tracts. Only 4% of white voucher users throughout the Baltimore Region live in census tracts with greater than 80% black population concentration, while over 45% of black voucher users live in such tracts. *See id.* at 15, tbls. 7B & 7C, figs. 18A–19B; *see also Thompson*, 348 F. Supp. 2d at 460 (finding as fact that "the majority – more than 67 percent – of the City's Section 8 voucher holders live in census tracts that are 70 to 100 percent Black"); SOF ¶ 93. And only about 4% of white voucher users live in census tracts with less than 50% of the median state income, while 37% of black voucher users live in such census tracts. *See* Ex. 653, Webster Report tbls. 7B & 7C.

Thus, while the racial segregation of African-American voucher users is not *quite* as extreme as that of family public housing residents, *see infra* Part I.B.1, the voucher program has nonetheless done little if anything even to begin approaching a remedy to the extreme concentration of African-American public housing residents in the most segregated parts of Baltimore City.

In its 2005 Liability Order, this Court examined similar data and concluded, in its finding of § 3608(e)(5) liability, that Section 8 vouchers are inadequate to desegregate public housing. *Thompson*, 348 F. Supp. 2d at 460 ("Just as rearranging the siting of public housing units within Baltimore City is insufficient to advance the cause of desegregation, *Section 8 vouchers are inadequate to achieve this end*." (emphasis added)).  On this basis alone, the Court should find that HUD's operation of the Section 8 voucher program is evidence of its failure to disestablish segregation as required by the Fifth Amendment.  *Id.*; *see also Brinkman*, 443 U.S. at 538.

In addition, Plaintiffs direct the Court's attention to its previous extensive findings of fact with regard to the Section 8 voucher program, including that HUD acquiesced in HABC's gross mismanagement of its Section 8 voucher program throughout the entire decade of the 1990s and up to the present; that HUD possessed but did not use oversight authority to compel compliance with program regulations; and that HUD's acquiescence in HABC's mismanagement resulted in tens of millions of dollars of unspent voucher funds that could have been used to provide desegregative housing opportunities.  *See Thompson*, 348 F. Supp. 2d at 521-24; SOF ¶¶ 132-44.

Further, HUD's administration of the Section 8 voucher program has created numerous obstacles to desegregation that have caused the racially-identifiable patterns identified above. The evidence plainly shows that HUD's decisions with regard to management of the voucher program have perpetuated segregation and undermined vouchers' utility for disestablishing the vestiges of prior discrimination.  HUD has created obstacles to voucher portability, has refused to provide what it recognizes as critical mobility counseling resources, has failed to use its authority to facilitate voucher use in areas of the Baltimore Region with higher rent and lower affordability than Baltimore City, and has refused to implement adequate processes for ensuring that voucher programs fulfill desegregative and fair housing goals.  As even HUD recognizes,

24

vouchers are necessary but hardly sufficient tools for desegregation. Simply providing low-income African-American families with a voucher, and then leaving them on their own to compete in tight housing markets, deal with rental discrimination, and navigate complicated bureaucratic obstacles simply replicates the existing patterns of residential segregation in the housing market. *See* SOF ¶¶ 91-100. HUD's duty to disestablish segregation requires more of HUD than leaving African-American families to desegregate themselves.

> **a.     HUD's Management of Section 8 Voucher Portability is an Obstacle to Desegregation**

In theory, Section 8 vouchers are "portable" – that is, a voucher-holder may theoretically pursue housing wherever he or she chooses. However, a number of features of HUD's management of the voucher program – including HUD policies that discourage PHAs from aiding portability, administrative obstacles, and the failure to provide for regional voucher administration – have rendered portability an illusory promise.

Contrary to the statutory goal of using vouchers to facilitate deconcentration, *see* 42 U.S.C. § 1437f(a), HUD's policies and practices discourage HABC from helping voucher holders move outside of Baltimore City and into communities of opportunity. In measuring HABC's compliance with HUD's voucher utilization requirements, HUD does not count voucher users who move out of Baltimore City toward HABC's voucher utilization score – that is, HABC is penalized, through the lowering of its utilization score, for every voucher holder that moves from the City to a neighborhood outside the City. This practice provides a strong disincentive to HABC from assisting tenants in moving out of the City. *See* SOF ¶¶ 104-06; Ex. 644, Kramer Dep. Tr. of 3/4/03, at 170-73 (HABC official admitting that "my primary interest is compliance with utilization and getting my vouchers utilized within the City. If you move outside of the City, you don't count towards my utilization . . . ."); *see also Thompson*, 348 F.

Supp. 2d at 523 (finding that HUD's utilization score discourages HABC from facilitating portability moves). HUD has recently gone so far as to direct local housing authorities that they may deny portability moves to higher-cost areas. SOF ¶ 100. So HUD has not only provided structural discouragement (by way of the utilization scoring process) to HABC from facilitating desegregative moves, but has also expressly discouraged HABC from honoring the portability promise when tenants seek better housing than is available in Baltimore City.

In addition, sizeable administrative obstacles block usage of a voucher in a different jurisdiction than that of the issuing housing authority, including differences in occupancy standards, variations in local agency procedures, and inadequate communication between housing agencies. *See* SOF ¶¶ 94-99. While HUD acknowledges that regional or metropolitan-wide administration of vouchers would eliminate most of these administrative obstacles and thereby increase desegregative moves, *see* SOF ¶¶ 101-03, HUD has not undertaken to provide or encourage regional voucher administration during the Open Period. To the contrary, in 1992, HUD recaptured 1,500 "Regional Certificates" that were the remnants of a short-lived "Regional Certificate Program" that HUD operated from 1978 to 1981.[13] *See* SOF ¶ 125. HUD ostensibly based its termination decision on the ground that national portability of vouchers rendered the program unnecessary, but HUD never evaluated the fair housing impact of the cessation of the Regional Certificate Program to ascertain whether the program was in fact no longer necessary, or whether the program's cancellation instead needlessly eliminated a possible resource for promoting desegregation. *See* SOF ¶¶ 125.

---

[13]HUD contracted with the State of Maryland to administer the Regional Certificate Program in the Baltimore Region. The program was regionally administered by the former Regional Planning Council, and permitted a certificate holder in one participating jurisdiction to use that certificate within another participating jurisdiction, thus avoiding certain administrative hurdles. *See* SOF ¶¶ 125.

**b.** **HUD's Failure to Provide for Mobility Counseling Has Impeded Desegregation**

HUD itself has acknowledged that if the Section 8 voucher program is to serve as an effective tool for fair housing choice and desegregation, it must include effective mobility counseling. *See* SOF ¶¶ 120-24. Yet during the Open Period HUD has not only failed to provide resources for mobility counseling programs in the Baltimore Region, but has actually removed resources from such programs.

Mobility counseling is a critical tool in facilitating desegregative voucher moves, as Plaintiffs' and Federal Defendants' experts agree. *See* SOF ¶¶ 120-24; Ex. 648, Khadduri Report 22 ("[W]ithout special mobility counseling efforts, most voucher users find housing in the same types of neighborhoods as other low-income families . . . ."). "[W]ithout effective mobility counseling, minority voucher recipients are much more likely than whites to be clustered in higher poverty neighborhoods." Ex. 657, Briggs Rebuttal Report 2; *see also Thompson*, 348 F. Supp. 2d at 522 ("African-American voucher holders encounter barriers to choice not faced by Whites in competing for the affordable units that exist in the mainstream market.").

Despite HUD's awareness that mobility counseling is necessary to further fair housing and provide desegregative opportunities for voucher holders, HUD has failed to act during the Open Period to provide mobility counseling resources, and instead has hampered mobility efforts or discontinued mobility programs in the Baltimore Region. For example, HUD informed HABC in 2001 that it was not eligible to apply for funding to provide housing search assistance to voucher holders; HABC's mobility section was shut down for lack of funds the following

year.[14]  HUD continues to refuse to fund any mobility counseling for HABC voucher recipients

(beyond that required by the Partial Consent Decree in this case), even though HUD's own

expert has explained that "HUD policy makers well [understand] that merely providing

region-wide vouchers [is] not enough to provide real 'freedom of choice' for those households

who [wish] to use their vouchers to move to a suburban location."[15]  Ex. 652, Fishman Report

(11/28/05), at 6.

> c.    **HUD Has Failed to Use Its Authority to Address Obstacles to Desegregative Voucher Use Created by the Tight Housing Market in the Baltimore Region**

The limited availability of affordable rental housing outside Baltimore City also restricts

the utility of Section 8 vouchers as a viable means of desegregation, but HUD has chosen not to

exercise its authority to alleviate this obstacle.  This Court has previously concluded, on

consideration of all the relevant evidence presented at the liability trial, that "the relative expense

and lack of affordability of housing outside of Baltimore City may present a significant barrier to

Section 8 voucher-holders who might wish to pursue private housing in the Baltimore Region

but outside the city."  *Thompson*, 348 F. Supp. 2d at 460.[16]  HUD has the ability to address these

---

[14]HUD has cited two programs – the Regional Opportunities Counseling program ("ROC"), and the Moving to Opportunity demonstration ("MTO") – that it claims promoted regional voucher mobility.  *See* Ex. 673, HUD Resp. to Interrogs. (Apr. 12, 2005) ¶ 7, 9.  But both programs were short in duration, assisted few families from Baltimore City, and, as administered, were not focused on desegregative moves.  *See* SOF ¶ 125.

