**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| CARMEN THOMPSON, et al., | |
| Plaintiff, | |
| v. | Civil Action No. MJG-95-309 |
| UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, et al., | |
| Defendants | |

**PLAINTIFFS' PROPOSED ORDER ON REMEDY**

This Court has found the United States Department of Housing and Urban Development ("HUD") liable for its role (and the role of its federal predecessor agencies) in failing to affirmatively further fair housing and for perpetuating maintaining and failing to disestablish racial segregation in violation of the constitutional and civil rights of a class of African-Americans.   After extensive briefing by the parties and a hearing on the final remedy it is ORDERED, ADJUDGED, and DECREED that the Honorable Alphonso Jackson, as Secretary of the Department of Housing and Urban Development, his officers, agents, servants, employees, successors, and all persons in active concert or participation with them shall be, and are hereby, PERMANENTLY ENJOINED, to take the actions necessary to effectuate the relief decreed by the provisions of this Remedial Order "Order", either directly, or through contractual or other arrangements, as set forth below.

I.      **DEFINITIONS**

        A.  <u>Baltimore Housing Market</u> -- The Baltimore Housing Market covers the Baltimore

1

Metropolitan Statistical Area (M.S.A.) as defined by the U.S. Census Bureau, specifically Baltimore City, and Anne Arundel, Baltimore, Carroll, Harford, Howard and Queen Anne counties.

B. <u>Baltimore Region</u> -- The Baltimore Region refers to Baltimore City, and Anne Arundel, Baltimore, Carroll, Harford, and Howard Counties.

C. <u>Class Member</u> -- A class member is any person within the class definition set forth in Section 11.1 of the Partial Consent Decree in this case.

D. <u>Communities of Opportunity</u> -- Communities of Opportunity are those census tracts in the Baltimore Housing Market identified as "high" or "very high" opportunity areas taking into account economic, educational, and neighborhood health indicators, as identified on page three of john powell's Expert Report dated August 19, 2005. Census tracts designated as Communities of Opportunity are listed in Appendix A to this Order. Census tracts designated as Communities of Opportunity shall be subject to review and updating every two years from the date of entry of this Order.

E. <u>Hard Units</u> -- Hard units are housing units financed with public housing funds, Low Income Housing Tax Credit units, project-based voucher units, units financed with Community Block Development Grant funds, units financed with HOME program funds, units financed with FHA Up Front Grants, FHA single or multifamily property disposition units or units financed with HUD-insured mortgages, provided the units are affordable to families at or below 30% of the median income.

F. <u>Minority or Poverty Impacted Areas</u> -- Minority or Poverty Impacted Areas are those census tracts identified as "impacted" in Section 2.11 of the Thompson Partial Consent Decree

2

(as amended from time to time).

G. <u>Significant HUD Decisions</u> -- Significant HUD Decisions are those decisions that affect the supply, location, availability or affordability of housing for minorities and low-income persons in the Baltimore Region.  Significant HUD Decisions include the following:

1.  Decisions related to the funding, siting, acquisition, demolition,  sale, disposition, mandatory conversion or voluntary conversion of public housing;

2.  Approval of Public Housing Authority  ("PHA") annual and five year plans, Consolidated and Annual Action Plans, and Moving to Work plans;

3.  Approval of the  sale, financing, restructuring, foreclosure, disposition and demolition of HUD insured or assisted multifamily properties;

4.  Approval of competitive grant funding applications;

5.  Approval of exception payment standards.

## II.  HUD'S AFFORDABLE HOUSING DESEGREGATION PLAN

A.  HUD shall develop an Affordable Housing Desegregation Plan for the Baltimore Region.

B.  Within four months of the date of this Order, HUD shall serve upon the Plaintiffs, and submit for approval of the Court, an Affordable Housing Desegregation Plan ("Plan") for the Baltimore Region.  The Plaintiffs shall have sixty days from the date of service within which to file comments or objections to the proposed Plan.  If such comments or objections are filed, the Court shall conduct such proceedings as are required to resolve any differences between the parties.

C.  The Plan shall be developed by a working group to be selected by HUD, which shall

3

be led by a representative of the Office of the Secretary or the Office of General Counsel ("OGC"), and should include the Assistant Secretary or his/her designee from the Offices of Housing ("OH"), Public and Indian Housing ("PIH"), Community Planning and Development ("CPD"), Fair Housing and Equal Opportunity ("FHEO"), Policy Development and Research ("PD&R"), and the Budget Office.

    D.  HUD's General Counsel shall be responsible for ensuring HUD compliance with its obligations as set forth in this Order.

    E.  The Affordable Housing Desegregation Plan developed and implemented pursuant to this Section shall include, but not be limited to the following:

        1.  Actions HUD will take to implement the changes in HUD decision-making to achieve the Desegregative Opportunities and other objectives required by this Order,

        2.  Steps HUD will take to ensure meaningful substantive review of funding decisions and program performance such that the federal funds provided by HUD and other federal agencies to grantees in the Baltimore Region, or used directly by HUD, are used to affirmatively further fair housing and to create housing opportunities in Communities of Opportunity that are affordable and available to class members.

