**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| CARMEN THOMPSON, *et al.*,<br><br>          Plaintiffs,<br><br>     v.<br><br>UNITED STATES DEPARTMENT OF<br>HOUSING AND URBAN<br>DEVELOPMENT, *et al.*,<br><br>          Defendants. | Civil Action No. MJG-95-309 |

**MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF PLAINTIFFS' MOTION**
**FOR FINAL APPROVAL OF SETTLEMENT AGREEMENT**

**TABLE OF CONTENTS**

OVERVIEW ........................................................................................................................1

FACTUAL AND PROCEDURAL HISTORY ...................................................................1

SUMMARY OF SETTLEMENT AGREEMENT ..............................................................3

ARGUMENT ......................................................................................................................8

I.     THE SETTLEMENT AGREEMENT IS FAIR, REASONABLE, AND ADEQUATE
      TO THE  PLAINTIFF CLASS .................................................................................8

     A.    The Views of Class Members Weigh in Favor of a Finding That the Settlement
          Agreement Is Adequate .................................................................................10

          1.    Class Members' Comments Strongly Support the Settlement Agreement ............12

          2.    To the Extent Commenters Raised Concerns, They Do Not Constitute
               Objections to the Terms of the Settlement Agreement and, Even If So
               Viewed, They Do Not Constitute Grounds to Reject the Settlement ...................16

          3.    There is Community Support for the Settlement Agreement ............................. 19

     B.    Other Factors Support a Finding That the Settlement Agreement Is Adequate ...........22

          1.    Plaintiffs' Likelihood of Success on the Merits ....................................................22

          2.    The Relief Offered Significantly Benefits the Plaintiff Class and the
               Baltimore Region as a Whole .............................................................................25

     C.    The Settlement Agreement Is Fair Because It Was the Product of Extensive,
          Arm's Length Negotiation ...........................................................................28

          1.    The Advanced Stage of Proceedings Favors Final Approval .............................28

          2.    The Extensive, Hard-Fought Negotiations Favor a Finding That the
                Settlement Agreement Is Fair .............................................................................29

          3.    Experienced Counsel's Endorsements Merit Deference ........................................29

II.    THE PUBLIC INTEREST IS ADVANCED BY THE SETTLEMENT AGREEMENT .....31

CONCLUSION .................................................................................................................32

## Exhibits

A.     Board of Directors Roster, Baltimore Regional Housing Partnership, Inc.

B.     Declaration of Support by Dr. Stefanie DeLuca, Associate Professor of Sociology,
       Johns Hopkins University

C.     Declaration of Support by Congressman Elijah E. Cummings

D.     Declaration of Support by Robert C. Embry, Jr., President, The Abell Foundation

E.     Declaration of Support by Mel Freeman, Executive Director, Citizens Planning &
       Housing Association, Inc.

**OVERVIEW**

On September 12, 2012, this Court preliminarily approved a proposed Settlement Agreement among the Parties in the above-captioned case to resolve all outstanding issues in this action and to avoid further litigation.  Docket No. 887.  The Court also directed that notice be given to the Plaintiff Class, *id.*, which was effectuated over the past two months.  *See* Docket Nos. 1241, 1243, 1244 (Parties' Decls. Confirming Compliance with Class Notice Procedures). For the reasons set forth below, Plaintiffs hereby request that the Court now find that the Settlement Agreement is fair, reasonable, and adequate pursuant to Federal Rule of Civil Procedure 23(e)(2), and that it finally approve the Settlement Agreement by entering the Order attached as Exhibit A to Plaintiffs' Motion for Final Approval of the Settlement Agreement (which is also Exhibit D to the Settlement Agreement).[1]

**FACTUAL AND PROCEDURAL HISTORY**

This civil rights class action was filed in January 1995.  *See* Docket No. 1.  Plaintiffs alleged that the Federal Parties, including the U.S. Department of Housing and Urban Development (HUD), and the Local Parties, including the Housing Authority of Baltimore City (HABC) and the City of Baltimore, created and continued a racially segregated system of public housing in Baltimore City that violated the U.S. Constitution, the Fair Housing Act, and other civil rights laws.  The Plaintiff Class of African-American past, present, and future residents of Baltimore City family public housing further asserted that the Federal and Local Parties discriminated on the basis of race by failing to disestablish segregation in Baltimore's public housing system and by locating public housing units only in areas that were predominantly

---

[1] In compliance with Federal Rule of Civil Procedure 23(e)(3), Plaintiffs hereby state that they are not aware of "any agreement made in connection with" the Settlement Agreement other than those: (a) expressly identified or referenced in the Settlement Agreement, or (b) already filed and docketed as separate submissions to the Court in this case.

minority and where poverty and assisted housing were concentrated.  *See* Docket No. 280

(Amended Complaint).  The Federal and Local Parties denied those claims on multiple grounds.

Certain parts of the case were settled by the Parties through a Partial Consent Decree that

was approved by the Court on June 25, 1996 (Docket No. 55), and subsequently amended.  *See,*

*e.g.*, Docket Nos. 77, 186, 245, 325, 366, 368, 827, 867.

Following a trial on liability in December 2003, the Court ruled in January 2005 that

HUD, but not Baltimore City or HABC, had violated a key provision of the Fair Housing Act, 42

U.S.C. § 3608(e)(5), by failing to adequately consider regional approaches to desegregation of

public housing in the Baltimore Region.  *See Thompson v. U.S. Dep't of Hous. & Urban Dev.*,

348 F. Supp. 2d 398 (D. Md. 2005).  The Court deferred judgment on Plaintiffs' constitutional

claims against HUD until a later phase of the case.  *See id.* at 451.

At the request of the Federal Parties, the Court reopened the record to consider additional

evidence regarding Plaintiffs' Fair Housing Act claim against HUD.  *See Thompson v. U.S.*

*Dep't of Hous. & Urban Dev.*, No. MJG-95-309, 2006 WL 581260, at *3 (D. Md. Jan. 10, 2006).

In the spring of 2006, the Court held another trial to consider the additional evidence regarding

the Fair Housing Act and constitutional claims against HUD and to determine appropriate relief

for the alleged violations of federal law.

After the trial was completed, but before the Court entered a final judgment, the Parties

commenced preliminary settlement negotiations in September 2009, and provided a preliminary

report to this Court at a status conference on January 14, 2010.  The Federal Parties provided

subsequent status reports.  *See* Docket Nos. 844, 846, 848.  On December 3, 2010, HUD notified

the local jurisdictions and public housing authorities in the Baltimore Region that it was

considering a settlement of the litigation and invited their views.

Thereafter, the parties, including HABC, continued to engage in negotiations.  On June 21, 2011, this Court referred the case to Magistrate Judge Paul W. Grimm for mediation.  Docket No. 855.  Settlement negotiations continued under the auspices of Judge Grimm, with his participation in status calls and mediation sessions.  *See, e.g.*, Docket Nos. 861, 865, 870.  At the end of a mediation session on April 30, 2012, the Parties reached an agreement in principle, and they thereafter exchanged a series of drafts to reduce that agreement to writing.  The Settlement Agreement was fully executed on August 13, 2012, and filed with the Court on August 24, 2012.  *See* Docket No. 876.

After a hearing, this Court preliminarily approved the Settlement Agreement, as amended, on September 12, 2012.  *See* Docket Nos. 887, 888.  Reflecting the agreement of the Parties, this Court also amended the definition of the Plaintiff Class originally certified by this Court (Docket No. 54), for settlement purposes only, to include: "all African Americans who have resided or will reside in Baltimore City family public housing units at any time from January 31, 1995 until January 1, 2027."  Docket No. 887.

Over the past months, the Parties have complied with the notice procedures set forth by Section XVIII of the Settlement Agreement and approved by this Court in its preliminary approval order.  *See id.*; *see also* Docket Nos. 1241, 1243, 1244 (Parties' Decls. Confirming Compliance with Class Notice Procedures).  In addition, local jurisdictions, public housing authorities, government officials, and civic leaders in the Baltimore Region have been informed about the Settlement Agreement.