[15]This refusal cannot arguably be based on lack of funds; HUD has recaptured tens of millions of dollars in unused voucher funding from HABC, at least part of which HUD could have allowed HABC to use for mobility counseling to promote desegregation.

[16] This Court further found that "HUD considers the Baltimore metropolitan area to have a tight housing market that makes it very difficult, even for families with vouchers, to secure housing"; and that "HUD itself recognized . . . that housing vouchers are 'not viable replacement housing options' in tight housing markets like Baltimore's."  *Thompson*, 348 F. Supp. 2d at 460 (quoting Pls.' Ex. 59).

obstacles to desegregative voucher use, both in the way it determines Fair Market Rents

("FMRs") for each metropolitan area, and in its procedures for authorizing departures from the

payment standard for vouchers in particular areas.[17]  Despite this ability, HUD's actions during

the Open Period have not only failed to address these obstacles, but have exacerbated the

difficulty that voucher users face in finding affordable rental housing outside the City.

HUD's decisions in calculating and setting FMRs have decreased the value of Section 8

vouchers as a desegregative option.  In 1995, HUD *reduced* FMRs nationwide by changing its

method of calculation from the 45th percentile of the rental distribution to the 40th percentile.

*See* 60 Fed. Reg. 42,222 (Aug. 15, 1995).  By 2000, HUD had recognized that this FMR

calculation was too low to provide meaningful housing opportunities to many voucher holders,

and raised the calculation to the 50th percentile for a number of metropolitan areas, *see* 65 Fed.

Reg. 58,870 (Oct. 2, 2000), but Baltimore was not among the included areas – *despite* HUD's

knowledge, through repeated monitoring reviews and audits of HABC's program, of the serious

difficulty faced by Baltimore voucher holders in finding affordable housing.  *See* SOF ¶¶ 132-

44.  It was not until October 2005 that HUD authorized a 50th percentile FMR for the Baltimore

area.  *See* 70 Fed. Reg. 57,653, 57,658 (Oct. 3, 2005).

HUD's recent decisions with regard to the process for approving exception payment

standards have also decreased the effectiveness of vouchers as a desegregative option.

Exception payment standards "can be an important dimension of efforts to help minority families

---

[17]The voucher program provides a rental subsidy to low-income families who secure
housing in the private rental market – tenants pay 30% of household income in rent and utilities,
and the voucher pays for the rest, up to a maximum based on HUD's determination of FMRs for
each metropolitan area.  A PHA may set a payment standard for its vouchers of between 90%
and 110% of the published FMR for its area.  *See* 24 C.F.R. § 982.503(b)(1)(i).  A PHA may
request that HUD approve an exception payment standard that is greater than 110% of the
published FMR for particular portions of the metropolitan area.  *See* 24 C.F.R. § 982.503(c)(2).

move from racially and economically concentrated areas to communities of opportunity."
Khadduri Report 23.  Previously, exception payment standards could be approved by HUD field
staff through a fairly straightforward review process.  *See* 24 C.F.R. § 982.503(c).  In 2003,
however, HUD revoked the authority of field staff to approve exception payment standards,
"instruct[ing] field office directors to not make any additional approvals of exception payment
standards."  Ex. 630, Tamburrino Dep. Tr. of 5/18/05, at 255-56.  This change "mak[es] it much
more difficult (or even impossible) to get an exception payment standard approved."  Ex. 648,
Khadduri Report 24.

      **d.**      **HUD's Processes Fail to Ensure that the Section 8 Program
Actually Results in Desegregation**

HUD has chosen not to include among the Section 8 performance measures a variable
based on whether voucher holders are able to find housing in areas outside of minority and
poverty concentration.  HUD has established, by agency final rule, a program known as the
Section 8 Management Assessment Program ("SEMAP") to ensure that the Section 8 program is
achieving its objectives and to measure the performance of administering authorities.  *See* 63
Fed. Reg. 48,548 (Sept. 10, 1998); 24 C.F.R. § 985.1 et seq.  When first proposed in 1996, the
SEMAP rule included a "deconcentration" indicator, which would have measured the success of
voucher holders in moving out of areas of minority and poverty concentration.  *See* 63 Fed. Reg.
at 48,550–51; 61 Fed. Reg. 63,930 (Dec. 2, 1996).  In response to objections from local housing
authorities, HUD withdrew this deconcentration indicator and replaced it in the final rule with an
optional, and minimal, bonus toward the housing authority's SEMAP score if certain poverty
deconcentration standards are met.[18]  *See* 63 Fed. Reg. at 48,551; *see also* Ex. 646, Khadduri

---

[18]The optional deconcentration indicator that was ultimately included sets a very lax
(continued...)

Dep. Tr. of 1/19/06, at 215 ("[T]he SEMAP deconcentration standard is not as far-reaching as it might be.  It doesn't provide many points, and it's not mandatory."); SOF ¶¶ 127-31.

For all of the reasons discussed, this Court should hold that HUD's development of public and assisted housing during the Open Period perpetuated the segregation of African-American public housing residents in Baltimore City and hindered the creation of desegregative opportunities throughout the Region.  Especially when viewed as a pattern of activity over time, HUD's actions from 1989 to the present fell short of the constitutional and statutory obligation to disestablish segregation and promote fair housing.  *See Brinkman*, 443 U.S. at 538.  As previous testimony in this case shows, the impact of HUD's policies can be ascertained not just through aggregate numbers and evidence of administrative mismanagement, but also through the individual experiences of African-American voucher holders.  As one class member testified at the liability trial, finding acceptable housing on her Section 8 voucher prohibitively difficult: "I was . . . homeless with a voucher.  I had a voucher but I couldn't find a place to go."  Trial Tr. 640 (Dec. 3, 2003) (testimony of Mary Leighton).  HUD's failure to desegregate through its operation of public and assisted housing in the Baltimore Region has had real and devastating effects on African-Americans in Baltimore City.

## B.    HUD Has Failed to Use the Significant Authority it Wields Through its Grant Programs to Achieve or Even Pursue Desegregation

In addition to perpetuating segregation through its public and assisted housing programs,

---

[18](...continued)
standard – a housing authority obtains the optional bonus if half of Section 8 families with vouchers live in low-poverty areas or if Section 8 movers choose low-poverty neighborhoods at a slightly higher rate than all Section 8 families.  *See* 63 Fed. Reg. at 48,551.  HABC has never qualified for the deconcentration bonus even under this lax standard.  *See* Tamburrino Dep. Tr. of 5/16/05, at 102-03.

HUD has failed to use its significant authority through the Community Development Block Grant ("CDBG") program to disestablish segregation. By routinely rubber-stamping the grant applications and performance reports of CDBG grantees in the Baltimore Region, despite those grantees' perpetual failure to comply with the program's fair housing requirements, HUD has perpetuated the segregation of public housing residents in Baltimore City.

The CDBG program, administered by HUD's Office of Community Planning and Development ("CPD"), was authorized by the Housing and Community Development Act of 1974. In pertinent part, the CDBG program provides annual grants to qualifying cities and counties ("grantees" or "entitlement jurisdictions") for the purpose of undertaking development activities directed toward housing and housing-related facilities and services, such as neighborhood revitalization, economic development, and community facilities. *See* 42 U.S.C. § 5301. The total amount awarded to grantees in the Baltimore Region as defined by this case exceeded $37 million in 2005. *See* SOF ¶ 233.

Grantees generally have significant latitude to develop their CDBG projects and funding priorities, within certain broad statutory and regulatory guidelines. Those guidelines include the requirements that at least 70% of CDBG funds be spent on activities that benefit low- and moderate-income persons, and that grantees certify that they will affirmatively further fair housing. *See* 42 U.S.C. §§ 5301(c), 5304(b)(2). These requirements are in accord with the statute's goals, which include concern for deconcentration of urban areas. *See* 42 U.S.C. § 5301(a) ("Congress finds and declares that the Nation's cities, towns, and smaller urban communities face critical social, economic, and environmental problems arising in significant measure from . . . the concentration of persons of lower income in central cities.").