        3.  The incentives and substantive fair housing performance standards and measures HUD will implement to guide the selection of sites and projects in the Baltimore Housing Market that will receive investments of HUD funds.

        4.  The requirements and substantive fair housing performance standards which HUD will implement to facilitate the use of remedial vouchers in Communities of Opportunity.

        5.  Steps HUD will take to strengthen cooperation and coordination among HUD

program areas to implement the Plan and to more effectively affirmatively further fair housing in

the Baltimore Region, including identification of resources administered by various program

areas of HUD that will be marshaled and coordinated to implement the Plan.

      6.  Steps HUD will take to fulfill its duties as the lead federal agency charged with

government-wide coordination of federal actions to affirmatively further fair housing under

Executive Order 12892, to forge new and stronger external partnerships with other federal

departments and agencies and to coordinate use of other federal resources to more effectively

affirmatively further fair housing in Baltimore Region.  This will include, but not be limited to,

coordination of HUD housing and community development programs with the Treasury

Department's LIHTC program, and the public transportation programs of the Department of

Transportation.

      7.  A list of impediments, both internal and external to HUD, including regulatory

barriers and local residency preferences, to achieving the goals and objectives of this Order,

actions planned to overcome the effects of identified impediments, and performance standards to

track progress in overcoming such effects.

      8.  Steps HUD will take to ensure consideration of affirmatively furthering fair

housing in decision-making processes involving Significant HUD Decisions.  Such consideration

shall include:

        a.)  the effect of the decision or proposed action on the supply of  assisted

or affordable rental housing in Communities of Opportunity,

        b.)  the potential that the decision or proposed action will have an adverse

impact(s) on African Americans, and if so how such impact can be avoided, minimized or

mitigated,

c.)  whether the Significant HUD Decision is consistent with this Order and HUD's Affordable Housing Desegregation Plan.  A decision will be considered "consistent" with the Plan if it funds, approves, implements, facilitates, expedites or promotes actions necessary to increase housing opportunities in Communities of Opportunities and does not reduce, hinder, delay or impede such opportunities.

9.  Milestones and timetables for the implementation of the Plan and the accomplishment of the goals of the Plan and this Order.

F.  HUD shall review the adequacy of the Affordable Housing Desegregation Plan as necessary and no less than once annually.  If the annual performance goals specified in Section (IV) of this Order are not met, HUD shall update the Affordable Housing Desegregation Plan and include:

1.  A listing of activities planned, currently being carried out, and accomplished to implement this Order, including those activities undertaken by HUD, state and local governments, PHAs, or others to implement this Order.

2.  A list of impediments, including regulatory barriers and local residency preferences, to achieving the numerical objectives set forth in this Order and the status of efforts made by HUD to address itself, or cause others to address, these identified impediments by implementing specific ameliorative actions to affirmatively furthering fair housing, and by eliminating or modifying proposals or actions that would have a segregative impact.

3.  Updated timetables for achieving the Plan's objectives.

G.  Any update shall be submitted to the Advisory Group created pursuant to Section V of

6

this Order and Plaintiffs' Counsel for comments and to the Court for review and approval. Plaintiffs shall have the opportunity to object, for good cause, to any provision of the Plan.

III.   **HUD REVIEW OF REGIONAL ACTIONS TO AFFIRMATIVELY FURTHER FAIR HOUSING**

A.  HUD shall ensure that the applicable jurisdictions and PHAs in the Baltimore Region are taking meaningful steps to meet their statutory duty to affirmatively further fair housing by implementing, at a minimum, the following requirements respecting the use and investment of federal resources in the development of public and assisted housing through each and every federal program where federal funds are used for such activity, by requiring the following:

1.  The development of guidelines, in Consolidated Plans, PHA Plans, MTW Plans, or in the expenditure of Housing Development Funds to encourage the location of rental housing for family occupancy in Communities of Opportunity and require that no fewer than 50% of the housing units developed with investment of federal resources be located in Communities of Opportunity.  These guidelines should discourage the investment of federal resources for rental housing construction and rehabilitation in minority or poverty impacted areas, unless the project is part of a coordinated, market-driven revitalization undertaking, and there is evidence of the following:

a.)  Demonstrable public and private investments have been made in schools, market rate housing and non-housing neighborhood improvements (e.g. transportation linkages to employment centers, public services, economic development, recreation and open space) in the census tract in which the proposed housing will be located, resulting in significant revitalization; and

b.)  Meaningful opportunities for educational and economic advancement exist in the census tract where the proposed development will be located; and

c.)  Development of market rate units in the same census tract where the proposed development will be located has occurred on such a scale that the market rate units will positively impact the poverty rate in the area.