## SUMMARY OF SETTLEMENT AGREEMENT

As part of the Settlement Agreement, HUD has agreed to take certain steps to increase residential housing choices for members of the Plaintiff Class, including:

3

A.  **Regional Housing Opportunities**.  HUD will continue the successful *Thompson* Voucher Mobility Program (also known as the Baltimore Housing Mobility Program) launched under the *Thompson* Partial Consent Decree, which has operated collaboratively with local jurisdictions and is nationally recognized for its success in providing participants a real opportunity to better their lives and the lives of their children.  *See* Poverty & Race Research Action Council & Balt. Reg'l Hous. Campaign, *New Homes, New Neighborhoods, New Schools: A Progress Report on the Baltimore Housing Mobility Program* (2009), *available at* www.prrac.org/pdf/BaltimoreMobilityReport.pdf; Ex. B (Decl. of Support by Dr. Stefanie DeLuca, Associate Professor of Sociology, Johns Hopkins University).

Under the Partial Consent Decree, the *Thompson* Voucher Mobility Program has provided Housing Choice Vouchers and high-quality mobility counseling to assist more than 1,800 families who have voluntarily chosen to move to Communities of Opportunity (neighborhoods with better schools, lower crime, and more jobs) in Baltimore City and throughout the Baltimore Region.  The Settlement Agreement will fund additional vouchers for up to 2,600 additional families to move to Communities of Opportunity through 2018.  *See* Settlement Agreement § IV.  Through 2027, all of the *Thompson* Vouchers will be administered regionally by a newly created nonprofit corporation under contract with HABC.  *Id.*[2]  The Settlement Agreement provides that HABC will pass through to this Regional Administrator all of the funding it receives from HUD for these *Thompson* Vouchers pursuant to an amendment to its Moving to Work Agreement.  *See* Settlement Agreement §§ III, IV.

---

[2] Pursuant to Section IV.A of the Settlement Agreement, Plaintiffs, after consultation with HABC, have established a nonprofit corporation called the Baltimore Regional Housing Partnership, Inc. (BRHP) to implement the *Thompson* Voucher Mobility Program going forward, and BRHP is currently negotiating a contract with HABC.  The roster of this organization's Board of Directors is attached as Exhibit A to this Memorandum.

**B.**     **Incentives for Affordable Housing Development**.  HUD will offer incentives

for private housing developers who seek mortgage insurance offered by the Federal Housing

Administration (FHA) if the developers agree, *inter alia*, to produce affordable multifamily

housing in Communities of Opportunity throughout the Baltimore Region and to market the

affordable units affirmatively to Plaintiff Class Members and other Housing Choice Voucher

holders, including marketing vacancies through the Regional Administrator.  *See* Settlement

Agreement § VII.  The incentives will be available for a total of 2,100 affordable units in the

Baltimore Region over a seven-year period.  *Id.*  On September 5, 2012, HUD published notice

of its intent to conduct this demonstration project in the Federal Register.  *See* Notice of Intent to

Conduct Affirmatively Furthering Fair Housing Demonstration in Baltimore, MD, Standard

Metropolitan Statistical Area (SMSA), 77 Fed. Reg. 54,602 (Sept. 5, 2012).  The deadline for

comments has passed, and Plaintiffs hope that these incentives will begin to be offered in the

coming months.[3]

**C.**     **On-line Housing Locator**.  HUD will develop an online geo-spatial listing to

provide assistance to families in locating public housing and other affordable housing

opportunities throughout the Baltimore Region.  Once the on-line geo-spatial listing is

substantially complete (within one year of the Effective Date of the Settlement Agreement,

absent good cause for delay), HUD will assist the Regional Administrator in making it publicly

available.  *See* Settlement Agreement § VI.

**D.**     **Regional Opportunity Study**.  HUD will sponsor a study of housing opportunity

throughout the Baltimore Region.  *See* Settlement Agreement § VIII.  The first phase of this

---

[3] In addition, HUD will make FHA disposition units available, under certain conditions, to HABC for use by the Regional Administrator to develop homeownership units or project-based rental units.  *See* Settlement Agreement § VII.B.

study is intended to assist the Regional Administrator in identifying Communities of Opportunity in the Baltimore Region by, *inter alia*, updating the methods and data employed in the analysis performed by the Kirwan Institute for the Study of Race and Ethnicity, relied upon and incorporated by reference in the Remedial Phase Expert Report of john powell.  *See* Docket No. 798.  The second phase will include, among other things, an assessment of regulatory barriers to development of public housing and other federal assisted or insured non-elderly family housing (including Low Income Housing Tax Credit projects) in Communities of Opportunity in the Baltimore Region, including an analysis of the fair-housing impact of such barriers, and identification of more inclusive alternatives and "best practices."  Settlement Agreement § VIII.B.

   **E.**  **Civil Rights Review**.  For a period of at least three years, HUD will conduct civil rights reviews of particular proposals (regarding certain federally funded housing and community development programs in the Baltimore Region, such as Demolition/Disposition Applications and Consolidated and Annual Action Plans) that are submitted to HUD for approval.  HUD will establish a Baltimore Region Working Group to conduct these reviews, comprised of four HUD employees designated by the HUD Assistant Secretary for Fair Housing and Equal Opportunity and the HUD General Counsel.  These reviews will pay particular attention to the impact of the proposals, individually and collectively, on the creation of a broader geographic distribution of desegregative housing available to the Plaintiff Class.  *See* Settlement Agreement § V.  To provide guidance to public housing authorities and jurisdictions seeking HUD approval of applicable decision or plans within the Baltimore Region, HUD will make available the document entitled "Civil Rights Information Assessment," attached as Exhibit C to the Settlement Agreement.  *See* Settlement Agreement § V.D.

If the Court approves the proposed Settlement Agreement, the *Thompson* Partial Consent Decree will be vacated, and the Court will release its jurisdiction over the Partial Consent Decree. *See* Settlement Agreement § X. The *Thompson* Voucher Mobility Program launched under the Partial Consent Decree, however, will be continued and expanded pursuant to the terms and conditions of the Settlement Agreement. *See* Settlement Agreement § IV. In addition, the Settlement Agreement incorporates terms requiring completion of the remaining housing opportunities required by the terms of the Partial Consent Decree and related Court orders. *See* Settlement Agreement § IV.L. Most of these housing opportunities have been completed, but a few projects are still in progress. For instance, the Settlement Agreement provides for:

a.   The use of funds previously set aside for the Partial Consent Decree to develop approximately 120 project-based voucher units throughout the Baltimore Region;

b.   Funding for approximately 15 additional *Thompson* homeownership units, for a total of up to 55 homeownership units; and

c.   The development of approximately 100 units of scattered-site housing in Baltimore City intended to replace some of the units that were demolished in 2000 at the Hollander Ridge development operated by HABC.

*Id.*

If this Court approves the Settlement Agreement, the Plaintiff Class will release certain specified claims against the Federal and Local Parties related to racial discrimination and segregation that have been or could have been asserted in this case, prior to the date that the Settlement Agreement goes into effect. *See* Settlement Agreement § XIV. Through at least 2019, the Court will retain jurisdiction to enforce specific obligations that the Federal and Local Parties have agreed to implement as part of the proposed Settlement Agreement. *See* Settlement Agreement § IX. Thereafter, the Settlement Agreement does not preclude the Plaintiff Class from seeking other avenues of relief that may be available. *Id.*

If a change in federal law precludes or limits certain parts of the relief contemplated by the Settlement Agreement and the Parties cannot work out alternative arrangements, the Plaintiff Class has the right to go back to Court and continue litigating certain claims.  *See* Settlement Agreement §§ XXI-XXIII.