Because grantees must use CDBG program funds for housing and related services for

low-income persons, and because grantees must certify that they will further fair housing in their use of program funds, the CDBG program has significant potential to be used as a vehicle for desegregating public housing. However, from 1989 to the present, HUD – through a combination of minimal implementation of fair housing compliance requirements, ineffective fair housing review, and acquiescence in non-compliance – has failed to use the powerful leverage it holds through its CDBG grant-making authority even to require minimal steps toward desegregation. This pattern of HUD decisions resulting in hands-off management of the program and its fair housing requirements reflects conscious policy choices, rather than statutory or regulatory constraints.

### 1.  HUD's Review of CDBG Fair Housing Requirements is Minimal and Non-Substantive

To receive its CDBG grant, each grantee must develop and submit to HUD a planning document and funding application called the Consolidated Plan, or "Con Plan."[19] The Con Plan is submitted every five years, with certain components re-submitted annually. *See* 24 C.F.R. § 91.5, 91.15(b). Among the annual requirements is a certification that the grantee will affirmatively further fair housing. *See* 24 C.F.R. § 91.15(b)(1). This certification (the "AFFH Certification") is defined to mean that the grantee "will conduct an analysis to identify impediments to fair housing choice within the jurisdiction,[20] take appropriate actions to overcome the effects of any impediments identified through that analysis, and maintain records reflecting the analysis and actions in this regard." 24 C.F.R. § 91.225(a)(1).

---

[19]The Consolidated Plan also serves as the application and planning document for three other formula grant programs administered by the HUD CPD Office, including HOME Investment Partnerships, Housing Opportunities for Persons with AIDS ("HOPWA"), and Emergency Shelter Grants ("ESG"). *See* 24 C.F.R. § 91.2(a).

[20]This analysis is referred to as the "Analysis of Impediments," or "AI."

33

HUD field staff review Con Plan submissions in a purely perfunctory manner, simply using a checklist to ensure that the required contents are present, but conducting no substantive review of a grantee's plan. *See* SOF ¶¶ 159-64. A grantee's AFFH Certification is considered presumptively correct and is automatically approved in forty-five days; the presumption of correctness must be affirmatively challenged by HUD, and then only if HUD determines that there is substantial evidence calling into question a grantee's future performance. *See* 24 C.F.R. §§ 91.5, 91.500(b), 570.429(g); *see also* SOF ¶ 165. Moreover, HUD does not review the Analysis of Impediments for completeness or sufficiency – in fact, the Analysis of Impediments is not ordinarily even submitted to HUD. *See* SOF ¶¶ 162-65. The AFFH Certification is approved so long as the grantee has completed an Analysis of Impediments at some point in the past, however long ago; HUD does not direct grantees that they must submit an updated Analysis of Impediments,[21] and HUD sets no timelines for performance or progress on removing identified impediments. *See id.* HUD has thus reduced the fair housing planning process and the AFFH Certification to mere exercises in paper compliance, devoid of any meaningful standards for actual performance.

HUD recognizes the inadequacy of its guidance as regards fair housing certification and performance review standards for CDBG grantees. In 1998, HUD published a proposed rule with the goal of clarifying how to determine the accuracy of a grantee's AFFH Certification, and of establishing performance review standards for the fair housing requirements. *See* 63 Fed. Reg. 57,882, 57,882 (Sept. 25, 1998) ("This proposed rule would . . . establish a standard for determining if the jurisdiction's certification regarding affirmatively furthering fair housing is

---

[21]Not a single grantee within the Baltimore Region has submitted an updated Analysis of Impediments for nearly ten years – each grantee thus bases its annual AFFH Certification on the Analysis of Impediments jointly submitted in 1996. *See* SOF ¶¶ 171-90.

inaccurate. . . . [and] provide performance review standards for affirmatively furthering fair housing requirements."). However, this rule was subsequently withdrawn after significant opposition was received from grantees, who complained that the proposed regulations would hold them to too high a fair housing standard. *See* SOF ¶ 166. HUD officials continue to concede today that the standards for determining the accuracy of a grantee's AFFH Certification should be clearer. *Id.* ¶ 167

> **2.      Although Unconstrained from Doing So, HUD Has Decided Not to Use its Leverage under its CDBG Grant-Making Authority to Facilitate Regional Desegregation in Baltimore**

In practice, HUD's application of the fair housing and desegregation requirements in the CDBG program is even more lax than the marginal, *pro forma* standards would suggest. During the Open Period, HUD officials have written literally dozens of intra-agency memos and letters to each of the Baltimore-area grantees – that describe not just the Baltimore grantees' lack of progress toward removing the impediments to fair housing in their respective geographic areas, but more fundamentally their lack of commitment to further fair housing at all. *See* SOF ¶¶ 171-92 (listing the extensive findings of noncompliance or poor compliance by Baltimore Region CDBG grantees with fair housing requirements). Nonetheless, and in the face of the Baltimore grantees' well-documented disregard for even the most basic of fair housing requirements, HUD has continued year after year to approve these grantees' Con Plan submissions, AFFH Certifications, and performance reports.[22]  *See* SOF ¶¶ 190-91.

---

[22]To give just one egregious (but not unusual) example, HUD's recent review (in 2005) of Baltimore County's use of its CDBG funds listed a number of concerns with regard to whether Baltimore County was affirmatively furthering fair housing, including that the County was not keeping records on investments in minority areas; that African-Americans and other minorities appeared to be excluded from the benefits of certain program activities; that the County did not identify any actions it took to remove identified impediments to fair housing; and

(continued...)

HUD has available to it the authority to suspend or terminate payments to CDBG grantees, or to impose a range of graduated, intermediate sanctions, as a remedy for noncompliance with program requirements such as the AFFH Certification.  *See* 42 U.S.C. § 5311(a); 24 C.F.R. § 570.913; *see also infra* Part IV.B.  Indeed, this authority entails not so much HUD's discretion as its *obligation* to suspend payments for noncompliance.  *See* 42 U.S.C. § 5311(a) (noting that if the Secretary of HUD finds a grantee in substantial noncompliance with any part of the CDBG program requirements, the Secretary "*shall*" terminate or reduce grant payments until the noncompliance is remedied).

HUD recognizes that this leverage provides it with a "powerful tool for fair housing." Ex. XX, 2005 Budget Submission for CPD, at 3 ("The failure . . . to develop an analysis of impediments to fair housing or to take reasonable action to address such impediments may result in the denial or loss of . . . formula funds until compliance is secured.  This is a powerful tool for fair housing."); *see also* SOF ¶ 154.  Notwithstanding the incredible leverage that HUD possesses to promote desegregation through this grant program, it is the *de facto* practice at HUD not to pursue such remedial steps at all.  *See* Kennedy Dep. Tr. 65-66 (statement by director of the CDBG program office that HUD is reluctant to restrict funds on the ground of noncompliance with program requirements, because communities are "entitled" to the funds). Indeed, despite the years of inadequate actions by Baltimore Region grantees with regard to their AFFH Certifications as described above (and set out in more detail in Plaintiffs' Statement of

---

[22](...continued) that the County did not describe actions taken to remove barriers to affordable housing for African-Americans.  *See* SOF ¶ 189.  Despite all of these findings, the review rates Baltimore County's annual performance "satisfactory."  *Id.*  The director of the CDBG program office at HUD headquarters testified that all of the concerns identified by the review looked like "red flags" to him, but nonetheless gamely asserted that "I can imagine circumstances in which this would be considered acceptable, minimally acceptable."  Ex. 647, Kennedy Dep. Tr. 179-88.

Facts), HUD has never once suspended or limited the annual CDBG grant for any of the Baltimore grantees. *See* SOF ¶¶ 190-91.

HUD's failure to exercise the immense leverage it controls through its grant-making authority to require or even encourage local jurisdictions to use their grant funds, in part, in the service of desegregation, is plainly evidence of HUD's failure to meet its constitutional obligations. As to the central constitutional requirement that HUD's policies actually achieve desegregation, the statistical evidence cited above sufficiently establishes that HUD has not remedied the longstanding concentration of black public housing residents in segregated areas. HUD's constitutional obligation is to "take *whatever steps might be necessary*" to eliminate the vestiges of segregation "root and branch." *Freeman*, 503 U.S. at 486 (quoting *Green*, 391 U.S. at 437-38) (internal quotation marks omitted) (emphasis added). In the housing desegregation context, such steps must include using related housing programs, where possible, to further desegregative goals. Accordingly, by failing to use its influence to require grantees to promote desegregation, and by failing even to enforce the minimal desegregative program requirements that do exist, HUD's actions in the Baltimore Region during the Open Period have perpetuated segregation in violation of the Fifth Amendment.