2.  HUD shall require that Consolidated Plans, PHA and MTW Plans include:

a.)  Investment of the grantee's HOME and CDBG funding in family rental housing that is proportional to the housing needs of small and large family households with incomes below 30% of area median;

b.)  An analysis of how the jurisdiction's or PHA's Plans will support the desegregation of public and assisted housing opportunities throughout the Baltimore Housing Market as well as within the jurisdiction preparing the plan;

c.)  For the State of Maryland, an explanation of how Maryland's Qualified Allocation Plan ("QAP") for the LIHTC supports the development of units of affordable family housing outside minority or poverty impacted areas.  For the local jurisdictions, an explanation of their criteria for giving and for withholding local government support for projects proposing to apply to the State of Maryland for Low Income Housing Tax Credits and other funds.

3.  Analysis of Impediments.  HUD shall require its grantees, including the State of Maryland and all jurisdictions required to complete Annual Action and Consolidated Plans, and all PHAs required to complete PHA Annual and Five Year Plans, to examine and perform a new Analysis of Impediments to Fair Housing Choice ("AI") and develop, as part of the

8

Consolidated Plan or PHA Five Year Plan a Fair Housing Action Plan with specific performance measures, including objectives and timetables for the actions it will take to eliminate any identified impediments (including, those impediments identified in the 1996 Regional AI), and to engage in fair housing planning on an on-going basis. This AI and Fair Housing Action Plan shall be performed within one year of the entry of this Order and thereafter, no less frequently than every five years in conjunction with, and at the same time that the jurisdiction is preparing a new Consolidated Plan, PHA Five Year Plan or MTW Plan.

4.    PERFORMANCE STANDARDS AND MONITORING

a.)  HUD shall obtain the AI for each jurisdiction and PHA in the Baltimore Region, shall establish performance standards for the evaluation of Fair Housing Action Plans adopted to address identified impediments, and shall monitor progress in implementing the Fair Housing Action Plan, and the results of those actions.

b.)  HUD shall perform a substantive review annually of the performance of each jurisdiction and PHA under their Fair Housing Action Plan for compliance with the HUD established requirements described above.

c.)  HUD will ensure that its monitoring schedule for  jurisdictions and PHAs  includes a Title VI and Title VIII compliance review of  each entitlement grantee in the Baltimore Region within five years of the date of entry of this Order and an on-site fair housing/civil rights monitoring review of each grantee no less than once every three years.

5.  HUD shall not approve a competitive grant application for the use of HUD funds for development unless at least half of the grant funds requested in the application are used to develop public or assisted housing opportunities in Communities of Opportunity.

9

6.  HUD shall not approve any plans for demolition or redevelopment of public and assisted housing in the Baltimore Housing Market or Baltimore Region that would have the effect of reducing the net number of assisted or affordable housing units in Communities of Opportunity.  HUD shall not approve any plans for demolition or redevelopment of public and assisted housing which will result in adverse impacts on minority occupants, or a reduction of housing opportunities for minority families, unless HUD requires measures to mitigate those adverse impacts, including a plan that describes the units, if any, that will be developed  on site or off-site to restore the demolished units.

7.  HUD shall set performance standards for the relocation plans associated with the redevelopment of public housing or the retirement of units from the public housing stock that encourage and assist families to move to Communities of Opportunity rather than to minority or poverty impacted areas or to neighborhoods that have rapidly increasing African American populations.  These performance standards shall include, at a minimum, a goal for providing housing opportunities in Communities of Opportunity to persons eligible for relocation assistance by HUD or its agents.  HUD shall also monitor the implementation of the relocation plans.

## IV.    DESEGREGATIVE HOUSING OPPORTUNITIES

A.  CREATION OF DESEGREGATIVE HOUSING OPPORTUNITIES

1.  HUD shall, to the full extent of any power and discretion it possesses to impose conditions on grantees, recipients, beneficiaries, participating jurisdictions or others under any grant or any other program, cause to be placed into use 675 housing opportunities in Communities of Opportunity per year, for ten years, in addition to the Special Certificates,

10

project-based and/or hard units that HUD funds and places into use in non-impacted[1] areas pursuant to Section 10.7 of the Thompson Partial Consent Decree.

  2. HUD shall be given credit towards achievement of the annual numerical goal of desegregative housing opportunities required under Section (IV)(A)(1) of this Order when it provides, or causes its grantees or recipients to provide, in a Community of Opportunity

   (a) the placement of a Class Member household or an African-American Baltimore City household on the HABC waiting list in a hard unit that meets Housing Quality Standards and is "affordable" to the household;

   (b) the use of a voucher by a Class Member household or an African-American Baltimore City household on the HABC waiting list to rent a unit that meets Housing Quality Standards.

  3. Within the guidelines set forth in this Section, HUD shall have the flexibility and discretion to change the mix of types of opportunities and program emphasis from year to year as necessary .

  4. HUD will make efforts to avoid clustering of desegregative opportunities within a single development or elementary school zone and shall otherwise seek to have such opportunities take advantage of or be connected to job opportunities and community support.

 B. CREATION OF HARD UNITS

  1. This Court has found that the creation of hard-units is necessary to provide full relief to the Plaintiffs.

---

[1]As that term is defined in the Thompson Partial Consent Decree, as amended.  Under the terms of the Thompson Partial Consent Decree, to date, HUD is required to fund 2,253 Special Certificates, project-based and/or hard units.