## ARGUMENT

I.   **THE SETTLEMENT AGREEMENT IS FAIR, REASONABLE, AND ADEQUATE TO THE PLAINTIFF CLASS**.

Pursuant to Federal Rule of Civil Procedure 23(e)(2), a federal district court may approve a settlement "only after a hearing and on finding that it is fair, reasonable, and adequate."  As the Fourth Circuit has recognized, "[t]he primary concern addressed by Rule 23(e) is the protection of class members whose rights may not have been given adequate consideration during the settlement negotiations."  *In re Jiffy Lube Sec. Litig.*, 927 F.2d 155, 158 (4th Cir. 1991).

While the decision to approve the Settlement Agreement is committed to the sound discretion of this Court, it should be guided by the strong public interest favoring settlements, especially where, as here, the case involves enforcement of federal civil rights laws.  *See Vaughns v. Bd. of Educ. of Prince George's Cnty.*, 18 F. Supp. 2d 569, 578 (D. Md. 1998) ("The public interest is served when the parties formulate lasting solutions to divisive litigation through mutual cooperation.  There can be little doubt that 'a remedy that everyone agrees to is a lot more likely to succeed than one to which the defendants must be dragged kicking and screaming.'" (quoting *Little Rock Sch. Dist. v. Pulaski Cnty. Special Sch. Dist.*, 921 F.2d 1371, 1383 (8th Cir. 1990))); William B. Rubenstein et al., 4 Newberg on Class Actions § 11:41 (4th ed. 2002) ("The compromise of complex litigation is encouraged by the courts and favored by public policy.").

When reviewing class action settlements pursuant to Rule 23(e), the Fourth Circuit has endorsed the bifurcated analysis adopted by Maryland federal district courts, *see In re Jiffy Lube Sec. Litig.*, 927 F.2d at 158-59 (following *In re Montgomery Cnty. Real Estate Antitrust Litig.*, 83 F.R.D. 305, 315 (D. Md. 1979)), which "includes separate inquiries on the 'fairness' and the 'adequacy' of the proposed settlement," *L.J. v. Massinga*, 699 F. Supp. 508, 512 (D. Md. 1988) (quoting *In re Mid-Atl. Toyota Antitrust Litig.*, 605 F. Supp. 440, 443 (D. Md. 1984)); *Whitaker v. Navy Fed. Credit Union*, No. 09-2288, 2010 WL 3928616, at *2-3 (D. Md. Oct. 4, 2010) (following *In re Jiffy Lube Securities Litigation* and conducting separate inquiries regarding the fairness and adequacy of a class action settlement); *In re Tyson Foods, Inc.*, No. 08-1982, 2010 WL 1924012, at *2-3 (D. Md. May 11, 2010) (same).

Regarding adequacy, "the court must weigh the likelihood of the plaintiffs' recovery on the merits against the amount offered in settlement." *L.J.*, 699 F. Supp. at 512 (quoting *In re Montgomery Cnty. Real Estate Antitrust Litig.*, 83 F.R.D. at 315). Specifically, the amount of the settlement should be weighed against such factors as:

> (1) the relative strength of the plaintiffs' case on the merits, (2) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial, (3) the anticipated duration and expense of additional litigation, (4) the solvency of the defendants and the likelihood of recovering a litigated judgment, and (5) the degree of opposition to the settlement.

*In re Jiffy Lube Sec. Litig.*, 927 F.2d at 159 (citing *In re Montgomery Cnty. Real Estate Antitrust Litig.*, 83 F.R.D. at 316).

As to fairness, a court must determine whether "the settlement was reached as a result of good-faith bargaining at arm's length, without collusion, on the basis of (1) the posture of the case at the time settlement was proposed, (2) the extent of discovery that had been conducted, (3) the circumstances surrounding the negotiations, and (4) the experience of counsel in the

[pertinent] area of . . . class action litigation." *Id.* at 159.  In reviewing these factors, "[i]t is the settlement taken as a whole, rather than the individual component parts, that must be examined for overall fairness." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998).  In sum, under Rule 23(e), "the question [for a court to] address is not whether the final product could he prettier, smarter or snazzier, but whether it is fair, adequate, and free from collusion." *Id.* at 1027; *see generally* Manual for Complex Litigation (Fourth) §§ 21.61, 21.62.

As set forth below, application of these factors heavily favors a finding that the Settlement Agreement is fair, reasonable, and adequate.

### A.   THE VIEWS OF CLASS MEMBERS WEIGH IN FAVOR OF A FINDING THAT THE SETTLEMENT AGREEMENT IS ADEQUATE.

In reviewing a class action settlement under Rule 23(e), "the obvious first place a court should look is to the views of the class itself." *Shuford v. Ala. State Bd. of Educ.*, 846 F. Supp. 1511, 1517 (M.D. Ala. 1994).  Indeed, "'[i]t is well-settled that the reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy.'" *Ebbert v. Nassau Cnty.*, No. 05-5445, 2011 WL 6826121, at *10 (E.D.N.Y. Dec. 22, 2011) (quoting *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 362 (S.D.N.Y. 2002)).

Where, as here, a case has garnered publicity and involves a large number of class members, "it would be 'extremely unusual' not to encounter objections." *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 478 (S.D.N.Y. 1998) (citation omitted).  In such circumstances, "[t]he fact that only a handful of class members objected to the settlement . . . weighs in its favor." *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1178 (8th Cir. 1995); 4 Newberg on Class Actions § 11.41 ("If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement."); *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 118 (2d Cir. 2005) (where only 18 out of 5,000,000 class members

objected, evidence established that the class was "overwhelmingly in favor of the Settlement");

*In re Jiffy Lube Sec. Litig.*, 927 F.2d at 159 (approving the district court's decision to afford

"great weight to the fact that only one of over 12,000 class members notified expressed

opposition to the terms of settlement"); *DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 293 (W.D.

Tex. 2007) (finding that "the minimal level of opposition from absent class members weighs in

favor of approving the settlement"); *Hammon v. Barry*, 752 F. Supp. 1087, 1093 (D.D.C. 1990)

(one indication of the fairness of the settlement is "[t]he low percentage of objectors").

This case is one of those "extremely unusual" cases where there are no objections to the

Court's approval of the Settlement Agreement. *In re NASDAQ Market-Makers Antitrust Litig.*,

187 F.R.D. at 478. Plaintiff Class Members were given reasonable notice of the terms of the

Settlement Agreement and had the opportunity to submit comments, in compliance with Rule

23(e)(4)(A) and the Court's Preliminary Approval Order. *See* Docket No. 887. In addition to

publication in local newspapers and posting on websites and in HABC's offices, the Class Notice

was mailed to approximately 42,442 current or potential future Plaintiff Class Members,

according to HABC. Docket No. 1243-2. As of November 14, 2012, the Court had docketed

comment forms from approximately 304 individuals. Approximately 203 of these individuals

provided detailed written comments. *See* Docket Nos. 889-1240. As explained in more detail

below, many of these comments are supportive, and none constitute objections to the Court's

approval of the Settlement Agreement. Moreover, Plaintiffs' counsel, and paralegals under their

supervision, have spoken directly with at least 503 persons who called in response to the Class

Notice, seeking information about the Settlement Agreement or, most commonly, information

about how to obtain a *Thompson* Voucher. None of these callers expressed opposition to the

Settlement Agreement. *See* Docket No. 1241.

The numerous positive responses and the absence of any clear objections to the terms of the Settlement Agreement from either Class Members or the general public support the conclusion that the proposed Settlement Agreement is adequate.

**1.      Class Members' Comments Strongly Support the Settlement Agreement**.

Many Plaintiff Class Members expressed support for the Settlement Agreement through comments submitted to the Court.  For instance, two named plaintiffs filed supportive comments. *See* Docket Nos. 1199-1 (Isaac Neal) ("I hope, very much, that this settlement is approved."), 1200-1 (Carmen Thompson) ("I support the *Thompson v. HUD* settlement and I am proud to have my name represent the African-American residents of public housing in Baltimore City.").