### C.    HUD Has Failed to Undertake Coordinated Efforts to Promote Regional Desegregation Across its Program Offices

Compounding the segregative effect of the HUD actions and inaction described *infra* Parts II.A. & II.B. is that HUD has never implemented a process by which its program offices could uniformly undertake a coordinated approach to promoting desegregation. While the Office of Fair Housing and Equal Opportunity ("FHEO") is responsible for implementing civil rights and fair housing requirements as they apply to HUD's public and assisted housing programs and HUD-funded grantees, FHEO's role in practice is limited to making

recommendations regarding whether a grantee or PHA is in violation of civil rights requirements. *See* SOF ¶¶ 219-26. FHEO has not been given any real authority to impose noncompliance sanctions such as withholding of funds; that authority is reserved for individual line offices, which do not follow any uniform or predictable approach. *Id.* The result, as HUD itself concedes, is that HUD has not effectively used the tools available to it to obtain greater compliance with civil rights and fair housing requirements. *Id.*

In addition to this lack of uniformity in enforcing civil rights requirements, there is no coordinated approach to making sure that fair housing considerations are raised at appropriate times in the decision-making processes of HUD's various line offices. *See* SOF ¶¶ 227-31. Given what has been described as the "fragmented" and "decentralized" decision-making process across HUD program areas, *see* Ex. 648, Khadduri Expert Report 9-10, this failure to provide for any over-arching review to ensure consideration of statutory and constitutional desegregation mandates amounts to an abdication of HUD's duty to remedy the effects of prior discrimination, and has plainly led to the segregated public housing patterns described above.

On the basis of all of the facts presented here, and those already found by the Court in its 2005 Liability Order, this Court should conclude that HUD has violated the Fifth Amendment by failing to disestablish the vestiges of segregation in Baltimore City public housing.

## III. This Court Properly Held that HUD Violated Its Statutory Obligation to Further Fair Housing

### A. HUD Has a Statutory Duty to Take Actions that Affirmatively Further Fair Housing

In the recent Memorandum and Order denying Federal Defendants' Motion for Summary Judgment, this Court rejected Federal Defendants' argument that they did not receive sufficient notice of the § 3608(e)(5) claim on which the Court based its liability holding. 2006 Summary

Judgment Order 6-9 (Paper 751).  The Court nonetheless held that it would permit Federal

Defendants to present supplemental evidence and argument regarding Plaintiffs' § 3608(e)(5)

claim.  *Id.* at 9.  Additional evidence from post-trial discovery reinforces rather than undermines

this Court's original conclusion that HUD violated § 3608(e)(5) by failing to affirmatively

further fair housing.

Section 3608(e)(5) of the Fair Housing Act ("the Act" or "Title VIII") requires the

Secretary of HUD to "administer the programs and activities relating to housing and urban

development in a manner affirmatively to further the policies of this subchapter."  42 U.S.C.

§ 3608(e)(5).  The policies of the Act are "to provide, within constitutional limitations, for fair

housing throughout the United States," 42 U.S.C. § 3601; to replace concentrated African-

American ghettos with "truly integrated and balanced living patterns," 114 Cong. Rec. 3422

(statement of Sen. Mondale); and to "remove the walls of discrimination which enclose minority

groups," 114 Cong. Rec. 9563 (statement of Rep. Celler).  The Supreme Court has held that

assuring fair housing is "a policy that Congress considered to be of the highest priority."

*Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 211 (1972).  Section 3608(e)(5) thus imposes

on HUD an affirmative obligation, of the highest priority, to act to promote fair housing and

desegregation in its programs and activities.  *See NAACP v. HUD*, 817 F.2d 149, 155 (1st Cir.

1987) (holding that the Act embodies "[Congress's] desire to have HUD use its grant programs

to assist in ending discrimination and segregation, to the point where the supply of genuinely

open housing increases") (opinion of then-Judge Breyer); *see also Thompson*, 348 F. Supp. 2d at

416, 457; 2006 Summary Judgment Order 4 (Paper 751).

HUD has previously argued in the instant action that mere consideration of actions that

may promote fair housing, however minimal or unsuccessful those actions may be, suffices to

meet the affirmative duty imposed by § 3608(e)(5). *See* Fed. Defs.' Trial Br. 43-45 (Nov. 17, 2003) (Paper 558). This argument is contrary to the Fair Housing Act's text and history, and to the weight of authority from courts construing the Act.

In one of the first decisions interpreting HUD's obligation under § 3608(e)(5), the Third Circuit ordered a remand of HUD's approval of an urban renewal plan in order for HUD to evaluate whether the project would increase ghettoization rather than alleviating it. *Shannon v. HUD*, 436 F.2d 809, 821-23 (3d Cir. 1970). The Third Circuit made clear that HUD's obligation under § 3608(e)(5), when read as part of the overall statutory context in which the Fair Housing Act was passed, involved taking active steps to achieve fair housing:

> Read together, the Housing Act of 1949 and the Civil Rights Acts of 1964 and 1968 show a progression in the thinking of Congress as to what factors significantly contributed to urban blight and what steps must be taken to reverse the trend . . . . In 1949, the Secretary [of HUD] . . . could not act unconstitutionally, but possibly could act neutrally on the issue of racial segregation. By 1964 he was directed . . . to look at the effects of local planning action and to prevent discrimination in housing resulting from such action. In 1968 he was directed to *act affirmatively to achieve fair housing*.

*Id.* at 816 (emphasis added); *see also id.* at 821 ("Increase or maintenance of racial concentration is prima facie likely to lead to urban blight and is thus prima facie at variance with the national housing policy.").

The Second Circuit has similarly held that under § 3608(e)(5), "[a]ction must be taken to fulfill, as much as possible, the goal of open, integrated residential housing patterns and to prevent the increase of segregation, in ghettos, of racial groups whose lack of opportunities the Act was designed to combat." *Otero v. N.Y. City Hous. Auth.*, 484 F.2d 1122, 1134 (2d Cir. 1973) (describing the § 3608(e)(5) obligation as an "affirmative duty to consider the impact of publicly assisted housing programs on racial concentration *and to act affirmatively* to promote

40

the policy of fair, integrated housing" (emphasis added)).  The First Circuit, reviewing the

applicable case law in *NAACP*, concluded that a reading of § 3608(e)(5) that requires HUD to

take affirmative action to promote fair housing and achieve desegregation is the "consensus

opinion set out in these many cases."[23]  *NAACP*, 817 F.2d at 155.

This broad interpretation of § 3608(e)(5) is consistent with the "familiar canon of

statutory construction that remedial legislation should be construed broadly to effectuate its

purposes."  *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967); *Hous. Opportunities Made Equal,*

*Inc. v. Cincinnati Enquirer, Inc.*, 943 F.2d 644, 646 (6th Cir. 1991) ("Courts have given a broad

reading to the [Fair Housing Act] in order to fulfill its remedial purpose."); *cf. City of Edmonds*

*v. Oxford House, Inc.*, 514 U.S. 725, 731 (1995) ("We also note precedent recognizing the [Fair

Housing Act's] 'broad and inclusive' compass, and therefore according a 'generous

construction' to the Act's complaint-filing provision." (quoting *Trafficante*, 409 U.S. at 209,

---

[23]Many other courts have concurred that § 3608(e)(5) imposes more than a mere
procedural obligation on HUD – that is, HUD may not meet its duty under § 3608(e)(5) simply
by giving "consideration" to the effect of its decisions on fair housing, but rather must take
affirmative steps toward the achievement of fair housing.  *See, e.g., Dean v. Martinez*, 336 F.
Supp. 2d 477, 487 (D. Md. 2004) (holding that § 3608(e)(5) "obligates HUD to do more than
simply refrain from discriminating; HUD must take *active steps* to ensure fair housing"
(emphasis added)); *Project B.A.S.I.C. v. Kemp*, 776 F. Supp. 637, 642-43 (D.R.I. 1991) ("[T]he
obligation [to further fair housing] does not end with a mere consideration of the proper
factors."); *Young v. Pierce*, 628 F. Supp. 1037, 1054 (E.D. Tex. 1985) ("It has been clear at least
since the passage of Title VIII . . . that HUD has had an affirmative duty to eradicate
segregation."); *NAACP v. Harris*, 567 F. Supp. 637, 644 (D. Mass. 1983) (holding that the
measure of HUD's satisfaction of its § 3608(e)(5) obligation is the *effectiveness* of HUD's
actions, and concluding that "[HUD]'s efforts to ensure fair housing have been ineffective. . . .
It has not used any of its immense leverage under [certain grant-making authority] to provide
adequate desegregated housing . . . ."); *Banks v. Perk*, 341 F. Supp. 1175, 1182 (N.D. Ohio
1972) ("The Fair Housing Act of 1968, in establishing a national policy of fair housing
throughout the United States, carried with it the clear implication that local housing authorities in
conjunction with Federal agencies responsible for housing programs are to *affirmatively institute*
*action* the direct result of which was to be the implementation of the dual and mutual goals of
fair housing and the elimination of discrimination in that housing." (emphasis added) (internal
citation omitted)), *rev'd in part on other grounds*, 473 F.2d 910 (6th Cir. 1973).

212)).