2.  Therefore, the annual number of housing opportunities required under Section (IV)(A)(1) of this Order shall include at least 300 two-or-more bedroom hard units in Communities of Opportunity, of which at least 200 shall have three or more bedrooms, to be provided through construction, acquisition, rehabilitation, or otherwise.

3.  Such hard units shall be occupied by Class Members and eligible families referred by the Regional Administrator in order to meet the obligations of this Section.  Hard units should be located within a mixed income apartment complex or development in which they comprise no more than 20% of the units, or widely scattered and integrated into a market rate neighborhood.

4.  Such hard units may also include Section 8 homeownership units and homeownership units built or acquired and rehabilitated through self-help housing programs such as Habitat for Humanity, provided the units are affordable to families at or below 30% of the median income and are occupied by Class Members or eligible families referred by the Regional Administrator.  HUD will cooperate with sponsoring organizations, faith-based and other non-profit developers seeking to acquire FHA single family disposition properties to sponsor such homeownership units.

C.  Should HUD fail to meet its obligations to produce the required number of desegregative units provided under this Order in any year, HUD shall, within 3 months of such failure, notify the plaintiffs and the Court and propose a mechanism whereby the shortfall will be corrected.

D.    USE OF VOUCHERS

1.  To the extent vouchers are used to create Desegregative Housing Opportunities

required under this Section, HUD shall establish region-wide administration of the vouchers.

2.  HUD will procure, or cause to be procured, the services of the administrator of the Partial Consent Decree vouchers to act as the Regional Administrator of vouchers under this Order, unless HUD shows good cause for not doing so.  In that event, HUD shall select a Regional Administrator which shall be responsible for the regional administration of vouchers to be made available by HUD, by means to be determined by HUD, to meet the requirements of this Order.

3.  Before exercising its discretion with respect the selection of the Regional Administrator, HUD shall notify Plaintiffs and the Advisory Group of its decisions made with respect to the preceding paragraph, and shall allow sixty days for Plaintiffs to evaluate and comment upon those decisions.  HUD shall take into account the comments of the Plaintiffs and the Advisory Group in making its final selection of the Regional Administrator.

4.  Vouchers administered by the Regional Administrator shall be used exclusively for the rental or purchase of units in Communities of Opportunity for the initial year of occupancy, with the exception of those vouchers provided to households eligible for relocation assistance from HUD or its grantees.  Participation in the remedial voucher program provided by this Order is based upon a voluntary choice of all who participate.

5.  The Regional Administrator will have responsibility for tracking the number of housing opportunities that will be credited toward HUD's annual and cumulative goals. The Regional Administrator will track the number and location of placements made through the Regional Mobility Program, and HUD will direct PHAs and assisted housing providers to report data on other qualifying placements and opportunities to the Regional Administrator.

6.  The Regional Administrator will work with interested local jurisdictions to prevent the creation of undue concentrations of poverty that could undermine the benefits of the program for participating families.  To this end the Regional Administrator will:

a.)  To the extent permitted by law,  make referrals of housing units and arrange placements so that (1) no more than 20% of the units in any one apartment complex or development with 50 or more units are leased by Housing Choice Voucher holders; and (2) take into account the number of children in the local school receiving free and reduced meals (if the family has school age children); (3) take into account the pace of placements in particular apartment complexes, developments and census tracts as well as the cumulative number of placements;

b.)  Monitor whether Communities of Opportunity with African-American populations already above the average for the region are  receiving a disproportionate number of placements or hard units, and if warranted by the data, recommend to the parties that particular census tracts be eliminated from the list of designated Communities of Opportunity.

7.  The Regional Administrator may utilize vouchers it administers as tenant-based assistance, project-based and homeownership assistance.

8.  Until the goals of this Order have been met, remedial vouchers administered by the Regional Administrator may include, but not be limited to:

a.)  Thompson PCD Special Certificates (now "Special Vouchers").  If the contractor administering the Special Certificates as defined under the Thompson Partial Consent Decree is retained as the Regional Administrator, that contractor will continue to administer the Special Vouchers. Use of the Special Vouchers, including all conditions and selection priorities,

will continue to be governed by the Partial Consent Decree;

b.) Tenant Protection Vouchers for Past Public Housing Demolition, i.e., replacement vouchers for all units of public housing that have been approved for retirement from the public housing stock in the Baltimore Region and for which vouchers have not yet been allocated as of January 1, 2006;

c.) Future Tenant Protection Vouchers, i.e., all tenant protection vouchers provided by HUD after January 1, 2006, as a result of the demolition, disposition, non-renewal, HUD enforcement action or other "vouchering out" of HUD assisted housing units in the Baltimore Region including public housing units.  The Regional Administrator must first use a tenant protection voucher to assist families adversely affected by the action and targeted for assistance.  Vouchers used by a targeted family will not be subject to the conditions applicable to the remedial vouchers as described in Section (III)(A)(4) of this Order;

d.) Former "Regional Certificates," i.e., 1,500 bonus certificates awarded by HUD to the Baltimore Region under the former AHOP program to promote regional mobility;