Other endorsements came from Class Members who are current or former Baltimore City public housing residents.  For instance, one current resident of Baltimore City family public housing stated: "I feel that the proposed settlement . . . is a wonderful idea for everyone, including myself who have been waiting on the list for a long time for the opportunity to finally have a nice home in a good neighborhood."  Docket No. 1148-1.[4]  And one former Baltimore City family public housing resident opined:  "I believe in this lawsuit because I feel everyone has a right to live in a place that's safe, healthy, and promotes positivity [and] not put or stuck in a place that does the opposite."  Docket No. 938-1.  This commenter went on to describe in poignant detail her own experience in Baltimore City public housing, where she "never felt safe" due to the crime and drug activity, and ultimately left because she "wanted better, healthier living conditions" for herself and her young son, who was adversely affected by their substandard living conditions and neighborhood environment as evidenced "thru his behavior in

---

[4] Except where ellipses are noted, Plaintiffs have attempted to quote comments exactly as they were filed.

school and around other people." *Id.*; *see also* Docket Nos. 1068-1 ("I feel like the whole system was designed to fail us. . . .  Our children and their children will be in this situation if we don't change it.  Thank you for bringing this situation to light and helping to make an effort to change our system."), 1115-1 ("I . . . feel like I wasn't given a fair chance to raise my three girls in a better community with better schools.  Because the choice was made for me and my family, the places were located in drug and crime neighborhoods.").[5]

---

[5] Many other comments express similar dissatisfaction with the high-crime, high-poverty neighborhoods in which many Baltimore City public housing units are located.  *See, e.g.*, Docket Nos. 1128-2 ("I feel that we were discriminated [against] because we were put into a bad environment far as being around drugs and people being beaten and killed.  We had to raise our young children in that type of atmosphere and around vacant houses that were rat infested."), 1049-1 ("I didn't have a chance. . . .  [A]ll I ever wanted was a chance"), 1156-1 ("I can only speak for myself and family when I say living in such extreme harsh condition[s in Baltimore City public housing] is detrimental to our sanity.  I am writing this letter hoping for my voice to be heard[,] my cry for help and for dignity. . . .  The infrastructure that I am a part of [is] segregation and doesn't provide any resources to overcome poverty."), 1232-2 ("I was racially segregated unfairly treated, and discriminated on and forced to only be placed in areas that were predominantly minority, and where poverty and low income housing were concentrated."), 1055-1 ("I felt like a disease and that everyone was quarantine[d] in the City.").  Another theme is the frustration of many Baltimore City public housing residents who feel trapped in these conditions after trying without success to obtain a regular HABC voucher or a transfer to another public housing unit, which if approved, often offers conditions that are little better.  *See, e.g.*, Docket Nos. 1023-1 ("I have been trying to get a voucher to move.  Every time I asked for a transfer they would say nothing was available or they would want to put you in the projects. . . .  I'm just asking for a way out so that my kids and myself can feel safe going to the store or when we walk out the door.  Why can't we move somewhere like Cockeysville or Timonium?"), 1196-1 ("I've been a resident at [a Baltimore City public housing scattered-site unit] for twelve years now and since I've been here raising my four children there has been nothing but drama and extreme violence. . . .  I've also put in several transfers and haven't gotten a call back its been three years now. . . .  Please!!  Relocate me and my children from this community I am very much afraid for our safety.").  In some comments, former Baltimore City public housing residents describe finally moving out to escape their distressing conditions, thereby giving up their housing assistance.  *See, e.g.*, Docket No. 938-1 ("Several times I tried to be transferred to a safer unit. . . . Things got so unbearable I moved on my own.").  Even a regular HABC Housing Choice Voucher is no guarantee of finding better conditions, as some comments from current or former holders of non-*Thompson* HABC Vouchers described the difficulty that they had finding housing outside poor, segregated, high-crime neighborhoods, or the loss of a voucher after a landlord was terminated for housing quality violations.  *See, e.g.*, Docket Nos. 1061-2, 1161-1.

A sampling of other positive comments include the following: "I would love to see HUD take certain steps to increase residential choices in housing, for members of the Plaintiff Class," Docket No. 1001-1; "I think it's about time that someone has step[ped] up for the African Americans in public housing," Docket No. 1046-1; and "God bless you for looking out for the little people having a voice for us all," Docket No. 1216-1; *see also* Docket Nos. 923-1, 936-1, 952-1, 961-1.

Numerous individuals filed comments indicating that they would like to take advantage of the opportunity provided by the Settlement Agreement to escape the adverse effects that living in high-poverty, minority-concentrated neighborhoods can have for families, and especially their children, and move to lower-crime and lower-poverty neighborhoods with good schools and better economic opportunities. *See, e.g.*, Docket Nos. 903-1, 941-1, 1021-1, 1023-1, 1050-1, 1059-1, 1085-1, 1103-1, 1113-1, 1134-1. For instance, one current resident of Baltimore City public housing wrote: "It would be nice to move out of where I am because these are run down neighborhoods, high crime, drug infested neighborhoods, and I don't like living here, and I look forward to moving from where I am into better neighborhoods with better schools, lower crime and more jobs." Docket No. 1114-1. Another current resident commented: "I think it's a great idea that we will get the Opportunity to bring our kids up in a good neighborhood . . . [with] good schools . . . and I hope I'll be one of the ones that gets one [of the *Thompson* vouchers]." Docket No. 1120-1; *see also* Docket No. 947-1 ("I want a better neighborhood with better schools. So my child can be a productive member of society."). In addition to the comments that were filed, counsel for the Plaintiff Class, and paralegals under their supervision, have responded to at least 503 calls in the weeks since the Class Notice issued. *See* Docket No. 1241. Of these callers, nearly half have expressly requested information regarding how to obtain a

14

*Thompson* Voucher.  *Id.*

These comments and phone calls from individuals eager to take advantage of a *Thompson* Voucher — and their often-moving explanations for why they are so desirous to leave their current housing conditions — are complemented by supportive comments from individuals who are participants in the *Thompson* Voucher Mobility Program and would like to ensure that others similarly benefit.  *See* Docket Nos. 1202-2, 1204-2, 1205-2, 1206-2.  One of these comments is worth recounting in detail because it epitomizes the transformative change that the *Thompson* Voucher Mobility Program, currently administered by Metropolitan Baltimore Quadel (MBQ), through a contract with HABC, can provide to participating families:

> My family and I signed up for public housing and section 8 in 2004.  My name finally came to the top of the public housing waiting list in 2007 at the same time that I learned about the MBQ program through word of mouth.  I knew what to expect in public housing: drugs, violence, crime and poor housing.  The *Thompson* voucher, on the other hand, would give me an opportunity to move to neighborhoods that I would otherwise not have access to.  I chose the MBQ program because it provided a way out for my 11 year-old son and me.  They helped me to clean up my credit, taught me about budgeting and took me on a housing tour where I saw nice houses, lots of green space and young kids playing outside.  My son and I found a home in Columbia and I feel like a part of the community here.
>
> After moving through the program, I was able to get a job working for Howard County schools in their Before and After Care program and was just promoted to Assistant Director.  I was enrolled in Howard County Community College and I am studying early childhood education.  I hope to be able to go on to receive a bachelor's degree in order to become an elementary school teacher.
>
> Not only have I found opportunity and happiness here, but so has my son.  In the city, I did not want my son to play outside, he didn't have many friends and he struggled in school.  Here, he is doing very well in school and our neighbors are welcoming — often picking him up after school while I'm working and arranging play dates and carpools.  On his birthday, for the first time in his life, I was able to give him a birthday party at a local park.  So many kids and parents came from the neighborhood and from his school to show their support for him.  It was very moving.  I support the settlement because other kids deserve to have the love and support that my son and I have.

Docket No. 1205-2.  These positive impacts are not just anecdotal.  In a Declaration of Support, attached hereto as Exhibit B, Dr. Stefanie DeLuca, Associate Professor of Sociology at the Johns Hopkins University, briefly describes preliminary findings of her research study of participants in the *Thompson* Voucher Mobility Program.