And as the First Circuit has further explained, even if HUD's statutory mandate is limited to mere consideration of the impact of its decisions on racial demographics, such consideration – if undertaken seriously – would itself bring about integrative results over time:

> [T]he need for such consideration itself implies, at a minimum, an obligation to assess negatively those aspects of a proposed course of action that would further limit the supply of genuinely open housing and to assess positively those aspects of a proposed course of action that would increase that supply. If HUD is doing so in any meaningful way, one would expect to see, over time, if not in any individual case, HUD activity that tends to increase, or at least, that does not significantly diminish, the supply of open housing.

*NAACP*, 817 F.2d at 156; *see also Jaimes v. Toledo Metro. Hous. Auth.*, 715 F. Supp. 835, 842 (N.D. Ohio 1989) ("If HUD is properly fulfilling its duties, over time one would expect to find HUD's activity increasing the supply of open, integrated housing. In this case, however, one finds that segregation in housing continued and the supply of open, integrated housing did not increase."). In other words, lack of integrative results over time is, *a fortiori*, evidence of a failure to meet the statutory mandate, even if that mandate is construed narrowly to require only consideration of the impact of HUD decisions on fair housing.

HUD is thus under an affirmative statutory obligation to take active steps toward the goal of open and integrated housing for African-American public housing residents throughout the Baltimore Region. As discussed below, HUD's pattern of activity in the Baltimore Region during the Open Period falls far short of its affirmative statutory duty to take steps toward the achievement of fair housing.

**B.     HUD's Actions and Failures to Act During the Open Period Fall Far Short of its Statutory Obligation to Further Fair Housing**

The pattern of actions and inaction described above in support of Plaintiffs'

constitutional claim more than suffice to demonstrate statutory liability as well.  Numerous courts have recognized that the same factual evidence can give rise to both constitutional liability under the Fifth Amendment for failure to disestablish, and to statutory liability under § 3608(e)(5) for failure to further fair housing.[24]  *See, e.g.*, *Clients' Council v. Pierce*, 711 F.2d 1406, 1425 (8th Cir. 1983); *Young*, 628 F. Supp. at 1052-57; *Resident Advisory Bd. v. Rizzo*, 425 F. Supp. 987, 1013-18, 1028 (E.D. Pa. 1976).

This Court already found, on the basis of the voluminous evidence presented at the liability trial, that HUD violated the Fair Housing Act by concentrating public housing in Baltimore City to the exclusion of suburban counties.  *Thompson*, 348 F. Supp. 2d at 456-65.  The additional evidence presented above only bolsters this conclusion.

HUD has plainly not met its statutory obligation to take affirmative steps to achieve fair housing.  As numerous courts have held, compliance with the § 3608(e)(5) mandate can be measured by whether HUD's actions, over time, are reflected in an increase in the supply of open housing opportunities for public housing residents.  *See NAACP*, 817 F.2d at 156; *Jaimes*, 715 F. Supp. at 842.  The facts as presented plainly show no such increase in open housing opportunities throughout the Baltimore Region for African-American public housing residents, either during the Open Period or earlier.

The duty to affirmatively further fair housing also requires, at the least, consideration of

---

[24]This Court may conclude that HUD's conduct gives rise to a § 3608(e)(5) violation even if this Court finds that HUD has not violated the Fifth Amendment.  *See Clients' Council*, 711 F.2d at 1425 ("Even if HUD were not liable under the fifth amendment, the facts here demonstrate that HUD failed to carry out its affirmative duty" to promote fair housing pursuant to § 3608(e)(5)).  However, if this Court finds that HUD has violated the Fifth Amendment, the same conduct that gave rise to constitutional liability would, *ipso facto*, mandate a finding of statutory liability as well.  *See id.* ("Because we have found HUD liable for a constitutional violation, it certainly cannot have met its responsibility to promote fair housing.").

whether a proposed course of action is likely to increase or decrease desegregative opportunities. *See, e.g.*, *NAACP*, 817 F.2d at 156. But as many of the specific examples cited above demonstrate, HUD makes major programmatic decisions with no consideration whatsoever of the impact on fair housing of alternative courses of action, and does not even have an institutionalized method for pursuing a coordinated fair housing strategy. *See generally infra* Part II; *see also Thompson*, 348 F. Supp. 2d at 443 ("Federal Defendants failed to take adequate action to disestablish the vestiges of discrimination they had participated in imposing. Specifically, in administering its housing policies during the Open Period, HUD failed adequately to consider policy options whereby low-income African-American families from Baltimore City might be afforded housing opportunities beyond the City limits. Indeed, Federal Defendants did not improve, and may have worsened, the racially discriminatory situation by making no more than token efforts to take a regional, rather than merely a city limited, approach to the siting of housing for members of the Plaintiff class.").

## IV.     Remedy for Constitutional and Statutory Violations

As shown, HUD has failed to meet its statutory and constitutional duties to promote fair housing and eliminate the legacy of segregation. This failure has caused a decreased supply of integrated housing in the Baltimore Region and an increase in the concentration of African-American public housing residents in Baltimore City. Accordingly, this Court can and should order HUD to undertake the specific steps identified in Plaintiffs' attached Proposed Remedial Order, so as to rectify the segregation that was caused and perpetuated by HUD's failure to adopt a regional approach to public housing in Baltimore.

### A.     Having Found Unlawful Activity, the Court Has Broad Remedial Power to Undo the Legacy of HUD's Statutory and Constitutional Violations

This Court has very broad authority to order such relief as may be necessary to remedy a

44

constitutional violation.  As the Supreme Court has held: "Our prior decisions counsel that in the event of a constitutional violation 'all reasonable methods be available to formulate an effective remedy,' and that every effort should be made by a federal court to employ those methods 'to achieve the greatest possible degree of [relief], taking into account the practicalities of the situation.'"  *Hills v. Gautreaux*, 425 U.S. 284, 297 (quoting *N.C. State Bd. of Educ. v. Swann*, 402 U.S. 43, 46 (1971), and *Davis v. Sch. Comm'rs of Mobile County*, 402 U.S. 33, 37 (1971)) (alteration in original); *see also Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971); 2006 Summary Judgment Order 27 (Paper 751).  As one district court has explained in a case of unconstitutional housing segregation: "[W]hen faced with a civil rights violation, a United States District Court has not merely the power but the duty to remedy the effects of past violations, as well as bar similar violations in the future."  *Resident Advisory Bd. v. Rizzo*, 425 F. Supp. 987, 1026 (E.D. Pa. 1976).

This Court similarly has broad authority under the APA to remedy HUD's statutory violation of the Fair Housing Act.  Under § 706(2) of the APA, this Court can "hold unlawful and set aside" agency action or inaction that is arbitrary, capricious, or in excess of statutory authority.  5 U.S.C. § 706(2).  As the Court has recognized, "in devising an appropriate remedy, the words 'set aside' need not be interpreted narrowly."  2006 Summary Judgment Order 27 (Paper 751) (quoting *NAACP*, 817 F.2d at 160) (internal quotation marks omitted).  Thus, while this Court may not intrude excessively upon HUD's administrative province, the Court retains its traditional equitable powers to "adjust its relief to the exigencies of the case in accordance with the equitable principles governing judicial action."  *Ford Motor Co. v. NLRB*, 305 U.S. 364, 373 (1939); *see also, e.g.*, *Darst-Webbe Tenant Assoc. Bd. v. St. Louis Hous. Auth.*, 339 F.3d 702, 713-14 (8th Cir. 2003) ("If the district court determines that HUD abused its discretion, the

district court has the authority to enjoin the use of HOPE VI grant funds or Section 108 loan guarantees until HUD satisfies the court that it has taken appropriate steps to affirmatively further fair housing."); 2006 Summary Judgment Order 27-28 & n.21 (citing cases) (Paper 751).

In considering Plaintiffs' proposed remedies, described below and set out in detail in the Proposed Remedial Order, this Court should thus bear in mind the scope of the violations that the remedy is intended to correct.  *See, e.g.*, *Thompson*, 348 F. Supp. 2d at 408 ("Baltimore City should not be viewed as an island reservation for use as a container for all of the poor of a contiguous region . . . .").[25]  Especially given this Court's previous finding that "absent judicial compulsion, [HUD] appears most unlikely [to meet its desegregative obligations] in the foreseeable future," *id.* at 464,  this Court should do more than merely "order[] HUD to perform acts which would be required of it even absent a finding of past culpability."  *NAACP v. Kemp*, 721 F. Supp. 361, 367 (D. Mass. 1989).