e.) Recaptured Vouchers.  HUD shall use its full authority and discretion, along with its best efforts to make funding available for authorized Vouchers that were not included in the renewal funding base of a PHA in the Baltimore Region because the vouchers were not in use during the May-July 2004 period.   Any such voucher funding that is restored will be administered by the Regional Administrator.  Families on the waiting list of the PHA from which vouchers are recaptured will be equally eligible to receive vouchers made available under this provision;

f.) Voluntary Contributions of Vouchers: HUD shall encourage PHA's

15

operating in the Baltimore Region to contribute vouchers and associated administrative fees to be administered by the Regional Administrator as part of the efforts of the PHA and its jurisdiction to affirmatively further fair housing:

i.) Portability Vouchers.  When a tenant wishes to "port out of" a local PHA, that PHA may transfer administration of the voucher to the Regional Administrator in lieu of utilizing the billing/absorbing portability procedures;

ii.) Project-based and Homeownership Vouchers.  A local PHA may transfer administration of the vouchers to the Regional Administrator to administer project-based or homeownership assistance to be offered to families on the PHA's waiting list for assistance.  For any vouchers made available under this provision, families on the county waiting list will be equally eligible to received such vouchers.

9.  The Regional Administrator shall receive administrative fees associated with the vouchers it administers.  The Regional Administrator shall be eligible to apply for incremental vouchers under any competitive NOFA, and shall also seek funding under federal, state and local programs that support relevant activities, including but not limited to housing counseling, planning, technical assistance, and fair housing initiatives.

10. Family participation in the Remedial Voucher Program is voluntary. By applying for  a remedial voucher, an applicant for a remedial voucher does not give up his or her standing on any other waiting list for public housing, regular Section 8 assistance, or any other type of assisted or subsidized housing.  The Regional Administrator will establish a system for accepting applications and maintaining a waiting list of interested families, and apply the Housing Choice Voucher screening and eligibility criteria and any appropriate screening criteria

16

to be agreed upon by the parties.

E.  MOBILITY COUNSELING

1.  The Court has also found that mobility counseling is necessary to make vouchers effective in creating Desegregative Housing Opportunities.

2.  Therefore, HUD shall procure a Mobility Counselor to provide mobility counseling to persons seeking to use vouchers in Communities of Opportunity in the Baltimore Housing Market.  The Mobility Counselor may be the same entity as the Regional Administrator, or the mobility counseling program may be subcontracted to a separate entity.

3.  Before selecting the Mobility Counselor, HUD shall notify Plaintiffs and the Advisory Group of its choice and allow sixty days for Plaintiffs and the Advisory Group to evaluate and comment upon the choice.  HUD shall take into account the comments of the Plaintiffs and the Advisory Group in making its final selection of the Mobility Counselor.

4.  HUD shall provide or cause to be provided funding for the Mobility Counselor sufficient to achieve the goals of this Order, including not only staff and facilities, but families' transportation costs (as they make efforts to locate housing in the Baltimore Region), incentive payments to landlords, and revolving loan funds to help participating families cover application fees, security deposits, and moving costs.

5.  The duties of the Mobility Counselor shall include, but not be limited to:

a.)  Outreach to potential participants, including provision of information on the benefits of moving to a Community of Opportunity;

b.)  Outreach to and recruitment of landlords, owners, and developers of housing units in Communities of Opportunity;

17

c.) Outreach to community organizations that can provide support to families, including but not limited to such groups as service organizations, YMCA's and YWCA's, Boys & Girls Clubs and faith-based organizations to solicit their involvement in identifying available housing and linking families to services and other supports in their communities;

d.) Intensive Pre-move counseling, including individual counseling, to inform participants about locational options in Communities of Opportunity, provide training in tenant/landlord rights and responsibilities, and to help participants pass standard private market screening procedures;

e.) Referral to at least three vacant and available housing units of appropriate size in Communities of Opportunity selected by the family;

f.) Housing search assistance, including listing of available housing units in Communities of Opportunity and the provision of transportation, child care and other advocacy services to assist voucher-holders in finding a unit;

g.) Intensive post-move counseling and advocacy, including assistance with needed transitions, assistance in maintaining stable housing, and, as needed, second move counseling;

h.) Assistance and appropriate referrals in the event that participants encounter discrimination or harassment;

i.) Collection of data on interim and long-term outcome of the Mobility Counseling Program including families' ability to access improved housing and neighborhood quality, transportation, health care, schools, and jobs in their new neighborhoods.

18

F.    PERFORMANCE STANDARDS

1.  HUD shall adopt performance standards to evaluate the performance of the Regional Administrator and Mobility Counselor and hold the entity(s) accountable for meeting these standards.

2.  For the Regional Administrator, performance standards shall include but not necessarily be limited to:

a.)  Achievement of an annual minimum number of placements of vouchers in Communities of Opportunity as described in Section (V) of this Order.

b.)  Achievement of a minimum retention rate measured by the number of participants who renew leases in their original placement or move to another Community of Opportunity,

c.)  Diversity of location and frequency of placement in Communities of Opportunity to which participants move.