 In addition to these favorable comments and phone calls, Plaintiffs' counsel have regularly met with and briefed members of the *Thompson* Client Advisory Council on the status of the settlement negotiations.  In the months preceding the execution of the proposed Settlement Agreement, counsel for the Plaintiffs reviewed the terms and conditions with the members of the Advisory Council, who expressed their support for entering into the Settlement Agreement. Moreover, Plaintiffs' counsel have solicited and received feedback from families participating in the *Thompson* Voucher Mobility Program, launched under the Partial Consent Decree.  Since 2005, several hundred families have participated in surveys, interviews, home visits, and focus groups conducted by Plaintiffs' counsel.  Their feedback informed the positions that Plaintiffs' counsel advocated in the settlement negotiations.

 Plaintiff Class Members will continue to remain involved in the implementation of the Settlement Agreement, through such surveys and outreach by counsel for the Plaintiff Class and the Baltimore Regional Housing Partnership, Inc. (BRHP), which will serve as the Regional Administrator to implement the Settlement Agreement, as well as through service on the BRHP's board of directors.  *See* Docket Nos. 1202-2, 1206-2; Ex. A (BRHP Board roster).

   **2.** **To the Extent Commenters Raised Concerns, They Do Not Constitute Objections to the Terms of the Settlement Agreement and, Even If So Viewed, They Do Not Constitute Grounds to Reject the Settlement**.

 Given that more than 42,000 individuals received the Class Notice, 304 individuals submitted comments, and over 500 communicated with counsel for the Plaintiff Class by phone,

the fact that at most only two individuals made statements that might be construed as expressing concerns about the Settlement Agreement weighs heavily in favor of a finding that the Settlement Agreement is adequate.  *See In re Jiffy Lube Sec. Litig.*, 927 F.2d at 159.  These two comments do not rise to the level of clear objections to approval of the Settlement Agreement; even if they did, they should not weigh against the Settlement Agreement because they are based on faulty premises and do not carry the "heavy burden of demonstrating that the settlement is unreasonable."  *DeHoyos*, 240 F.R.D. at 293 (quoting *Whitford v. First Nationwide Bank*, 147 F.R.D. 135, 139 (W.D. Ky. 1992)); 4 Newberg on Class Actions § 11:58; *In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, No. MDL 1500, No. 02-5575, 2006 WL 903236, at *15 (S.D.N.Y. Apr. 6, 2006) (rejecting "unsupported" and "conclusory" objections that failed to "provide[] a legal or factual basis for the alleged insufficiency of the Settlement" or to "consider the legal or factual context in which the Settlement was reached").

The first of the two comments raising potential concerns advocates that "no changes be proposed to the housing voucher program."  Docket No. 1118-2; *see also id.* ("We do not need to lessen the vouchers.").[6]  It is not clear whether this comment is intended as an expression of concern about the Settlement Agreement or support for the provision of additional *Thompson* Vouchers.  In any event, the Settlement Agreement does not make any changes to the existing Housing Choice Voucher Program as operated by HABC or any other public housing authority; rather, it provides funding for *Thompson* Vouchers that are authorized but currently unfunded and thereby will increase the number of vouchers and the amount of voucher funding available to

---

[6] According to HABC records provided to Plaintiffs' counsel, neither this individual nor the author of the second comment raising potential concerns, which is addressed in the next paragraph, currently lives in Baltimore City family public housing, and there is no indication that either of them did so in the past.  Thus, they are not currently Plaintiff Class Members and would become Plaintiff Class Members only if they were to move into Baltimore City family public housing at some point prior to 2027.  *See* Settlement Agreement § I.H; Docket No. 887.

Baltimore City families.  *See* Settlement Agreement § III & Ex. A.

The second comment raising potential concerns appears to be premised on the mistaken assumption that single persons living alone are ineligible for the *Thompson* Voucher Mobility Program.  *See* Docket No. 920-1.  The eligibility criteria under both the *Thompson* Partial Consent Decree and the Settlement Agreement do not exclude single-person households.  *See* Settlement Agreement § IV.I.

There are a few other comments that do not raise objections to the Settlement Agreement but express personal concerns about the writers' own experiences with MBQ, the current administrator of the Baltimore Housing Mobility Program.  *See* Docket Nos. 921-2, 985-1, 1031-1, 1097-1, 1098-1, 1127-1, 1146-2, 1203-1, 1215-1.  Rather than opposing the Settlement, the gist of several of these comments is that their authors wish to receive a *Thompson* Voucher but were determined by MBQ and/or HABC to be ineligible.  *See* Docket Nos. 985-1, 1031-1, 1097-1, 1146-2.  Eligibility under the Partial Consent Decree is limited to current Baltimore City family public housing residents, former residents who resided in public housing as of January 31, 1995, and persons who were already on HABC's waiting list for public housing and/or vouchers as of the inception of the program.  *See* Settlement Agreement § I.H.  Eligibility will be broader under the Settlement than under the Partial Consent Decree to take into account the fact that HABC's waiting list for vouchers has been closed to families since 2003, and is currently closed to all but certain narrow categories of applicants.  *See id.*  As in any voucher program, persons who are determined ineligible for *Thompson* Vouchers are afforded an opportunity to contest the factual basis for adverse eligibility determinations, and this procedure for resolving individual

18

eligibility disputes will continue under the Settlement Agreement.[7]

Moreover, the Parties have a well-established protocol for following up with MBQ about individual concerns, and Plaintiffs' counsel have agreed to reach out to each of these individuals in the coming weeks and make appropriate referrals.  Going forward, the creation of the Baltimore Regional Housing Partnership, Inc. as the Regional Administrator responsible for administering the Baltimore Housing Mobility Program, pursuant to Section IV of the Settlement Agreement, will allow another level of community oversight in addition to what is currently available under the Partial Consent Decree.  In any event, in surveys of participants in the Baltimore Housing Mobility Program, the overwhelming majority of respondents express satisfaction with the program and their placements.

### 3.      There is Community Support for the Settlement Agreement.

Although the Rule 23(e) inquiry focuses on the views of Class Members rather than the public at large, it is noteworthy that no comments opposing the Settlement Agreement have been received from the general public.  To the contrary, prominent civic leaders in the Baltimore

---

[7] One commenter noted problems resulting from car trouble and limited public transportation near the unit her family leases in the White Marsh area.  *See* Docket No. 893. Although the commenter identifies herself as a participant in the *Thompson* Voucher Mobility Program, she is actually living in one of the hard units constructed under the Partial Consent Decree.  While residents of such units can seek a transfer to other Baltimore City public housing units, they are not automatically entitled to a *Thompson* Voucher; instead, they must apply for one.  In any event, many of the Communities of Opportunity targeted by the *Thompson* Voucher Mobility Program are, in fact, accessible via public transportation.  Still, there are structural inequities in the transportation system in the Baltimore Region, which have been acknowledged by the Baltimore jurisdictions as an impediment to regional fair housing in their recently completed Regional Analysis of Impediments, discussed in Section I.A.3 below.  (Transportation barriers are also one area of focus for the Regional Opportunity Study pursuant to Section VIII.B of the Settlement Agreement.)  For that reason, since 2002, generous support from The Abell Foundation has enabled Vehicles for Change to provide approximately 50 cars annually to *Thompson* Voucher Mobility Program participants who have a job or job offer that is difficult to access via public transportation.  *See* Ex. D ¶ 8 (Decl. of Support by Robert C. Embry, Jr., President, The Abell Foundation).

Region have expressed support.  *See, e.g.*, Ex. C (Decl. of Support by Congressman Elijah E. Cummings); Ex. D (Decl. of Support by Robert C. Embry, Jr., President, The Abell Foundation); Ex. E (Decl. of Support by Mel Freeman, Executive Director, Citizens Planning & Housing Association, Inc.).