Accordingly, to address the conditions perpetuated by HUD's course of conduct, this Court should order HUD to take specific steps that the Court finds necessary to remedy HUD's statutory and constitutional violations in the Baltimore Region.  *See, e.g.*, *Ala. Ctr. for the Env't v. Browner,* 20 F.3d 981, 986 (9th Cir. 1994) ("In tailoring the relief granted, the district court correctly recognized that in order to bring about any progress toward achieving the congressional objectives of the [Clean Water Act], the EPA would have to be directed to take *specific steps*." (emphasis added)); *Santillan v. Gonzales*, 388 F. Supp. 2d 1065, 1085 (N.D. Cal. 2005) (requiring the agency to develop a specific process for providing relief to class members).  This Court has recognized that "if HUD had, in fact, fulfilled its duty [to affirmatively further fair

---

[25] *See also id.* at 461 ("HUD's various housing programs, as implemented, failed to achieve significant desegregation in Baltimore City.  This is true during the Open Period as it had been in the preceding decades.").

housing], HUD's actions would have tended to increase, or at least not significantly decrease, the supply of open housing." *Thompson*, 348 F. Supp. 2d at 460. The Court therefore can and should order HUD to take specific action necessary to undo the concentration of public housing in the Region's poorest, most racially segregated areas. *See Shannon*, 436 F.2d at 820-21. As described below in Part IV.B, the provisions set forth in Plaintiffs' proposed order are undeniably necessary for full relief from HUD's failure to desegregate public housing, but do not intrude unnecessarily upon HUD's province or require HUD to act outside its authority.

**B.    Plaintiffs' Proposed Remedy Requires HUD to Fulfill its Statutory and Constitutional Duties While Remaining Within the Bounds of HUD's Authority and Preserving HUD's Discretion**

The remedy Plaintiffs propose furthers the goals established for HUD by Congress and the Constitution, but falls well within HUD's authority and preserves agency discretion to the fullest extent appropriate. The proposed remedy requires HUD to create regional desegregative housing opportunities in order to disestablish the vestiges of past intentional segregation and affirmatively further fair housing. In addition, the proposed order requires HUD to consider regional approaches to desegregation and the promotion of fair housing in its own decision-making processes, its evaluation of applications for federal funding, and its control over the Section 8 voucher program. The creation of genuinely open housing and the consideration of regionalization in federal housing programs are integral to HUD's fulfillment of its constitutional and statutory duties.

**1.    This Court Can and Should Order HUD to Create an Affordable Housing Desegregation Plan for the Baltimore Region**

The first component of the proposed order is a requirement that HUD develop an Affordable Housing Desegregation Plan ("Plan") for the Baltimore Region. *See* Proposed Order § II.A. In the Plan, HUD must set out its goals for increasing the supply of open housing in the

47

Region, the points in its decision-making processes when these goals will be considered, the

actions HUD will take to achieve these goals, and the performance standards that will be used to

track its progress.  This part of the remedy flows directly from HUD's liability in this case.  In its

decision in the liability phase, the Court found:

> HUD must take an approach to its obligation to promote fair
> housing that adequately considers the entire Baltimore Region.
> The need for such consideration requires, at a minimum, that HUD
> "assess negatively those aspects of a proposed course of action that
> would further limit the supply of genuinely open housing and to
> assess positively those aspects of a proposed course of action that
> would increase the supply."

*Thompson*, 348 F. Supp. 2d at 458 (quoting *NAACP*, 817 F.2d at 156).  The Plan requires HUD

to explain how it will assess its decision-making processes and its control of federal resources so

as to increase the supply of genuinely open housing throughout the entire Baltimore Region.

The requirement that HUD develop the Plan incorporates the benefit of HUD's expertise

and retains HUD's discretion wherever possible.  Such planning requirements have been

included in remedial orders in numerous housing desegregation cases.  *See, e.g.*, *Young v.

Cisneros*, No. P-80-8-CA, at 2, 19 (E.D. Tex. Mar. 30, 1995) (Final Judgment and Decree)

[hereinafter *Young* 1995 Final Judgment] (incorporating HUD's East Texas Comprehensive

Desegregation Plan and requiring HUD to develop supplemental desegregation plans for any

area deemed to be racially hostile); *Walker v. HUD*, No. 3:85-CV-1210-R, at 10 (N.D. Tex. Apr.

16, 1996) (Remedial Order Affecting HUD) [hereinafter *Walker* 1996 Remedial Order]

(requiring HUD prepare and submit for court approval a schedule for funding and achieving

parity between conditions at predominantly-black and predominantly-white projects).

The appropriateness of requiring HUD to produce a regional desegregation plan is also

demonstrated by the requirements HUD itself imposes on local jurisdictions and PHAs to satisfy

their requirement to affirmatively further fair housing. HUD regulations require CDBG and HOME funding recipients to certify as part of their Consolidated Plans that the jurisdiction will identify and analyze impediments to fair housing, take actions to overcome these impediments, and maintain records to track progress. *See* 24 C.F.R. § 91.225(a)(1). HUD also requires PHAs to certify as part of their Annual Plans that they, too, will affirmatively further fair housing by engaging in fair housing planning. *See id.* § 903.7(o). Just as the planning process is integral to local jurisdictions' and PHAs' duty to affirmatively further fair housing, a regional desegregation plan is integral to HUD's consideration of regional approaches to its duty to affirmatively further fair housing.

### 2. This Court Can and Should Order HUD to Consider Regional Desegregation in Evaluating Applications for Federal Funding

The second component of the proposed order requires HUD to consider regional desegregation in its evaluation of applications for federal funding. *See* Proposed Order § III. Plaintiffs' proposed remedy requires HUD to consider whether local jurisdictions and PHAs use federal resources to further open regional housing as part of HUD's assessment of grantees' Con Plan and Action Plans, as well as PHAs' Five-Year and Annual Plans. HUD is also required to consider how federal housing development funds can be used to increase the supply of open housing and to safeguard against the use of federal funds to reduce the supply of open housing through demolition and redevelopment. This component of the remedy is again based directly on HUD's liability in this case. As the Court noted in denying HUD's motion for summary judgment, liability is based on HUD's failure to consider regionalization despite its control over vast federal housing resources in the Baltimore Region, its authority over the development of housing, and its supervision of federal housing and community development programs. *See* 2006 Summary Judgment Order 5-6 (Paper 751). Plaintiffs' proposed order requires HUD to

consider regional approaches to desegregation in exercising its considerable leverage and control over these processes.

Again, HUD's discretion is retained by allowing HUD to develop the specific performance standards and guidelines for evaluating funding applications and housing planning submissions. The requirement that HUD consider desegregation and fair housing in its control over federal resources has also been an integral part of the remedy in other housing desegregation cases. *See, e.g.*, *Kemp*, 721 F. Supp. at 370 ("In enforcing this Decree, HUD shall use any power it possesses to impose conditions on grantees, recipients, or beneficiaries, pursuant to any grant or any other program"); *Young v. Pierce*, 685 F. Supp. 986, 988 (E.D. Tex. 1988) (Interim Injunction) (requiring that HUD "exercise its discretion under its various housing programs" to create desegregative housing alternatives).

As this Court has noted, HUD's authority over local jurisdictions' use of federal resources gives it the power and leverage to accomplish desegregation by acting regionally, which no single jurisdiction can do. *Thompson*, 348 F. Supp. 2d at 462. Statutes and regulations give HUD tremendous authority over the use of federal housing resources. Statutes governing the CDBG program require grantees to submit to HUD, prior to receiving any federal funds, a statement of objectives and projected uses. 42 U.S.C. § 5304(a). No CDBG grant may be made unless a potential grantee certifies to the satisfaction of the Secretary of HUD that it will use federal funds to affirmatively further fair housing. *Id.* § 5304(b)(2). HOME program participating jurisdictions must submit to HUD a comprehensive housing affordability strategy that includes a certification that the jurisdiction will affirmatively further fair housing. *Id.* § 12705(b). PHAs must submit Five-Year and Annual Plans, setting out their objectives and certifying that they will affirmatively further fair housing. *Id.* § 1437c-1. All demolitions and

dispositions of public housing must be undertaken pursuant to a plan approved by HUD, *id.*

§ 1437p, and HUD must approve all sites selected for the development of public housing, 24

C.F.R. § 941.202.

As this Court found in the liability phase, "[c]ompliance with Federal law, including

Federal Civil Rights laws, is a condition of receiving federal funds . . . [and] HUD has a wide

range of sanctions it can impose . . . to carry out this task." *Thompson*, 348 F. Supp. 2d at 506.

HUD has the discretion to reject a CDBG grantee's Con Plan if the Secretary finds its

certification to affirmatively further fair housing unsatisfactory. 24 C.F.R. § 91.500(b). HUD

may disapprove a HOME participating jurisdiction's housing strategy if it is inconsistent with

the purposes of the program, which include improving housing opportunities for minorities and

expanding federal rental assistance to low-income families. *See* 42 U.S.C. §§ 12702(3);

12703(4); 12705(c). HUD may disapprove a PHA's plan if it is inconsistent with law, including

federal civil rights laws. *Id.* § 1437c-1(i)(3). HUD regulations state that HUD will challenge a

PHA's plan where the PHA does not reduce racial segregation or creates new segregation in

housing. 24 C.F.R. § 903.2(d)(3). HUD may reject an application for demolition if reasonable

modifications would make the project useful and may reject an application for disposition if it is

not in the best interests of the residents. 42 U.S.C. § 1437p(b). HUD can disapprove proposed

sites for the development of public housing for a host of reasons, including because the site is in

an area of minority concentration, because the site does not promote greater choice of housing

opportunities and avoid concentration of low-income residents, or because the travel time from

the site to places of employment for low-income workers is too high. 24 C.F.R. § 941.202.