2.  For the Mobility Counselor, performance standards shall include (but not necessarily be limited to) those specified above for the Regional Administrator, as well as the following:

a.)  Effectiveness of housing search assistance;

b.)  Number of referrals provided to each participant for placements in Communities of Opportunity;

c.)  Effective provision of information about housing options and community services in Communities of Opportunity, including potential employment opportunities;

19

d.) Nature and results of participant outreach;

e.) Nature and results of landlord outreach and recruitment;

f.) Effective provision of post-move and second-move counseling, including counseling to assist participants in passing standard tenant-screening procedure;

g.) An accounting of the duration of residence of participants who move to Communities of Opportunity;

h.) Diversity of location and frequency of placement in Communities of Opportunity to which participants move.

4. The Mobility Counselor and Regional Administrator will provide an annual work plan and monthly statistical and narrative reports to plaintiffs respecting its activities in implementing the program. The reporting format and content will be agreed upon by the parties, the Regional Administrator and the Mobility Counselor, and will include at a minimum, the following activities and their results: family outreach, intake, screening, pre- and post-placement counseling, landlord outreach, and leasing activity. The reports will also identify any impediments, internal or external, to achieving program goals and objectives, actions planned to overcome the effects of identified impediments, and performance standards to track progress in overcoming such effects.

G. FAIR MARKET RENTS AND EXCEPTION PAYMENT STANDARD PROCESSES IN THE BALTIMORE HOUSING MARKET

1. HUD shall ensure that vouchers are administered in the Baltimore Region in ways that expand and do not limit opportunities for Participants to choose desegregated housing in the Baltimore Housing Market. This shall include but not be limited to the following actions.

2. EXCEPTION PAYMENT STANDARDS. HUD will provide market data to the Regional Administrator annually. The Regional Administrator shall consult with PHAs in the Baltimore Region each year and submit a request for exception payment standards, supported by data, as the Administrator deems appropriate.

3. HUD shall provide its Baltimore field office with authority to approve exception payment standards for the Baltimore Housing Market requested by the Regional Administrator, or by a PHA in the Baltimore Region, unless good cause is shown. Before denying a request for an exception payment standard, HUD must submit to the Court and Plaintiffs in writing the grounds for its planned disapproval, along with the data and information supporting the decision. In making any decision with respect to a request for exception payment standards HUD will consider its duty to administer the voucher program to affirmatively further fair housing, and the goals and objectives of this Order.

4. HUD shall strongly encourage all PHAs in the Baltimore Region to utilize the exception payment standard amounts requested by the Regional Administrator and approved by HUD and will consider whether a PHA is utilizing the exception payment standards in considering whether a PHA and it entitlement jurisdiction are affirmatively furthering fair housing.

5. In determining the funding formula for tenant protection, incremental and renewal vouchers administered by the Regional Administrator and PHAs in the Baltimore Region, HUD shall consider its duty to affirmatively further fair housing, and the goals and objectives of this Order, and to the maximum extent permitted by law, HUD shall use its discretion to ensure that the formulas take into account the average cost of a voucher used in

21

Communities of Opportunity in the Baltimore Housing Market.

      6.  FAIR MARKET RENTS.   HUD shall continue setting Fair Market Rents for the Baltimore MSA at the 50th percentile level until the goals and objectives of this Order have been met, and will not withdraw 50th percentile FMRs based on poor or deficient reporting by one or more PHAs in the Baltimore Region.  HUD shall encourage PHAs in the Baltimore Region to set payment standards no less than 100% of the 50th percentile FMR, and will consider whether the PHA has done so in determining whether the PHA and its jurisdiction are affirmatively furthering fair housing.

      7.  LOCAL PREFERENCES.  HUD shall conduct a civil rights and fair housing review of any local residency preferences.  As a condition of approval of a local residency preference HUD shall require the PHA to conduct affirmative outreach to households working in the jurisdiction and will audit whether such persons are properly afforded the benefit of the residency preference.

    H.  Eligible families shall be selected to participate in the Remedial Voucher program in the following order of priority:

      1.  Class Members currently residing in public housing projects, including scattered site housing;

      2.  Other Class Members;

      3.  Families on the HABC waiting list living in a census tract with an African-American population above 75% and a poverty rate above 30%.

      4.  Within each of the above categories of priority, preference shall be given to:

        a.)  Families with an urgent need for relocation, including but not limited

to: a documented health condition of a family member, or the need of a family member to obtain

housing closer to a place of employment, education, or training;

        b.)  Families with children.

## V.    COMMUNITY INPUT

    A.  A standing Advisory Group shall be created for the purpose of generating alternatives,

and critiquing or fine-tuning specific proposals for HUD's consideration of regional approaches

to the desegregation of public housing. HUD shall create a mechanism to receive input from the

Advisory Group at the following points in its decision-making processes:

    1.  Formulation of the HUD Affordable Housing Desegregation Plan as set forth

in Section (II) of this Order;

    2.  Review of the Adequacy of the Affordable Housing Desegregation Plan as

required under Section (II)(F) of this Order;

    3. Any other point at which HUD or the Regional Administrator deems

appropriate.