Equally significant, the *Thompson* Voucher Mobility Program, which was launched under the Partial Consent Decree and will be continued under the Settlement Agreement, has become an important aspect of regional fair housing strategy.  For instance, Baltimore City and Baltimore, Howard, Harford, and Anne Arundel Counties have collaborated to conduct an analysis of impediments to fair housing choice in the Baltimore Region.  *Analysis of Impediments to Fair Housing Choice: Baltimore Region* 5 (Oct. 2011), *available at* http://static.baltimorehousing.org/doc/plansreports/ai_regional_oct2011.pdf (hereinafter the "Regional AI").[8]  This Regional AI expressly acknowledges:  "The early successes of the Baltimore Housing Mobility Program elevate it as a model for using vouchers to connect disadvantage[d] minority families to the opportunities available in resource-rich low-poverty neighborhoods."  *Id.* at 60.  Moreover, the Regional AI states that "[t]he results of such programs must be the foundational basis for any regional fair housing initiatives undertaken in the Baltimore region."  *Id.* at 62.  And it recognizes that expansion of such programs is necessary: "Housing mobility initiatives have leveraged vouchers as a means of mitigating segregation, but many voucher households continue to locate in neighborhoods of racial concentration, primarily in and around the region's core."  *Id.* at 34.

As part of their Action Plan adopted to address the impediments identified in the Regional AI, these local jurisdictions, through their Baltimore Regional Fair Housing Group,

---

[8] This October 2011 draft was finalized by the local jurisdictions in February 2012.

commit "to establish routine interaction and cooperation" with the "the entity implementing the

mobility program established pursuant to the *Thompson* partial consent decree," among others,

"regarding the implementation of the regional AI."  *Id.* at 76.  Finally, the local jurisdictions

express hope that the "final remedies of *Thompson v. HUD*" will promote increased regional

coordination "to devise and implement methods of collectively addressing patterns of racial and

economic segregation."  *Id.* at 5.

Further, the Baltimore Sustainable Communities Consortium — a coalition of

government, philanthropic, and advocacy organizations, including Baltimore City; the City of

Annapolis; Baltimore, Anne Arundel, Carroll, Harford, and Howard Counties; the Maryland

Departments of Housing and Community Development, Planning, and Transportation; the

Baltimore Metropolitan Council; the Baltimore Regional Transportation Board; the Annie E.

Casey Foundation; Associated Black Charities; Baltimore Integration Partnership; Baltimore

Neighborhood Collaborative; Citizens Planning & Housing Association, Inc.; Baltimore

Regional Initiative Developing Genuine Equality (BRIDGE); Central Maryland Transportation

Alliance; Enterprise Community Partners; The Greater Baltimore Committee; Innovative

Housing Institute; the Maryland Sustainable Growth Commission; and 1,000 Friends of

Maryland — recently submitted a regional planning grant application to HUD, which listed as

one of its key initiatives:

> Incorporation of the Thompson Mobility Program – The plan will incorporate a
> regional housing voucher program supported by vouchers set aside by HUD for
> this purpose that build on the experience of the Thompson Special Mobility
> Housing Voucher Program.

Baltimore Sustainable Communities Consortium, Regional Planning Grant Application 12,

*available at* http://www.baltometro.org/downloadables/SustainableCommunities/Application

Narrative.pdf.  In November 2011, HUD awarded a $3.5 million grant to support this

Consortium's efforts to coordinate housing, economic development, workforce development, and transportation plans to create jobs and economic opportunities and improve the quality of life in the Baltimore Region's communities over the next quarter-century.  *See* Baltimore Metropolitan Council, BMC Awarded $3.5 Million HUD Grant to Develop Regional Plan for Sustainable Development (Nov. 2011), http://www.baltometro.org/content/view/1473/.

      **B.**      **OTHER FACTORS SUPPORT A FINDING THAT THE SETTLEMENT AGREEMENT IS ADEQUATE**.

      In addition to the strong support from many Plaintiff Class Members and the lack of opposition, the adequacy of the Settlement Agreement is demonstrated by other factors that courts in the Fourth Circuit take into consideration when they weigh the plaintiffs' likelihood of success on the merits against the scope of relief offered by the negotiated resolution to a class action.  *See In re Jiffy Lube Sec. Litig.*, 927 F.2d at 159; *L.J.*, 699 F. Supp. at 512.  Specifically, the proposed Settlement Agreement provides significant relief to the Plaintiff Class, while avoiding the uncertainty and expense of protracted and contentious further litigation.  *See DeHoyos*, 240 F.R.D. at 291 (recognizing that "it is important to be mindful of the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation" (internal citation and quotation marks omitted)).

      **1.**      **Plaintiffs' Likelihood of Success on the Merits**

      Counsel for the Plaintiff Class do not recommend approval of this Settlement Agreement because of any perceived weakness in their case.  Rather, it is the strength of Plaintiffs' case on the merits that has permitted negotiation of a settlement affording substantial class relief.

      In 2005, after nearly ten years of litigation, this Court ruled that HUD violated the Fair Housing Act by unfairly concentrating African-American public housing residents in the most

impoverished, segregated areas of Baltimore City.  *See Thompson*, 348 F. Supp. 2d 398.  This Court further held that HUD must take a regional approach to promoting fair housing opportunities throughout the Baltimore Region.  *Id.*  Thereafter, the Court directed further proceedings to determine whether HUD's conduct also violated the U.S. Constitution's guarantee of equal protection and to decide on an appropriate remedy for the Plaintiff Class.  In addition, at the request of the Federal Parties, the Court reopened the record to consider additional evidence regarding the Fair Housing Act claim against HUD.  *See Thompson*, 2006 WL 581260, at *3.

The Plaintiff Class submits that the evidence at the liability and remedial trials established HUD's constitutional liability and reaffirmed its liability under the Fair Housing Act. *See* Docket Nos. 817 (Plaintiffs' Post-Trial Brief), 823 (Plaintiffs' Post-Trial Reply Brief).  The Plaintiff Class acknowledges, however, that the Federal Parties have vigorously contested both statutory and constitutional liability.  Moreover, the Federal Parties have equally vigorously asserted purported constraints on judicial authority to impose relief for any statutory or constitutional violation.  While many of these purported constraints were rejected by the Court in its 2005 liability order and its 2006 order denying the Federal Parties' motion for summary judgment (Docket No. 751), they could be the source of protracted appellate proceedings going forward.

Thus, absent settlement, all Parties, including the Plaintiff Class, recognize that the complexity, expense, and delay of continued litigation could be substantial, including potential appeals from one or more Parties.  *See* Docket No. 877 (Joint Motion for Preliminary Approval). The likely protracted nature of any such continued litigation should weigh heavily in the Court's analysis of the adequacy of the Settlement Agreement.  *See Flinn v. FMC Corp.*, 528 F.2d 1169,

1173 (4th Cir. 1975); *see also Ayers v. Thompson*, 358 F.3d 356, 369 (5th Cir. 2004) ("settling

now avoids the risks and burdens of potentially protracted litigation"); *Sanders v. U.S. Dep't of

Hous. & Urban Dev.*, 872 F. Supp. 216, 220 (W.D. Pa. 1994) ("Litigation of the constitutionality

of the housing policies and practices of [federal and local housing agencies] spanning the last

five decades has been complex and burdensome.").

Moreover, even if a Court-ordered remedy, upheld on appeal, included a significant

number of regional housing opportunities, the chance to build upon the nationally recognized

model of the *Thompson* Voucher Mobility Program might be jeopardized.  The supply of tenant-

based *Thompson* Vouchers awarded under the Partial Consent Decree has been exhausted, and

these *Thompson* Partial Consent Decree Vouchers are now being fully used by families.  As a

result, without this Settlement Agreement, there would be immediate consequences not only for

the many Class Members who expressed interest in participating in the *Thompson* Voucher

Mobility Program but also for dozens of families who have already entered into the Program and

are working hard to improve their credit, stabilize their income, and save funds required to move.

Without the Settlement Agreement, those families would be left in limbo waiting for years

hoping for turnover Partial Consent Decree vouchers to become available.