HUD has great authority to control and condition federal housing resources. Plaintiffs' proposed

order requires HUD to take regional desegregation into account when wielding this impressive

51

authority.

### 3.    This Court Can and Should Order that HUD Create Measurable Desegregative Housing Opportunities

The third component of Plaintiffs' proposed order requires HUD to create 675 desegregative housing opportunities per year for ten years after the date of this Court's order, in addition to the opportunities created under the Partial Consent Decree in this case.[26]  *See* Proposed Order § IV.  The creation of desegregative housing opportunities on a set timetable is necessary to remedy HUD's constitutional and statutory violations.  *See* Khadduri Rebuttal Report at 1 (agreeing with HUD's expert William Rohe that there should be a fixed number of units in the remedial order).   This Court noted that if HUD in fact fulfills its statutory duty to adequately consider regional desegregation, HUD's actions will increase the supply of genuinely open, integrated housing.  *Thompson*, 348 F. Supp. 2d at 458 (citing *NAACP*, 817 F.2d at 156).  As a reflection of this expected outcome, and the necessity of fashioning a constitutional remedy that effectively disestablishes the vestiges of segregation, Plaintiffs' proposed order requires HUD to create desegregated housing opportunities on a set timetable.  This timetable provides a necessary means of measuring whether HUD has taken steps to disestablish segregation and to promote regional housing through its planning process, thereby moving toward fulfillment of its statutory and constitutional duties.

HUD should receive credit toward the creation of desegregative housing opportunities

---

[26] The methodology used to derive this number – which is required to provide Plaintiffs with an appropriate choice of homes in Communities of Opportunity – is set out by Plaintiffs' expert witness Dr. Jill Khadduri in her Rebuttal Expert Report of January 6, 2006.  *See* Khadduri Rebuttal Report at 1-2.  At the end of ten years, it would result in housing opportunities for the Plaintiffs in the suburban counties to the same extent (relative to the number of such units in the City) that the private market has created housing opportunities for unassisted low-income renter families.  *Id.*

when it provides for the placement of a class member in a "community of opportunity" in the Baltimore Region.[27]  *See* Proposed Order § IV.A.2.  The requirement that HUD provide housing in communities of opportunity is directly tied to its liability in this case.  HUD perpetuated the segregation of public housing residents, in violation of the Fifth Amendment and the Fair Housing Act, by impeding the development of and access to housing opportunities outside Baltimore City.  HUD's actions isolated African-American public housing residents from communities with high performing schools, meaningful employment, and various civic institutions.  *See* powell Report at 11.  The only effective remedy to the unconstitutional segregation of public housing residents in Baltimore City ghettos is the creation of desegregative housing opportunities for those residents in communities of opportunity in the Baltimore Region.  Housing opportunities in these communities provide the Plaintiffs with exactly what HUD's constitutional and statutory violations deprived them of: the choice to live in a neighborhood with high performing schools, gainful employment, viable transportation, and other meaningful opportunities.

The appropriateness of requiring HUD to create housing in communities of opportunity is also reflected in the goals Congress has established for the agency and HUD's own directives to recipients of its assistance.  The objectives and purposes of housing and community development legislation directly support the creation of housing in communities of opportunity.  Federal public housing law requires the deconcentration of poverty in public housing, and HUD's regulations similarly require PHAs to promote such deconcentration.[28]  *See* 42 U.S.C.

---

[27] Plaintiffs' proposed remedy defines communities of opportunity based on economic opportunity, educational opportunity, and neighborhood stability, Proposed Order § I.D., as mapped out by Plaintiffs' expert john powell.  *See* powell Report at 3, 50-52.

[28]Other relevant statutes and regulations similarly support this goal.  The "primary

(continued...)

§ 1437n(a)(3); 24 C.F.R. Part 903. The creation of housing opportunities for class members in communities of opportunity effectuates the goals established for HUD by Congress and effectively remedies HUD's constitutional and statutory violations in this case.

Under Plaintiffs' proposed order, HUD would retain discretion to determine the types of opportunities created and the programs used to create them, but the proposed order suggests several potential sources of voucher opportunities, including vouchers from the *Thompson* Partial Consent Decree, unused tenant-protection vouchers, recaptured vouchers, and voluntary contributions of vouchers from PHAs in the Baltimore Region. *See* Proposed Order § IV.D.8.

The proposed order also directs that of the 675 additional housing opportunities HUD is to create each year, an annual average of 300 should be "hard units." *See id.* § IV.B. This requirement reflects the finding, made by this Court, HUD, and the experts, that vouchers alone are inadequate to achieve desegregation in the Baltimore Region. *See Thompson*, 348 F. Supp. 2d at 460 (stating that "HUD itself recognized that one of the 'lessons learned' from its HOPE VI program is that housing vouchers are not viable replacement housing options in tight housing markets like Baltimore," and noting that Section 8 vouchers alone are inadequate to advance desegregation); Replacement Housing Factor in Modernization Funding, 63 Fed. Reg. 46,104

---

[28](...continued)
objective" of the CDBG program is "the development of viable urban communities, by providing decent housing and a suitable living environment and expanding economic opportunities, principally for persons of low and moderate income." 42 U.S.C. § 5301(c). The goals of the HOME program are "to increase the Nation's supply of decent housing that is affordable to low-income and moderate-income families and accessible to job opportunities" and "to improve housing opportunities for...members of disadvantaged minorities. *Id.* § 12702. The purposes of HOPE VI are to "provid[e] housing that will avoid or decrease the concentration of very low-income families" and "build[] sustainable communities." *Id.* § 1437v(a). HUD's regulations also recognize that the development of public housing must promote greater choice of housing opportunities; avoid concentration of assisted persons; provide access to social, recreational, educational, commercial, and health facilities; and be located where a range of jobs are accessible to residents. 24 C.F.R. § 941.202.

(Aug. 28, 1998) ("With respect to the creation of 'hard replacement units' as opposed to tenant based assistance, [HUD] believes both approaches should be used."); Turner & Briggs Report 33-39 (explaining why "[a]n effective remedy must include a supply-side strategy as well as vouchers"); Khadduri Rebuttal Report 3 (explaining that hard units are an important part of fair housing remedies because they provide access to areas where vouchers are ineffective due to high rents, lack of rental housing, or discrimination). This element of the proposed order is also grounded in a number of practical realities. HUD programs that finance hard units continue to exist, and provide a valuable resource to meet remedial goals. *See* SOF ¶¶ 245-85. In addition, the siting of units developed through these programs, if not used to help the remedial goals, will perpetuate the previous patterns of concentrating hard units in segregated areas. Also, as more and more HUD-assisted units leave the housing stock and the supply of affordable housing shrinks, it becomes increasingly difficult for displaced and other low-income families to find housing, even with a voucher. As one HUD official explained, "there is not an infinite number of units available, and as the vacancy rate gets lower and lower, it gets scarier and scarier about whether or not we will find places for people to move to." Ex. 639, Henderson Dep. Tr. of 2/26/03 at 248.

### 4.    This Court Can and Should Require HUD to Manage its Voucher Program in a Way That Achieves Desegregation

The fourth component of the proposed order requires HUD to exercise its control over tenant-based assistance to make open, integrated housing throughout the Baltimore Region available to the Plaintiffs. The proposed remedy requires HUD to select an entity to administer on a regional basis the vouchers used to provide fair housing opportunities under the order. *See* Proposed Order § IV.D. HUD must also select and fund an entity to provide mobility counseling to voucher holders. *Id.* § IV.E. Finally, HUD would be required to exercise its authority over

55

the portability provisions of the Section 8 voucher program to make vouchers in the Baltimore metropolitan area truly regional.  *Id.* § IV.G.

Because vouchers are a key source of federal housing assistance, the regional administration of the vouchers is an integral part of requiring HUD to assess regional desegregation in a way that increases the supply of open housing.  The Court recognized in its 2005 Liability Order that Section 8 vouchers as currently administered are inadequate to advance the cause of desegregation.  *See Thompson*, 348 F. Supp. 2d at 460.  Because of mismanaged voucher administration, procedural constraints on voucher portability, and the Baltimore Region's tight housing market, minority voucher-holders are denied access to housing in communities of opportunity outside Baltimore City.  This perpetuation of the vestiges of segregation is made worse by the fact that vouchers are HUD's primary new source of federal housing assistance.  *See id.* (noting "any increase in federally-assisted housing opportunities during the 1990s came as a result of the Section 8 voucher/certificate program").  Plaintiffs' proposed remedy requires HUD to exercise its control over vouchers in a way that fulfills its statutory and constitutional duty to further open, integrated housing.