    B.  The Advisory Group will act as an Advisory Board to the Regional Administrator.

    C.  ADVISORY GROUP COMPOSITION

    1.  The Advisory Group shall be comprised of members nominated by the parties,

and selected by this Court, and shall include at least one representative from each of the

following communities, organizations, or entities:

    a.)  Community organizations in the Baltimore Region (including faith

based organizations);

    b.)  The local governmental entity in each jurisdiction in the Baltimore

Region responsible for administration of housing programs;

    c.) The Maryland Department of Housing and Community Development;

    d.) Fair housing and tenant advocacy organizations;

    e.) Family support organizations;

    f.) Workforce development organizations;

    g.) Local foundations supporting housing opportunity;

    h.) Business organizations (e.g. Greater Baltimore Committee, Presidents Roundtable);

    i.) Major Baltimore employers of service and entry level workers;

    j.) Labor organizations involved in promoting affordable housing;

    k.) Developers experienced in the production of affordable housing;

    l.) Multifamily property managers operating in the Baltimore Region;

    m.) Local transportation planing entity (e.g. Baltimore Metropolitan Council);

    n.) Local financial institutions; and

    o.) The real estate industry.

2. The Court suggests that the Advisory Group consider the creation of task forces as appropriate, including a "Family Support Task Force" to focus on the effective provision of social services to families who move to Communities of Opportunity and a "Housing Supply Task Force" to focus on procurement of affordable housing in those communities.

3. A Steering Committee of 10 members shall be selected by vote of the Advisory

Group, and shall be responsible for final determination and submission of the recommendations of the Advisory Group to be provided to HUD.

4. An Advisory Group Chair shall be selected by this Court, with the assistance of the parties, who will be responsible for directing the work of the Advisory Group and Steering Committee.

C. ADVISORY GROUP ADMINISTRATION

1. The Advisory Group shall meet at such times and adopt such procedures as the Advisory Group shall agree by majority vote of its members, provided that such meetings are frequent enough to allow for Advisory Group input to HUD as set forth in Section (II)(G) and (V)(A) of this Order.

2. HUD shall be responsible for the administrative costs of the meetings of the Advisory Group, including travel costs of the members to attend, and a full-time professional staff member to support the work of the Advisory Group.

## VI. DATA COLLECTION, REPORTING, AND MONITORING REQUIREMENTS

A. For the Baltimore Housing Market or Baltimore Region, HUD shall produce or commission an annual report of:

1. The location of HUD assisted housing units, including information on the locations of LIHTC rental developments, and families using the Housing Choice Voucher Program. The analysis shall include:

a.) Housing conditions of the identified housing stock;

b.) Income and racial characteristics of the tenants occupying the units;

c.) Size of the unit and number of bedrooms of individual units; and

25

d.)  Their location with respect to measures of opportunity.

2.  An inventory of FHA single and multifamily property disposition units and private housing inventory, to target for housing voucher locations and hard unit development acquisition.

3.  The uses of HUD funds in the Baltimore Region.

4.  These reports shall be made available by HUD to the Plaintiffs' Counsel, grantees and the public in the Baltimore Region.

B. HUD shall produce to Plaintiffs' Counsel and the Court annually a report of the following:

1.  The cumulative total number of remedial vouchers being administered by the Regional Administrator, the number of remedial vouchers issued, and the number and percentage successfully used under this Order;

2.  The cumulative total number of hard units provided under this Order;

3.  The location of hard units provided under this Order, (for single family units the census block group will be reported instead of a street address);

4.  The accounting of receipt and expenditure of funds related to implementation of the Affordable Housing Desegregation Plan.

## VII.    NOTICE AND OUTREACH TO CLASS MEMBERS

A.  HUD shall, based on the information compiled in Section (VI) of this Order, distribute annually to each Class Member a written notice of all HUD-assisted low-income housing developments in the Baltimore housing market that offer housing opportunities in a Community of Opportunity.

26

B. The notice shall include a description of the remedial voucher program, the address and telephone number of the Regional Administrator, and the general eligibility requirements for participation.

C. The notice shall also include the full address, telephone number, and name of the person responsible for accepting applications for a development, a short description of the type of housing offered by the development, and the general eligibility requirements for the development.

## VIII.    MISCELLANEOUS

A. This Order overrides any provisions of the Moving to Work agreement between HUD and HABC that are in conflict with provisions of this Order.

## IX.    JURISDICTION OF THE COURT

A. All provisions of this Order shall require or be construed as requiring compliance with federal statutes, as they now exist or as they may be amended or enacted.

B. The Court retains jurisdiction to enforce and modify this Remedial Order according to general equitable principles.

C. Ten years after the date of the Order, HUD may ask the Court to review the progress made in implementing this Order, and based upon such review, to modify or terminate any obligations provided therein.

## X.    ENFORCEMENT

A. Plaintiffs may move this Court for an Order to compel or enforce the obligations provided for in this Order after thirty (30) days' notice to HUD, stating the default or non-compliance alleged in such a motion, and the actions needed to resolve the alleged default or

non-compliance.  Where extraordinary circumstances require immediate action, the notice period shall be waived.  In that event, the provisions of the Federal Rules of Civil Procedure 65 will govern.