By settling now, the Plaintiff Class is able to secure significant relief immediately and

prevent disruption to the successful operation of the *Thompson* Voucher Mobility Program.  *See

Ingram v. Coca-Cola Co.*, 200 F.R.D. 685, 690 (N.D. Ga. 2001) ("The benefit of obtaining

guaranteed relief, in the face of serious obstacles to successful litigation, enhances the value of

the settlement to the class and strongly demonstrates its fairness.").  Moreover, all Parties are

able to achieve finality after nearly two decades of litigation.

2.      **The Relief Offered Significantly Benefits the Plaintiff Class and the Baltimore Region as a Whole**.

A settlement "must afford the plaintiffs relief that is at least comparable to what they could have received following trial on the merits." *L.J.*, 699 F. Supp. at 513.  Here, the relief provided by the Settlement Agreement "is well within the range of reasonableness in light of the best possible recovery and the attendant risks of litigation." *Sanders*, 872 F. Supp. at 222.

In Plaintiffs' view, the Proposed Remedial Order, filed with the Court after the remedial trial on May 31, 2006 (Docket No. 817), sets out the necessary and proper relief for HUD's violation of the Fair Housing Act established by this Court's 2005 ruling. *Thompson*, 348 F. Supp. 2d 398.  Moreover, although the Court deferred ruling on HUD's constitutional liability, the Proposed Remedial Order is also supported by strong record evidence that HUD violated the Plaintiffs' constitutional rights by failing, for generations, to remove the vestiges of prior intentional discrimination in Baltimore public housing. *See* Docket Nos. 817 (Plaintiffs' Post-Trial Brief), 823 (Plaintiffs' Post-Trial Reply Brief); *Hills v. Gautreaux*, 425 U.S. 284, 297 (1976) (holding that once a constitutional violation has been established, "the scope of a district court's equitable powers to remedy past wrongs is broad" (quoting *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971))).

While the Settlement Agreement represents a negotiated compromise by all of the parties, it includes many elements of Plaintiffs' Proposed Remedial Order, such as the creation of a significant number of regional housing opportunities through the continuation of the successful *Thompson* Voucher Mobility Program under the Partial Consent Decree.  The proposed Settlement Agreement will provide hundreds of millions of dollars in federal funding over the next fifteen years to lease up to 2,600 *Thompson* Remedial Vouchers through 2018 and to continue administration of the 1,788 *Thompson* Vouchers already leased under the Partial

Consent Decree.  Taken together, these 4,388 *Thompson* Remedial and Partial Consent Decree Vouchers, along with the completion of several Partial Consent Decree projects required by the Settlement Agreement, should result in the creation of at least half of the 9,000 regional housing opportunities that Plaintiffs requested in their Proposed Remedial Order.[9]  Nor is that the maximum number of regional housing opportunities that could be created as a result of the Settlement Agreement.  The programmatic relief provided by the Settlement Agreement, including the provision for incentives from the Federal Housing Administration for up to 2,100 affordable units over a seven-year period, *see* Settlement Agreement § VII, could yield substantial additional regional housing opportunities.

The Settlement Agreement's promise of funding for a significant percentage of the regional housing opportunities originally proposed by Plaintiffs compares favorably with the scope of relief approved by courts in other contexts.  *See, e.g.*, *Wright v. Stern*, 553 F. Supp. 2d 337, 347 (S.D.N.Y. 2008) (approving a civil rights class action settlement that amounted to approximately 40% to 50% of the best possible outcome from trial, because the parties traded a lower, guaranteed payout for the uncertainty of proceeding with litigation of their complex issues); *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 618 (N.D. Cal. 1979) ("It is not necessary or expected that litigants will obtain through settlement all they might have realized through a victorious trial. . . .  [S]imply because a settlement may amount to only a fraction of the potential recovery does not in itself render it unfair or inadequate.").

In addition to the creation of regional housing opportunities, the Settlement Agreement's programmatic relief addresses the core of Plaintiffs' complaint and the Court's statutory liability finding that HUD violated its legal obligations by permitting the discriminatory siting of public

---

[9] The Proposed Remedial Order would have credited HUD for any such regional housing opportunities already created under the Partial Consent Decree.  *See* Docket No. 817.

and assisted housing in the Baltimore Region.  *See Thompson*, 348 F. Supp. 2d 398.  This Court

has repeatedly expressed an interest in meaningful policy changes to ensure that a regional

approach to fair housing is at the forefront of HUD decision-making processes that affect the

Baltimore Region.  *See, e.g.*, *id.* at 409, 456-64.  To that end, the civil rights reviews pursuant to

Section V of the Settlement Agreement will help further compliance with all existing applicable

civil rights laws in a way that is consistent with HUD's own priorities and does not micro-

manage HUD decision-making.  Those civil rights reviews should help, over time, expand

housing opportunities for Baltimore City public housing families in Communities of Opportunity

throughout the Baltimore Region.  Absent penalties for non-compliance, the Settlement

Agreement calls for the implementation of these reviews for only three years, but it is the

Plaintiffs' hope that this process will become institutionalized over the long term, as an

important complement to the various regional activities by local entities that are already under

way.  *See* Section I.A.3 *supra*.[10]

     Although no Settlement Agreement, and no court order, could ever fully compensate each

and every Plaintiff Class Member, and the community, for the harms of systematic housing

discrimination suffered over many years, the regional housing opportunities promised, along

with substantial programmatic relief, should provide significant redress and help dismantle

entrenched patterns of regional housing inequity.  Where, as here, the Parties have engaged in

"protracted and expensive litigation" and not insubstantial legal obstacles still stand in the way of

full recovery, it is entirely proper for a Plaintiff Class "to take the bird in the hand instead of a

---

[10] The other elements of programmatic relief provided by the Settlement Agreement are geared to address specific obstacles to regional fair housing that were identified in the *Thompson* record.  For instance, Section VI provides for an on-line housing locator.  During the remedial trial and again at the January 2010 status conference, the Court urged additional steps to enhance information and access to housing opportunities throughout the Baltimore Region.

prospective flock in the bush." *In re Shell Oil Refinery*, 155 F.R.D. 552, 560 (E.D. La. 1993) (internal citation and quotation marks omitted).

### C.   THE SETTLEMENT AGREEMENT IS FAIR BECAUSE IT WAS THE PRODUCT OF EXTENSIVE, ARM'S LENGTH NEGOTIATION.

The Court should also find that the Settlement Agreement is fair because it "was reached as a result of good-faith bargaining at arm's length, without collusion." *In re Jiffy Lube Sec. Litig.*, 927 F.2d at 159. First, the advanced stage of the proceedings supports the Settlement Agreement because the Parties have adduced sufficient evidence to provide a reliable basis for assessing the relative strength of their positions. Second, the Settlement Agreement is the result of extensive and vigorously-contested negotiations, which since June 2011 have occurred under the supervision of Magistrate Judge Grimm. Third, experienced counsel for all Parties were sufficiently familiar with the relevant facts and law to assess the strengths and weakness of the cases and the relative benefits of the Settlement Agreement compared to further litigation.

### 1.   The Advanced Stage of Proceedings Favors Final Approval.

One "factor which militates strongly in favor of the settlement" is that it "was reached at a very advanced stage of litigation." *Vaughns*, 18 F. Supp. 2d at 579. In light of the extensive investigation, research, discovery, and briefing, as well as full-length trial proceedings on both liability and remedy, the case has proceeded to a stage at which counsel for all Parties have a thorough understanding of the complexity of the issues and the strengths and weaknesses of their respective claims, defenses, and strategies. *Id.* ("While each party still faced the litigation risk of not knowing how the Court might rule, the parties had an unusually full opportunity to assess that risk by seeing all the evidence the Court would weigh in arriving at its decision.").