Administration of vouchers by an alternate entity is consistent with precedent and well within HUD's statutory authority.  Similar provisions have been part of other housing desegregation remedies.  *See, e.g.*, *Young* 1995 Final Judgment 16-17 (ordering HUD to establish and fund a "Fair Housing Services Center" to administer desegregative Section 8 housing vouchers).  Where HUD determines a PHA is unable to implement a voucher program or where a PHA is not performing effectively, HUD itself can administer the voucher program or contract with another entity to do so.  *See* 42 U.S.C. §§ 1437a(b)(6)(B)(iii), 1437f(b)(1).  Where a PHA does not comply with the federal laws and regulations that are conditions of its funding

contract, HUD may solicit proposals and select an entity to administer the programs operated by the PHA. *Id.* § 1437d(j)(3)(A)(i). In addition, HUD has the authority to place a mismanaged PHA under administrative receivership and hire a contractor to administer the PHA's program. *Id.* § 1437d(j)(3)(A)(iv). In this case, the findings by this Court, and by HUD itself, demonstrate that HABC is unable to implement or effectively administer a Section 8 voucher program. Any voucher remedy administered by HABC would inevitably be undermined by the poor reputation and credibility of HABC's Section 8 program, as well as the reality that it is barely able to operate a functional program, much less one that is regional in scope. Because vouchers are essential to expanding housing opportunities, Plaintiffs' proposed order requires HUD to exercise its authority to select a regional voucher administrator so as to fulfill its statutory and constitutional duties to increase the supply of genuinely open, integrated housing in the Baltimore Region.

Plaintiffs' proposed order also requires HUD to assist class members in finding and moving to desegregative housing opportunities. Mobility counseling is an integral aspect of a housing desegregation remedy. *See* Ex. 656, Turner & Briggs Report 22-24 (explaining how mobility counseling "can significantly improve locational outcomes for voucher recipients"); Ex. 648, Khadduri Report 22 ("[W]ithout special mobility counseling efforts, most vouchers users find housing in the same types of neighborhoods as other low-income families.").

Under Plaintiffs' proposed order, HUD must make mobility counseling available to public housing residents seeking to make desegregative moves. *See* Proposed Order § IV.E. HUD retains discretion to determine who provides the mobility counseling. Numerous housing desegregation cases have required HUD to provide specified mobility counseling services but allowed HUD discretion to choose the mobility counselor. *See, e.g.*, *Young* 1995 Final Judgment

17 (requiring HUD to submit a request for proposals for nonprofit organizations to provide specified mobility counseling services); *Walker* 1996 Remedial Order 18 (requiring HUD to fund mobility counseling services to be provided by local PHA or nonprofit organization). Housing experts, courts, and HUD agree that mobility counseling is integral to furthering open housing. Plaintiffs' proposed order requires HUD to fulfill this key part of its statutory and constitutional duty, but retains HUD's discretion over the process to the fullest extent possible.

Plaintiffs' proposed order also requires HUD to consider regional desegregation in making decisions regarding the Section 8 voucher program. *See* Proposed Order § IV.G. The proposed remedy requires HUD to maintain Fair Market Rents for the Baltimore housing market at the 50th percentile, to approve requests for exception payment standards for the Baltimore housing market unless good cause exists for denial, and to review the effect of local residency preferences on desegregative housing opportunities. *See* Proposed Order § IV.G. Requiring HUD to consider desegregation in the operation of the Section 8 program has been a part of other housing desegregation remedies. *See, e.g.*, *Young*, 685 F. Supp. at 990 (requiring HUD to consider the effect of rent levels on desegregative housing opportunities for class members); *Walker* 1996 Remedial Order 18-19 (requiring HUD to authorize exception payment standards to promote desegregative housing opportunities unless inconsistent with statutory requirements). These requirements are consistent with HUD's statutory and regulatory authority. HUD controls FMRs and may set FMRs at the 50th percentile where warranted. *See* 24 C.F.R. § 888.113(c). HUD also has authority to approve exception payment standards where supported by data. *See id.* § 982.503(c).

The proposed order also requires HUD to review local preferences for selecting voucher families, and to determine their effect on regional housing opportunities. *See* Proposed Order

§ IV.G.7.  Such local restrictions are often barriers to the use of vouchers by minorities hoping to make desegregative moves.[29]  HUD regulations require that local residency preferences comply with the equal opportunity and non-discrimination requirements of Title VI and the Fair Housing Act.  24 C.F.R. § 982.207(b).  The Plaintiffs' proposed remedy requires HUD to examine whether local preferences contribute to this problem and determine whether such restrictions on voucher use are consistent with PHAs' duty to affirmatively further fair housing and HUD's duty to ensure equal opportunity and non-discrimination in housing.

> **5.    This Court May Order That HUD Make Provision for Community Input into HUD's Consideration of Regional Approaches to Fair Housing**

Finally, the fifth component of the Plaintiffs' proposed order requires community input into HUD's consideration of regional desegregation.  The proposed remedy includes an Advisory Group that will present to HUD suggestions and observations regarding regional approaches to fair housing at appropriate points in the decision-making process.  *See* Proposed Order § V.  This component of the Order reflects the importance of effective and appropriate community participation in the remedy.  *See* Ex. 656, Turner & Briggs Report 39-42 (explaining why "[t]he Baltimore remedy would benefit from well-targeted and structured stakeholder participation in the development of implementation plans").  The proposed order encourages the participation of receiving communities in the implementation of the remedy, but does not allow these communities to prevent the integration of public housing residents.  The Advisory Group includes landlords and developers to ensure the effective creation of desegregative housing opportunities.  *See* Ex. 657, Briggs Rebuttal Report 9 (explaining why remedy should include

---

[29]*See* Ex. 656, Turner & Briggs Report 28 (noting "[s]uburban communities often oppose the arrival of voucher families from nearby cities, because of their race, their poverty, or both").

input from landlords in communities of opportunity).  The Advisory Group also includes representatives of state and local governments, local businesses, and community organizations to ensure early consultation on the siting of affordable housing and reduce resistance to desegregative moves.  *See id.* at 9-10 (explaining why "early consultation has a clear role to play where new units are developed"); Susan J. Popkin et al., Baseline Assessment of Public Housing Desegregation Cases 100 (2000).  The Advisory Group should provide input for the formulation and review of HUD's Affordable Housing Desegregation Plan, and at any other point that HUD deems appropriate.  HUD retains the discretion to determine how to receive and consider comments from the Advisory Group.

Proper consideration of community input can play an integral role in both equitable remedies and HUD housing programs.  The Supreme Court has counseled that "[i]n exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."  *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982).  The Advisory Group serves as an important indicator of the "public consequences" of this Court's order and HUD's actions, and can ensure that the kind of input received is advice about how, and not whether, to comply with this Court's remedy.

## CONCLUSION

For the foregoing reasons, this Court should hold that Federal Defendants violated the Fifth Amendment by failing to disestablish segregated public housing; reaffirm its earlier holding that Federal Defendants violated the Fair Housing Act by failing to meet their obligation to affirmatively further fair housing; and order the relief requested in Plaintiffs' Proposed Remedial Order.

Dated: <u>February 21, 2006</u>.

                          Respectfully submitted,

                          Theodore M. Shaw, Director-Counsel
                          Robert H. Stroup
                          Melissa S. Woods
                          Matthew Colangelo
                          Melanca D. Clark
                          NAACP LEGAL DEFENSE &
                           EDUCATIONAL FUND, INC.
                          99 Hudson St., 16th Floor
                          New York, NY 10013
                          212-965-2200; (fax) 212-226-7592

                          Peter Buscemi
                          E. Andrew Southerling
                          Edward S. Keefe
                          David M. Kerr
                          Harvey Bartle, IV
                          Jason Benion
                          Jennifer A. Bowen
                          MORGAN, LEWIS & BOCKIUS LLP
                          1111 Pennsylvania Avenue, NW
                          Washington, D.C. 20004
                          202-739-3000; (fax) 202-739-3001

                             / s /
                          _____
                          Andrew D. Freeman, Bar No. 03867
                          BROWN, GOLDSTEIN & LEVY, LLP
                          120 E. Baltimore Street, Suite 1700
                          Baltimore, MD 21202-6701
                          410-962-1030; (fax) 410-385-0869

                          Barbara Samuels, Bar No. 08681
                          ACLU FOUNDATION OF MARYLAND
                          3600 Clipper Mill Road, Suite 350
                          Baltimore, MD 21211
                          410-889-8555; (fax) 410-366-7838

                          *Attorneys for Plaintiffs*