B.  Any party may, pursuant to appropriate procedures, move this Court to enter an Order adding another entity or person as a party to this action for the purpose of enjoining that entity or party from interfering with or frustrating the implementation of this Order.

DATED:  _____

_____
The Honorable Marvin J. Garbis
United States District Judge

## APPENDIX A–CENSUS TRACTS

| | | | | |
|---|---|---|---|---|
| 24003701101 | 24003740202 | 24005408400 | 24005490603 | 24027601202 |
| 24003701102 | 24003740203 | 24005408502 | 24005490605 | 24027602100 |
| 24003701300 | 24003740301 | 24005408503 | 24005490701 | 24027602200 |
| 24003701400 | 24003740303 | 24005408505 | 24005490703 | 24027602302 |
| 24003702100 | 24003740400 | 24005408506 | 24005490800 | 24027602303 |
| 24003702201 | 24003740500 | 24005408507 | 24005490900 | 24027602304 |
| 24003702202 | 24003740601 | 24005408601 | 24005491000 | 24027602305 |
| 24003702300 | 24003740602 | 24005408602 | 24005491100 | 24027602306 |
| 24003702401 | 24003740603 | 24005408702 | 24005491201 | 24027602600 |
| 24003702402 | 24003740700 | 24005408703 | 24005491701 | 24027602700 |
| 24003702601 | 24003740800 | 24005408704 | 24005491702 | 24027602800 |
| 24003702700 | 24003740900 | 24005408800 | 24005491800 | 24027602900 |
| 24003702800 | 24003741000 | 24005408900 | 24005492200 | 24027603000 |
| 24003706101 | 24003741100 | 24005410100 | 24013504100 | 24027604001 |
| 24003706300 | 24003750101 | 24005410200 | 24013504201 | 24027604002 |
| 24003706402 | 24003750102 | 24005411101 | 24013504202 | 24027605101 |
| 24003706500 | 24003750201 | 24005411102 | 24013505101 | 24027605102 |
| 24003706600 | 24003750202 | 24005411201 | 24013505102 | 24027605401 |
| 24003706700 | 24003750203 | 24005411202 | 24013505202 | 24027605402 |
| 24003730100 | 24003750300 | 24005411302 | 24013505203 | 24027605501 |
| 24003730300 | 24003750400 | 24005411303 | 24013505204 | 24027605502 |
| 24003730401 | 24003750500 | 24005411304 | 24013507801 | 24027605503 |
| 24003730402 | 24003750600 | 24005411306 | 24013508200 | 24027605601 |
| 24003730502 | 24003750700 | 24005411307 | 24013513000 | 24027605602 |
| 24003730503 | 24003750801 | 24005411404 | 24013514202 | 24027606601 |
| 24003730601 | 24003750804 | 24005411406 | 24025301102 | 24027606603 |
| 24003730603 | 24003750900 | 24005411407 | 24025301103 | 24027606604 |
| 24003730604 | 24003751000 | 24005411408 | 24025301104 | 24027606605 |
| 24003730700 | 24003751102 | 24005411409 | 24025301202 | 24027606701 |
| 24003730800 | 24005400100 | 24005411410 | 24025301203 | 24027606703 |
| 24003730901 | 24005400400 | 24005430102 | 24025301701 | 24027606704 |
| 24003730902 | 24005400500 | 24005430600 | 24025302100 | 24027606705 |
| 24003731001 | 24005401503 | 24005430700 | 24025302802 | 24027606802 |
| 24003731002 | 24005402507 | 24005440200 | 24025303100 | 24027606803 |
| 24003731101 | 24005402603 | 24005440300 | 24025303201 | 24027606804 |
| 24003731102 | 24005403601 | 24005440600 | 24025303202 | 24027606901 |
| 24003731103 | 24005403801 | 24005440702 | 24025303300 | 24027606902 |
| 24003731201 | 24005403802 | 24005440800 | 24025303400 | 24027606903 |
| 24003731202 | 24005403803 | 24005441101 | 24025303500 | 24510120100 |
| 24003731203 | 24005404401 | 24005450200 | 24025303602 | 24510130700 |
| 24003731204 | 24005404402 | 24005450300 | 24025303603 | 24510271101 |
| 24003731303 | 24005404800 | 24005452200 | 24025303604 | 24510271102 |
| 24003731308 | 24005404900 | 24005490100 | 24025303700 | 24510271200 |
| 24003731309 | 24005405000 | 24005490200 | 24025303800 | 24510271300 |
| 24003740102 | 24005406000 | 24005490301 | 24025303900 | 24510271400 |
| 24003740103 | 24005408100 | 24005490302 | 24025304201 | 24510271503 |
| 24003740104 | 24005408200 | 24005490400 | 24025304202 | |
| 24003740105 | 24005408301 | 24005490500 | 24027601101 | |
| 24003740201 | 24005408302 | 24005490601 | 24027601102 | |
| | | 24005490602 | 24027601201 | |