    **2.**    **The Extensive, Hard-Fought Negotiations Favor a Finding That the Settlement Agreement Is Fair**.

The Settlement Agreement is the product of intense negotiations, over a span of nearly three years, among experienced and informed counsel representing all Parties.  Magistrate Judge Grimm's supervision of and participation in these negotiations beginning in June 2011, when this Court referred the case to him for mediation (Docket No. 855), provides further evidence that they were at arm's length.  *See Charron v. Pinnacle Group N.Y. LLC*, __ F. Supp. 2d __, No. 07-6316, 2012 WL 2053530, at \*12 (S.D.N.Y. June 6, 2012) (finding that the involvement of a magistrate judge who was "an experienced mediator" and "whose oversight of earlier proceedings made him fully familiar with the details of the case" supported the conclusion that the settlement was the product of arm's length negotiations).

    **3.**    **Experienced Counsel's Endorsements Merit Deference**.

"While the opinion and recommendation of experienced counsel is not to be blindly followed by the trial court, such opinion should be given weight in evaluating the proposed settlement." *Flinn*, 528 F.2d at 1173; *accord DeHoyos*, 240 F.R.D. at 292 ("The endorsement of class counsel is entitled to deference, especially in light of class counsel's significant experience in complex civil litigation and their lengthy opportunity to evaluate the merits of the claims."); *Vaughns*, 18 F. Supp. 2d at 579; *Ingram*, 200 F.R.D. at 691.

Counsel for the Plaintiff Class are well-qualified to judge both the benefits of the Settlement Agreement and the risks of proceeding with litigation.  They have extensive experience in complex class-action litigation generally as well as civil rights advocacy, and they are thoroughly familiar with federal housing policies and similar desegregative litigation around the United States.  They also have years of experience in litigating this case and in negotiating and implementing the Partial Consent Decree.  In addition to the counsel listed in the signature

block of this pleading, it is notable that, prior to his untimely death in March 2012, John Payton, President and Director-Counsel of the NAACP Legal Defense & Educational Fund, Inc., was an active participant at key junctures in these settlement negotiations.  In light of their substantial experience, Plaintiffs' counsel have come to the conclusion that, when the benefits are weighed against the long delays and considerable risks of waiting for this Court's ruling and the results of any appeals, it is clear that accepting this Settlement Agreement is in the best interest of the Plaintiff Class.  *See Reed v. Gen. Motors Corp.*, 703 F.2d 170, 175 (5th Cir. 1983) ("[T]he value of the assessment of able counsel negotiating at arm's length cannot be gainsaid.  Lawyers know their strengths and they know where the bones are buried.").

Like the Plaintiff Class, the Federal Parties were ably represented by a seasoned negotiating team, which included at several sessions high-level HUD and U.S. Department of Justice officials, as well as HUD attorneys with extensive experience with the relevant federal policies and programs at issue.  The Local Parties, too, were well represented by a negotiating team that included both experienced counsel and HABC Commissioner Paul Graziano, who provided critical assistance in working through the real-world application of the federal policies that are implicated by the relief offered by the Settlement Agreement.

The "comprehensiveness and intricacy" of the Settlement Agreement that resulted from these negotiations "suggests the professionalism" of all Parties' negotiating teams.  *In re Mid-Atlantic Toyota Antitrust Litig.*, 605 F. Supp. at 443.  In light of the expertise and experience they brought to bear in these negotiations, the endorsement from experienced counsel for all the Parties "'weigh[s] in favor of approving the Settlement.'"  *Ball v. AMC Entm't, Inc.*, 315 F. Supp. 2d 120, 132 (D.D.C. 2004) (quoting *In re Baan Co. Sec. Litig.*, 284 F. Supp. 2d 62, 66 (D.D.C. 2003)).

II.     **THE PUBLIC INTEREST IS ADVANCED BY THE SETTLEMENT
        AGREEMENT**.

In addition to the foregoing factors expressly considered when courts in the Fourth

Circuit review class action settlements under Rule 23(e), the public interest is significantly

advanced by this Settlement Agreement.  *See, e.g.*, *In re Dunn & Bradstreet Credit Servs.

Customer Litig.*, 130 F.R.D. 366, 371 (S.D. Ohio 1990); 4 Newberg on Class Actions § 11:41.

First, this Settlement Agreement furthers the public interest by freeing up judicial

resources for resolution of other disputes while allowing the Parties to resolve the claims in a

cooperative manner.  *See In re U.S. Oil & Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992)

("Complex litigation . . . can occupy a court's docket for years on end, depleting the resources of

the parties and the taxpayers while rendering meaningful relief increasingly elusive."); *Vaughns*,

18 F. Supp. 2d at 578.

Second, the civil rights reviews and other aspects of the Settlement Agreement will

further the coordination of fair housing policy on a region-wide basis, thereby enhancing the

vitality of the Baltimore Region as a whole.  *See* Ex. D (Decl. of Support by Robert C. Embry,

Jr.) ("As this Court recognized in its 2005 ruling, Baltimore can move forward only by taking a

regional approach to housing opportunity."); Ex. E (Decl. of Support by Mel Freeman) ("This

historic agreement will help to achieve the goals of housing choice and access to opportunity for

all who live and work in the Baltimore Region.").

Moreover, by expanding housing choice for Baltimore City public housing families in

Communities of Opportunity, the continuation of the successful *Thompson* Housing Mobility

Program has the potential to positively transform the lives and well-being of thousands of the

area's residents, according to preliminary findings in Baltimore as well as evidence from other

mobility programs elsewhere.  *See* Ex. B (Decl. of Support by Dr. Stefanie DeLuca).  As

Congressman Elijah E. Cummings has recognized, "[t]he Baltimore Housing Mobility Program is a sound investment.  Its benefits are not limited to families who participate.  Rather, the program strengthens the entire Baltimore Region."  Ex. C.

Finally, the Settlement Agreement is consistent with federal policies designed to encourage fair housing choice and promote a geography of opportunity.  In a June 2012 speech on housing mobility, HUD Secretary Shaun Donovan recognized:

> [W]hen you don't have mobility, you don't have access to opportunity.  That's because when you choose a home, you choose so much more than a home.  You also choose access to jobs, to schools for your children, to public safety.  You choose a community — and the choices available ***in*** that community.

Shaun Donovan, HUD Secretary, Prepared Remarks at the Fifth National Conference on Housing Mobility (June 12, 2012), *available at* http://portal.hud.gov/hudportal/HUD?src=/press/speeches_remarks_statements/2012/Speech_06122012.  Secretary Donovan further stressed that HUD is "committed to mobility efforts" like the Baltimore Housing Mobility Program, which will be continued by this Settlement Agreement, because "it represents not only justice for families who were wronged — but also a testing ground for mobility policies and lessons that can be applied more broadly in communities across the country."  *Id.*

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court find that the Settlement Agreement is fair, reasonable, and adequate pursuant to Federal Rule of Civil Procedure 23(e)(2), and that it finally approve the Settlement Agreement by entering the Order attached as Exhibit A to Plaintiffs' Motion for Final Approval of the Settlement Agreement (which is also Exhibit D to the Settlement Agreement).

Respectfully submitted,

_____/s/_____

Barbara A. Samuels, Bar No. 08681          Andrew D. Freeman, Bar No. 03867
American Civil Liberties Union             Brown, Goldstein & Levy, LLP
Foundation of Maryland                     120 E. Baltimore Street, Suite 1700
3600 Clipper Mill Road, Suite 350          Baltimore, MD 21202
Baltimore, Maryland 21211                  (410) 962-1030

Peter Buscemi                              Joshua Civin, Bar No. 28772
Morgan, Lewis & Bockius LLP                NAACP Legal Defense & Educational Fund, Inc.
1111 Pennsylvania Avenue, NW               1444 I Street, NW, 10th Floor
Washington, DC 20004                       Washington, DC 20005

Robert H. Stroup                           Debo P. Adegbile
Levy Ratner, P.C.                          Elise C. Boddie
80 Eighth Avenue, 8th Floor                Ria A. Tabacco
New York, NY 10011                         NAACP Legal Defense & Educational Fund, Inc.
                                           99 Hudson Street, 16th Floor
                                           New York, NY 10013

*Attorneys for the Plaintiff Class*